

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

Laura Elizabeth Grice, Pro Se, Sui Juris

Plaintiff

Civil Case No. ___2:25-cv-3821-RMG-MGB___

v.

Governor Ronald DeSantis, in his individual and official capacity as Governor of the State of Florida

Governor Henry McMaster, in his individual and official capacity as Governor of the State of South Carolina

Attorney General Alan Wilson, in his individual and official capacity as Attorney General of the State of South Carolina

Florida State University, in its Official Capacity


I.    INTRODUCTION / PRELIMINARY STATEMENT

1.  Plaintiff brings this emergency hybrid action for redress, remedy, and emergency monetary and injunctive relief, arising from ongoing violations of constitutional, civil, and federal statutory rights. These violations include, but are not limited to, alleged Violations of Racketeer Influenced and Corrupt Organizations Act (RICO), the Sherman Act, Violence against Women Act (VAWA), American with Disabilities Act (ADA), The Rehabilitation Act of 1973, as well as other Constitutional and federal protections.

2. Defendants' conduct has caused and continues to cause serious physical, emotional, economic, financial, and property harms, and poses an ongoing threat Plaintiff's life, liberty, property, and fundamental rights secured by the Constitution and federal law.

3. The Defendants' actions, and their repeated failures to act despite notice, have directly contributed to Plaintiff's financial collapse, physical injuries, threats, deprivation of essential

1

resources, and forced displacement. Plaintiff is presently residing in a women's shelter to avoid homelessness, separated from her dog and other essential support resources, and is unable to meet basic life-sustaining needs. Emergency judicial intervention is necessary to prevent further irreparable harm and to preserve Plaintiff's access to courts and other protections.

4. Emergency intervention by this Court is necessary to prevent further irreparable injury and to preserve Plaintiff's access to judicial protection.

5. This action is brought under well-established federal jurisdiction. Claims seeking relief for violations of federal constitutional or statutory rights are valid and cognizable under Bell v. Hood, 327 U.S. 678 (1946).

6. The statute of limitations is equitably tolled due to the continuing nature of the violations and procedural barriers that impeded timely filing, consistent with Cada v. Baxter Healthcare Corp., 920 F.2d 446 (7th Cir. 1990) and Carr v. Saul, 593 U.S. ___ (2021).

## II.    PARTIES AND DEFINITION OF DEFENDANTS' CONDUCT

7. Parties:

Plaintiff Laura Elizabeth Grice is Pro Se, Sui Juris, lives and was born in the State of South Carolina and also lived in the State of Florida. Plaintiff lived in both states during the onset of harms. Despite injuries resulted physical limitations Laura is fully competent, capable of managing personal and financial matters, and is *sui juris*.

Versus

Defendants as follows:

· Governor Ronald DeSantis, in his individual and official capacity as the Governor of the State of Florida
· Governor Henry McMaster, in his individual and official capacity as Governor of the State of South Carolina
· Attorney General Alan Wilson, in his individual and official capacity as Attorney General of the State of South Carolina
· Florida State University, in its Official Capacity

2

Governors had a duty to coordinate with relevant state agencies, including law enforcement, the State Treasurer/Financial Office, and licensing boards, to ensure that reported violations were promptly investigated and stopped.

Attorney General (or state prosecutor or officers of the court) had a duty to seek injunctions, refer responsible parties for criminal investigations, and pursue indictments before a grand jury when warranted.

Florida State University had a duty, when informed of Laura's standing and involved allegedly embezzled/extorted properties had a duty to provide due process of law.

[Note: Defendants addresses and telephone numbers are provided in the Certificate of Service and on the USM-285 Summons forms filed with this Complaint pursuant to the Court's granting of IFP.]

8. Due to financial hardship caused by others, Plaintiff has listed the named Defendants in this filing. Additional parties connected to this case are identified in the Petition and/or accompanying attachments and exhibits to address any potential conflicts of interest. The named Defendants were informed of the involvement of certain additional parties, and despite this knowledge, they allowed serious, preventable harms to continue, thereby bearing ultimate responsibility for these ongoing violations. If warranted, the named Defendants may seek subrogation or pursue declaratory actions or alleged criminal complaints for potential indictments related to their conduct. The Plaintiff reserves the right to seek relief from these additional parties, should further investigation reveal their involvement in the ongoing misconduct.

9. For purposes of this Complaint, the term "Defendants' conduct" shall mean all acts, omissions, policies, practices, and failures to act by the Defendants or any person acting under their authority, whether direct or indirect, that have resulted in, contributed to, or allowed the ongoing deprivation of Plaintiff's constitutional, statutory, and fundamental rights. Such conduct includes, but is not limited to, unlawful restraints, interference with Plaintiff's freedom of

movement, denial of access to legal and personal resources, failure to prevent foreseeable harm, and other acts or omissions causing preventable physical, emotional, property and economic injuries to Plaintiff.

III.   JURISDICTION AND VENUE

10. This Federal Court, presided over by an Article III Judge with trial by jury, is empowered to hear and decide claims arising under federal law. The Court has Federal Question Jurisdiction over this original proceeding involving constitutional violations and other federal claims under 28 U.S.C. § 1331, including matters implicating Federal Supremacy. No immunity applies to government actors acting under color of law in these circumstances.

11. Given the severity and urgency of this Emergency Petition, Plaintiff respectfully requests expedited consideration to prevent further imminent harm, including threats to her ability to sustain life.

12. This case also satisfies Diversity Jurisdiction under 28 U.S.C. § 1332, as the parties are Citizens of different states. The claims meet statutory requirements, involve ongoing and continuing harms, and are subject to equitable tolling. Prior waivers of the Eleventh Amendment, including removal of state cases to federal court and Congressional exceptions, further support jurisdiction.

13. Defendants' actions are not shielded by Eleventh Amendment immunity, as Florida Previously waived immunity (see Section V, Immunity), and such waiver does not bar claims for Injunctive or monetary relief.

14. Plaintiff Laura Elizabeth Grice (hereafter "Plaintiff" or "Laura") brings claims under federal jurisdiction, including but not limited to factually alleged:

-       Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962

4

- 42 U.S.C. § 1983 (constitutional and civil rights violations)

- Federal statutory claims including the Violence Against Women Act (VAWA), the Rehabilitation Act of 1973, and the Americans with Disabilities Act (ADA)

- Sherman Act and Hobbs Act violations

- Unlawful restraints, denial of access to courts, wire and mail fraud, embezzlement, extortion, peonage, financial indebtedness, torturous interference in intellectual properties and economic and other financial harms

- Intentional infliction of emotional distress (IIED) and other physical, emotional, property, and economic injuries

15. These violations affect Plaintiff's constitutional, statutory, common law, and fundamental rights, and continue to endanger her life, liberty, and property. For example, Plaintiff recently in August of 2025 discovered a 2022 state court case involving her property, of which she was never notified. These claims are inextricably intertwined with constitutional and federal issues.

16. Plaintiff previously lived in South Carolina when the undisclosed harms first occurred, originating in Florida. She later lived in both South Carolina and Florida, where state-court proceedings, including cases removed to federal court, took place. Plaintiff had financial standing and was a real party in interest (though not a named plaintiff) in a Florida federal case involving her property, and was prohibited from filing therein. A former federal clerk later apologized for preventing her filing. In 2021, Plaintiff returned to South Carolina to avoid ultra vires threats of homelessness from her Florida residence, where she had been denied discovery, hearings, and a jury trial for property exceeding twenty dollars. Harms continued while Plaintiff suffered severe distress and health issues related to the defendants' conduct. She consistently objected to violations, escalating complaints to Governors, Attorneys General, and, in 2025, Congressional Oversight Committees and the U.S. Inspector General.

17. The amount in controversy is substantial. Using Trezevant v. City of Tampa as a baseline,

damages may exceed $1.8 million per day. In D.L. v. Jackson, privacy and emotional distress violations yielded approximately $1.2 billion. Considering ongoing harms since at least 2019 (originating in Florida) and using Trezevant calculations alone, damages exceed $4 billion to date excluding potential RICO treble Damages. Federal jurisdiction is further supported by case law involving complex claims with multi-million-dollar damages.

18. The Court has supplemental jurisdiction over related state-law claims pursuant to 28 U.S.C. § 1367, as these arise from the same facts and form part of the same case or controversy. Qualified immunity does not shield government officials who knowingly violate clearly established constitutional or statutory rights. Defendants' deliberate misconduct outside lawful jurisdiction forfeits any claim to immunity.

19. This case concerns Defendants' ongoing, intentional violations of Plaintiff's constitutional, civil, fundamental, common-law, and basic human rights, as well as federal statutes and the Federal Supremacy Clause.

20. Ex parte Young permits injunctive relief against ongoing violations. The Rooker-Feldman Doctrine does not bar this case, as Plaintiff challenges unlawful, ongoing misconduct rather than attempting to overturn any valid, final state-court judgment. All relevant state-court judgments lack jurisdictional standing, ultra vires actions, and involved procedural and constitutional violations including due process, notice, discovery, hearings, jury trial, frauds before the court material misrepresentations of material fact, and equal protection violations - rendering them unconstitutional, tainted, invalid, void ab initio. Plaintiff's claims are independent of those judgments, seeking redress for separate injuries. Yet, in Exxon Mobil Corp. v. Saudi Basic Industries Corp (2005), the Court clarified that the doctrine is not constitutional and should not be applied too broadly. The court has subject matter jurisdiction because the claims arise under

the Constitution, Federal law, and the Commerce Clause, among other violations, present

substantial federal questions under 28 U.S.C. 1331, and satisfy diversity jurisdiction under 28

U.S.C. 1332, as the amount in controversy far exceeds $75,000, and the parties are citizens of

different states.

21. Courts recognize that when state actors engage in extrinsic fraud or unconstitutional conduct,

federal courts retain jurisdiction. Plaintiff's claims arise from unlawful deprivations of

constitutional and other rights independent of any state-court judgment, and are therefore

properly heard in federal court.


IV.    STATEMENT OF FACTS/FACTUAL ALLEGATIONS:

22. The following Statement of Facts/Factual allegations are supported by court records, other

official records, authenticated emails sent and/or received by Plaintiff Laura, and by Plaintiff's

sworn declarations, which are true to the best of her knowledge and recollection. Once Plaintiff

obtains emergency funds, if necessary, she will be able to amend the exhibit list to include

additional supporting evidence. Regardless, Defendants, their affiliates, and other relevant

persons were provided information, have had knowledge, received communications by emails,

letters, phone calls and/or through other means regarding the majority of the factual allegations

herein.

23. Plaintiff submits that, in the interest of judicial economy and to avoid unnecessary length, the

Statement of Facts is presented first in an abbreviated, condensed summary form, then

chronologically in a condensed and abbreviated format. Plaintiff reserves the right to supplement

or amend the petition and allegations as additional information becomes available through

discovery, or as otherwise permitted under the Federal Rules of Civil Procedure and consistent

with her constitutional rights.

24. Furthermore, these allegations factually involve at least Eight Court cases or records that were intertwined and commingled, crossing state lines between Florida and South Carolina.

25. Plaintiff submits that equitable tolling and good cause are warranted due to pervasive and repeated due process violations, jurisdictional defects, ultra vires, and court-created barriers across multiple state and federal proceedings. These matters including but potentially are not limited to: Marzen v. Florida State University (Florida state and federal courts), Marzen v. Grice (Florida state court), Stokes v. Grice (South Carolina state/municipal court), Stokes v. Odom (South Carolina state court), the 2021 Florida court records relating to the satisfaction of a mortgage and Plaintiff's property interests in which Plaintiff previously requested discovery and all financials via filings and emails, the 2022 Stokes v. Grice South Carolina property matter discovered only in August 2025, and Windward Long Point v. Grice - all involved substantial deprivations of Plaintiff's constitutional and federally protected rights.

26. These court cases involve recurring issues including but not limited to: (1) deprivations of constitutional, civil, and fundamental rights; (2) violations of due process failures to provide proper notice or substantial notification; (3) fabricated or erroneous jurisdictional determinations; (4) ultra vires - lack of jurisdiction or jurisdictional standing resulting in void orders as the law requires proof of jurisdiction to appear on the record of all proceedings as established in Hagans v. Levine 415 US 528 (1974); (5) misrepresentations of material fact or frauds upon the court; (6) fabricated or erroneous jurisdictional determinations; (7) forged, misdocketed, concealed, or intentionally mislabeled filings; (8) refusal to docket Plaintiff's verified submissions or provide mandatory disclosures and discovery; (9) concealment or withholding of material evidence; (10) denials or disregard of rights to hearings; (11) deprivation of jury trials; (12) failure to address void jurisdictional defects, including failures to recuse despite conflicts of interest or lack of standing; (13) unauthorized actions affecting Plaintiff's property, including purloining, embezzlement type conduct involving Plaintiff's property, unjust enrichment, economic and interstate commerce interests, peonage and involuntary servitude; (14) doxing, false light, false statements defamatory and other harms; (15) unlawful restraints; (16) consistently denied

8

meaningful access to the judicial process and courts; (17) violations of the RICO act, Sherman Act, fruit of the poisonous-tree, Monell and other doctrines, maximums of law, case laws such as Trezevant v. City of Tampa among other authorities including but not limited to Plaintiff's Table of Authorities.

27. These court-induced impediments, combined with obstruction by court personnel and parties acting under color of law, deprived Plaintiff of meaningful access to the courts and prevented timely assertion and prosecution of her claims, thereby establishing both equitable tolling and good cause.

28. In several of these matters, Plaintiff Laura either received no notice at all or received notice that was not substantial or reasonably calculated to inform her, including instances in which a Florida court used an incorrect email address differing by one letter (as she was forewarned), and instances in which "courtesy" emails or a phone conversation communicated denials of jury trials or due process violations, thereby implicating equal protection concerns.

These actions have caused serious ongoing physical, emotional, financial, economic, and other harms to Laura. As a result, each of the individual court cases connected to Defendants involves at least two predicate acts relevant to a RICO analysis. Throughout these events and continuing to the present, Plaintiff has suffered clear and ascertainable harm, injury, and loss that satisfy the elements of corpus delicti, and from coercive conditions, duress, and distress tantamount to continuous coactus feci. Such circumstances include, but are not limited to, unlawful restraints, uncompensated work, threats of homelessness resulting in forced unpaid labor, and other serious multifaceted ongoing harms.

29. Plaintiff further alleges that the conduct described herein constitutes violations of internationally recognized human rights norms. These actions are inconsistent with obligations reflected in United Nations human-rights instruments, including the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the Convention on

the Elimination of All Forms of Discrimination Against Women (CEDAW). Such conduct is identified at the international level as constituting cruel, inhuman, or degrading treatment, discrimination on the basis of sex, and other forms of abuse prohibited by settled human-rights principles. While Plaintiff's claims in this petition arise under federal law, the referenced international standards further illustrate the severity and universally condemned nature of the violations at issue. The United States Supreme Court has similarly recognized as crimes of violence, even in circumstances where no direct physical contact occurs.

30. These allegations have long been within Defendants' knowledge and, in the interest of justice and to ensure the truth of the matter asserted, are submitted to lawfully stand unrebutted and unrefuted as follows:

31. Governor's and Attorney General's Duty and Failure to Act

    A. Prior to 2017 to date, Plaintiff, Laura Elizabeth Grice, has been subjected to an ongoing series of constitutional, civil, and fundamental rights violations, many of which were reported to the Governor of South Carolina, the South Carolina Attorney General, and various state agencies. Despite this, the Defendant government officials failed to uphold their duties to protect Plaintiff's rights and prevent further harm. In 2025, Laura was forced to send Pre-Suit Notice and Demand to Florida Defendants, Declaratory Factually Alleged Criminal Complaints, and emails of harms which went unrefuted and unrebutted.

    B. There were multiple court cases in which Laura was a party with financial and/or Property interests and had standing yet there were violations of due process and constitutional rights. Laura owned property and was financially stable prior to misconduct. Multiple state employees, agencies, and officials knowingly engaged in a pattern and practice of violating Laura's constitutional, civil, and statutory rights with resulted in serious physical, emotional and financial harms.

32. Governors' Duty to Coordinate State Agencies

A. As the chief executive officer of Florida, Governor Ron Desantis had a duty to ensure that violations of Plaintiff's rights were promptly investigated and remedied. This duty included coordinating with relevant state agencies, such as law enforcement, the State Treasurer/Financial Office, and various licensing boards. The Governors' via their office, employees, and/or agencies such as the Florida Chief Financial Officer's Office, South Carolina Attorney General's Office have been informed of Plaintiff's ongoing harms and suffering, including unlawful restraints, denial of rightful access to the courts, financial and other abuses, physical and multifaceted harms.

B. As the chief executive officer of South Carolina, Governor Henry McMaster had a duty to ensure that violations of Plaintiff's rights were promptly investigated and remedied. This duty included coordinating with relevant state agencies, such as law enforcement, the State Treasurer/Financial Office, and various licensing boards. The Governor was informed of Plaintiff's ongoing suffering, including unlawful restraints, violations of Laura's constitutional rights, endangerment of life, denial of access to the courts, coercion, financial and other abuses, physical and other grave harms.

C. However, despite Plaintiff's repeated notifications, the Governors of Florida and South Carolina failed to act in any meaningful way to stop these violations or even investigate the claims raised.

D. Governor Ron DeSantis via his office emailed Plaintiff to contact the Judicial Counsel which has no jurisdictional purview and allegations were against members of an association. Similarly, Governor Henry McMaster's agency, the South Carolina Attorney General's Office, via their website commits the same alleged obstructions of justice, Gang conspiracy, wire/electronic fraud, conspiracy against constitutional rights, misprision of felony (the Bar Association dismissed evidentiary allegations of violations of Civil and Constitutional Rights, Fundamental Rights, Involuntary Servitude, criteria for Human Trafficking violations, including mail and wire frauds via mailing or emailing letters involving criminal matters as personal and confidential), aiding and/or abetting in factually alleged crimes of serious nature by referring them to a membership organization/association which has no jurisdictional purview in leu of applicable Grand

11

Jury Indictments.

E.   The Governor's inactions and disregard for Laura's right to life, liberty, and property, further enabled the continuing harm and left Plaintiff in a position of continuous vulnerability and sustained injuries.

33. Attorney General's Duty to Seek Injunctions and Criminal Action

A. Similarly, South Carolina Attorney General Alan Wilson (and state prosecutors) had a duty to ensure that the state's legal system functioned fairly and that individuals violating Plaintiff's constitutional and civil rights were held accountable. The Attorney General is responsible for investigating and seeking injunctions to prevent ongoing harm. Additionally, the Attorney General or State Solicitors have had the power to refer cases for criminal investigation and pursue indictments before a grand jury when violations were criminal in nature.

B. Despite being informed about the harms inflicted upon Plaintiff and subsequently harms including wire fraud, extortion, unlawful restraints, denial of due process, obstruction of justice, threats of harms, tampering with a victim, witness, informant, and peonage the Attorney General took no action to stop the violations or protect Plaintiff from ongoing physical, emotional, and economic harms which continue to harm her and endanger her life. The lack of response and the failure to refer these serious claims for criminal investigation directly contributed to Plaintiff's continued preventable suffering.

C. Attorneys General, Solicitors, and Affiliates – South Carolina Attorney General Alan Wilson, David Pascoe, Steve Fulmore, and other affiliated Solicitors who were emailed and/or informed over the years of factually alleged crimes. The Attorney General's website (as an Agency of the Governor) refers potential criminal matters to the Bar Association yet there is no mention of the Realtor's Association when there is involvement of unlawful or illegal real estate or property embezzlement type transactions.

D. Plaintiff alleges this constitutes RICO Violations, obstruction of justice, conspiring, wire fraud, conspiracy against constitutional rights, misprision of felony (and when the Bar Association dismisses violations and mails letters personal and confidential), aiding and/or abetting in factually alleged crimes of serious nature by referring them to a

12

membership organization/association which has no jurisdictional purview in leu of
applicable Grand Jury Indictments.

E.  In 2025, the New York Attorney General provided Laura with a case number based
on evidentiary allegations of felony mail theft (and Laura's property), misprision of
felony, retaliation, obstruction of justice, conspiracy against rights, breach of contract,
violations of ADA, victims rights, and VAWA, among other violations.

34. Florida State University's Duty to Provide Due Process and Failure to Act

A. In 2019, Plaintiff, Laura Elizabeth Grice, informed the Florida Chief Financial
Officer's Office and Florida State University (FSU) of her involvement and standing in
legal matters concerning her intellectual property, financial injuries, work product among
other concerning issues. Despite being fully aware of Plaintiff's legal standing, including
her property interests and factually alleged peonage, embezzlement, extortion,
misappropriations of Trade Secrets and intellectual properties, FSU failed to uphold its
duty to provide due process and protect Plaintiff's rights.

B. FSU's Knowledge of Plaintiff's Standing

In 2019, Florida State University, through its legal representatives and members of the
Bar Association, were made aware that Plaintiff was a legitimate party in various legal
proceedings, including those involving her intellectual property and financial standing.
Plaintiff informed FSU that her work product was being misappropriated and that her
rights were being violated, including through the alleged embezzlement, extortion, wire
fraud, and other fraudulent or alleged criminal means of purloining her properties.

C. FSU's Duty to Provide Due Process

FSU had a duty to ensure that Plaintiff received fair treatment and equal protection in
legal proceedings, including access to the courts and due process protections. Given that
Plaintiff had legal standing in the matters at hand, FSU was obligated to take appropriate
action to protect Plaintiff's rights, facilitate her ability to participate in legal proceedings,
and prevent further harm. This duty included providing Plaintiff with notice of hearings,
the opportunity to be heard, and protection of her intellectual property and financial
assets.

13

D. Failure to Act and Violation of Due Process

Despite being informed of Laura's legal standing and the serious violations being committed against her, FSU failed to provide Plaintiff with due process as State and Federal court records reflect. Laura was not given proper notice of legal proceedings that affected her, and her rights to present her case, access discovery, and be heard in court were deliberately obstructed.

E. FSU's failure to act resulted in Plaintiff's continued suffering, as she was denied meaningful access to the courts and her rightful properties (including aspects of her Trade Secrets despite Laura's diligence by creating an S Corp, Privileged Solutions, Inc., acting in good faith and due diligence to property intellectual properties. FSU's refusal to honor Plaintiff's legal rights left her vulnerable to further exploitation, embezzlement, abuses and violence, unlawful financial practices, violations of Constitutional and Basic Human Rights and protections not only Federally protected rights but also Human Rights as the United Nations addresses. These actions were not only a violation of Plaintiff's constitutional rights but also a preventable direct contribution to the ongoing cruelty and injuries inflicted upon her.

F. FSU's Role in the Violation of Plaintiff's Rights

Florida State University's actions or lack thereof were integral in the continuation of Plaintiff's injuries. By their patterns and practice of knowingly failing to protect Plaintiff's rights, prevent the unlawful use of her intellectual properties, and ensure due process in legal matters, FSU acted in a way that supported and contributed to the ongoing violation of Plaintiff's rights. This failure to intervene in the face of clear wrongdoing has made FSU liable for its role in these violations.

35. Escalation to Federal, Congressional, and Other Authorities

In 2025, with Plaintiff's life, liberties, property, and safety continuing to be endangered by these ongoing violations, Plaintiff was compelled to escalate the matter to higher authorities. She notified and requested investigations by the New York Attorney General's Office who provided a case number, Congressional Oversight Committees, the United States Inspector General, and other authorities, seeking immediate intervention and investigation into the ongoing violations

14

and failures of state actors to cease violations and/or protect her rights. Laura sent a Pre-Suit Notice and Demand to Florida Defendants, Declaratory Factually Alleged Criminal Complaints against Florida and South Carolina Defendants among others, and emails of harms which went unrefuted and unrebutted.

36. Failure to Act and Legal Duty of Defendants

Despite repeated requests for intervention, Plaintiff continued to endure preventable harms, Serious painful harms that could have been prevented or mitigated had the Defendants fulfilled their legal duties. Plaintiff's repeated notifications to the Governors, Attorney General, Florida State University (later the Florida Board of Governors among others) demonstrates that these officials were aware of the violations but intentionally chose not to act, despite years of Laura notifying them as to the life threating harms. These inactions constitute negligence at best and complicity at worst, as the Defendants' failure to intervene allowed the violations to continue unchecked.

37. Consequently, the Defendants' continuous failure to act renders them alleged accessories to the ongoing violations. Their inaction, especially after being informed of the harms, leaves them liable for their role in perpetuating these injustices, both civilly and criminally.

A. General Background

- Plaintiff owned property and was financially stable prior to violations of her rights.

- Multiple state employees, agencies, entities, associations, and officials knowingly engaged in a pattern and practice of violating Plaintiff's constitutional, civil, fundamental, common law, statutory, and basic human rights.

B. Specific Harms / Constitutional and Other Violations

1.) Constitutional Violations (42 U.S.C. §1983)

  o Denials of Due Process, jury trial, notice, access to courts, discovery, abuse of process.

  o Unlawful/Illegal restraints, false imprisonment, cruel and unusual treatment.

  o Including and not limited to Deprivations of: property and assets, safety and security in her person, property and papers, denial of access to properties for needed healthcare, freedom of movement, privacy rights, and travel restrictions.

  o Equal Protection and other Violations

2.) RICO / Fraud Pattern

- o Diversion of property and funds to relief defendants and/or to others benefits and Laura's harms.

- o Coordination among state actors to continue the pattern of embezzlement, extortion, obstruction of justice, obstructions of criminal investigations, obstruction of state or local law enforcement, obstruction of federal audits via deprivations of discovery, witness tampering, threats of harms (violations of the Hobbs Act), conspiracy against rights, mail fraud, wire fraud, bank fraud, property financial frauds, aiding/abetting in others receiving stolen property (also involving interstate commerce), unlawful restraints/false imprisonment, involuntary servitude, criteria of human trafficking, threats of harms/injuries which came to fruition, threats of intents of Laura's death (alleged attempted murder for financial and other gains), crimes of violence, cruel and inhuman treatment, retaliating against a witness, victim, informant, document fraud (affidavits, Power of Attorneys, Will, among others), computer/electronic crimes access devise fraud, obstruction of lawful tax returns and accurate tax filings (among other denied discoveries), among other alleged predicate acts.

3.) Health / ADA / VAWA Harms

- o Severe long term sleep deprivation injuries, coercive abuses, sleep deprivation and stress-induced physical illness, severe rectal hemorrhaging, trauma responses, cruel and inhuman treatments, crimes of violence, unlawful restrains, and psychological harms caused by prolonged continuous denial of rights.

- o Denial of access to see dying mother in 2019–2020, ongoing health deterioration through 2025.

- o Financial harm prevented access to medical care and Laura's properties desperately needed for basic survival needs.

4.) Notification and Ignored Complaints

- o July 2025: after years of notifications and ignored complaints, Laura was forced to send Declaratory factually alleged criminal complaints against the Florida and South Carolina Governors, South Carolina Attorney General, high-ranking officials, judges, and others which has lawfully gone unrefuted and unrebutted.

- o Pre-suit settlement demand to Florida which was ignored, unrefuted and unrebutted.

- o In 2025, the Florida State Board of Governors requested time to investigate but no resolution or response was received. They were notified via email the prior year and had more than ample time to investigate.

- o Congressional oversight committees and U.S. Inspector General were notified of ongoing violations via Declaratory Criminal Complaints.

38. CONDENSED CHRONILOGICAL TIMELINE From 2015 thorough 2025

16

2015

1.  In 2015, Laura met Mr. Chad Marzen, a Florida State University professor and licensed attorney, online. Mr. Marzen falsely represented that he shared Laura's life goals, including marriage, children, and family stability.

2.  Mr. Marzen introduced Laura to his parents, Dennis and Salud "Sally" Marzen, by phone. Shortly thereafter, Dennis and Sally Marzen made false and disparaging statements about Laura, including defamatory claims across state lines. Laura requested that they stop making false statements, and Mr. Marzen also instructed his parents not to do so.

3.  In the fall of 2015, Sally Marzen became a naturalized U.S. citizen. Mr. Marzen commented that she was not fluent in English and that this violated her naturalization requirements. These statements provide context for later actions allegedly intended to and did cause Laura physical, emotional, financial and economic harms, including threats to her safety and wellbeing.

2016

4.  In early 2016, Dennis and Sally Marzen opposed Laura's marriage to Mr. Marzen due to their ten-year age difference, refused to provide a guest list, and made additional false statements about Laura. To avoid conflict, Laura and Mr. Marzen eloped, planning a later formal wedding.

5.  Mr. Marzen started financially deceitfully obtaining Laura's assets, induced Laura to sell her South Carolina home, purchased in 2014 (prior to knowing Mr. Marzen) for approximately $135,000 then substantially gutted and remodeled through Laura's funds and labor. Mr. Marzen represented that they would share marital assets and that all accounts and properties would be jointly owned. Based on his false promises, Laura sold her home in May 2016 prior to their marriage. He also claimed to induce her to sell her home which she wanted to keep and rent, that she would be occupied with family responsibilities as a wife and mother.

6.  In mid-April, a few weeks before marriage at the Palmer House in Chicago, Laura planned to make stock investments. Previously she invested through the insurance companies where she worked, ad never held a personal trading account. Mr. Chad Marzen stated it would be costly and to use his, assuring Laura that they would soon be married and were combing all assets and all that was his was equally hers and she would be a joint owner, including but not limited to all accounts and properties. In or around 2018, Laura learned her named had not been added as a joint owner to the stock accounts and properties.

7.  On May 5, 2016, Laura and Mr. Marzen were married in Apalachicola, Florida, where Laura's mother was born and her grandmother's family had lived for generations.

8. In May 2016, Laura traveled to South Carolina to finalize the sale of her home pursuant to a contract she had signed prior to the marriage. She would not have sold her home had Mr. Marzen been truthful about his financial circumstances. After the marriage, Mr. Marzen disclosed additional debts and, through false representations, allegedly used and depleted Laura's assets for his own benefit, including paying his personal debts, mortgage payments, and other obligations. These actions have resulted in Mr. Marzen's unjust enrichment and have caused Plaintiff Laura serious and ongoing financial and other multifaceted injuries.

9. Between May and summer 2016, Laura became pregnant but suffered a miscarriage. Shortly thereafter, Mr. Marzen limited and ended marital relations and later moved Laura to a guest bedroom, causing emotional distress, isolation, and pain.

10. In 2016, Laura, Mr. Marzen, and Darren and Audra Prum met with Attorney Marie Mattox regarding alleged discrimination and retaliation by Florida State University (FSU). Ms. Mattox advised the matter was not yet ripe because tenure had not been granted or denied. Later, Laura was told that Ms. Mattox represented both her and Mr. Marzen. In 2019, Laura learned that Mr. Marzen and Ms. Mattox had allegedly obtained and used her work product under the pretense of joint representation and Mr. Marzen stated provided to other plaintiffs despite Laura's previous objections and statements to Ms. Mattox that Laura's research and discovery was for her and Chad's case only. Later, in 2020, Laura's attorney Harriet Williams stated she contacted Ms. Mattox regarding payment for Laura's work and per Ms. Williams, Ms. Mattox refused and stated I was not her client. Taking my work without payment under the guise of my being Ms. Mattox's client, is alleged involuntary servitude, peonage, modern day slave labor, purloining, wire fraud, economic and financial harms, obstruction of justice via what appear to be false statements before the State and/or Federal Court.

11. Laura was a party to the case with financial standing because when FSU bypassed Mr. Marzen for certain courses, Laura suffered premarital and marital financial losses. She further discovered that her intellectual property had allegedly been used by Mr. Marzen and shared with other plaintiffs suing FSU, benefiting Ms. Mattox and others and harming Laura. That same year, she instructed Mr. Marzen not to use her work and, with counsel, formed Privileged Solutions, Inc., to protect her trade secrets.

12. In 2016, Mr. Marzen had told Laura that marriage would help him appear more stable for tenure consideration. Laura later came to believe that access to her assets was also a motive for the marriage which others also believe was a short-term fraud.

13. Before discovering Mr. Marzen's alleged embezzlement, Plaintiff Laura had purchased her home with attainable goals of paying it off within a few years, retiring before the age of 50, and dedicating years to developing white papers and a potential book on insurance and business topics. Mr. Marzen represented that he wished to co-author a publication with her, which Plaintiff now believes was a deceptive misrepresentation. In 2019, she discovered that he had allegedly incorporated elements of her work into a future

18

3.   Mr. William Campbell of the South Carolina Bar Association informed Laura that her
     complaint against Aaron Jophlin and Ed Bell had been dismissed. The complaint arose
     after Laura discovered that Mr. Jophlin had represented parties adverse to her interests,
     including Amy Stokes. Laura believed she was being represented by Ed Bell, as they had
     communicated via telephone and email, including discussions regarding information from
     forensic and biokinetic experts she had contacted.Incidentally, in 2020, Ms. Stokes
     became the personal representative of the Estate of Laura's deceased mother, despite
     Laura's objections to the Court. Laura's requests for discovery, including property
     records and financial information, were denied, and she has been deprived of such
     information to date, despite the defendants' knowledge of these communications via
     Laura's emails. On September 12, 2019, Laura was informed that she would receive an
     equal share of her inheritance alongside her brother and sister. Additionally, Laura's
     mother had set aside funds specifically for Laura to receive upon the finalization of her
     divorce, to prevent Chad Marzen from wrongfully obtaining any portion of her mother's
     estate. Laura had promised her mother that she would protect her inheritance from Mr.
     Marzen. Despite repeated communications with attorneys, Laura has been deprived of her
     property and has not received a full financial accounting, including tax returns and other
     requested documents. Attorneys recommended a three-year look-back review due to
     suspicions of embezzlement in anticipation of her mother's death. Laura has continued to
     report these matters to the Attorney General, the Governor, and federal officials since it
     involved interstate parties and Federal Statutes. In 2025, Laura submitted declaratory
     criminal complaints alleging embezzlement, conspiracy against rights, and other
     violations, as she continues to be deprived of her lawful property.

4.   Mr. William Campbell was among the first to inform Laura that Bradley's body had been
     cremated, despite prior arrangements for an open-casket service and statements from his
     parents indicating otherwise. A retired FBI Special Agent retained by Laura subsequently
     confirmed that the cremation had occurred. This action may constitute destruction of
     evidence and obstruction of justice. Major Nunn of the Florence County Sheriff's Office
     made false statements to Laura via interstate wire communications. Freedom of
     Information requests by Laura and Mr. Marzen were repeatedly denied.

5.   Laura contacted the South Carolina Highway Department's MAIT team to obtain vehicle
     "black box" data relevant to Bradley's death. The local FBI opened an inquiry and
     referred the case to Florence, South Carolina, although there appeared to be potential
     conflicts of interest.

6.   Mr. Marzen and Laura submitted evidentiary allegations with exhibits to the South
     Carolina Law Enforcement Division (SLED). SLED forwarded Laura's confidential
     investigative materials to the alleged perpetrators and mailed Laura a letter from
     Columbia SC to Tallahassee Florida they had done so. This potentially constituted
     tampering with a victim, witness, or informant, wire fraud, mail fraud, endangerment,
     obstruction of justice, and related offenses.
     Governor Henry McMaster and SLED Chief Mark Keels never returned any of Laura's
     phone calls to date.

publication without her consent and despite her objections, constituting purloining, peonage, involuntary servitude, uncompensated labor, and potential violations of the Defend Trade Secrets Act, misappropriation of her intellectual property, also involving potential patent infringements, among other matters.

Prior to these events, Plaintiff maintained a healthy and active lifestyle with no physical injuries, pain, or limitations, all of which she now experiences which were preventable.

14. During 2016, Laura provided assistance to Jason Grice and Tamara Broach Grice in their roofing business based on verbal promises of agreed compensation during phone conversations. Despite her travels from Florida to South Carolina to work and subsequent requests for payment (including in 2025 when she faced potential homelessness), she was not paid and remains owed funds as of 2025.

15. November 30, 2016, Laura's nephew, Bradley Ryan Clark, tragically died under highly suspicious circumstances. Laura began investigating aspects of his death, including potential wrongful conduct, given her insurance and investigative expertise.

16. In December 2019, Laura spoke with Ms. Helen Cain of the Florence County Sheriff's Office in South Carolina from the Myrtle Beach airport, and later, after returning to Florida, she spoke with Mr. Nunn of the same office. Ms. Cain stated the case was treated as a homicide yet was closed in approximately 3 business days. The vehicle was not taken into care, custody, or control, swabbed for fingerprints, the electronic recording device was not downloaded, despite there being no witnesses, Laura was informed there was no autopsy prior an open casket visitation and funeral and graveside service, yet Laura was later told but alleges the body was cremated.

17. In December 2019, Mr. Marzen was granted tenure. At that time, prior to future financial harms and deprivations of Constitutional and other rights, Laura was opposed to pursuing any claims in court against Florida State University.

18. During 2015–2016 and to date, Mr. Marzen allegedly misappropriated Plaintiff Laura's assets, induced her into financial transactions under false pretenses, and engaged in conduct intended to isolate her and cause financial, emotional, and personal harm. This conduct forms the basis for claims including, but not limited to, fraud, embezzlement, conversion, breach of contract, financial indebtedness, isolation, unlawful restraints, violation of the Violence against Women Act (VAWA), crimes against violence, severe sleep deprivation and other abuses resulting in physical injuries, intentional infliction of emotional distress, among other harms.

## 2017

1. Since December 2016, Laura has actively investigated and sought justice for the highly suspicious death of her nephew, Bradley Ryan Clark.

2. In January 2017, Laura continued her investigation by contacting attorneys, researching death investigators, and compiling evidence regarding potential foul play.

7. Laura contacted the South Carolina Attorney General and Department of Justice regarding SLED's conduct; both offices refused to investigate directly, citing they only take referrals from SLED or DOJ. A man who claimed to be Mr. Ben Gardiner with the SC Department of Justice stated they only take information related to crimes from SLED or the Attorney General's office despite my explaining the concerning situation.

8. Laura contacted Governor Henry McMaster and Laura's messages went unreturned. In 2018, Laura emailed Governor McMaster and SLED agents regarding the highly suspicious death of Bradley Ryan Clark and need for a Crime Victim's Advocate; her requests went unanswered.

9. Laura investigated the accuracy of the deputy coroner's report, identifying numerous inconsistencies, including physically impossible injuries to Bradley, which she verified with biokinetics and forensic experts. Despite this, the insurance company overseeing the claim found no issue.

10. In Tallahassee, Florida Laura met with FBI Special Agent Kevin Cwirka who suggested Laura contact a gunshot wound expert. Laura contacted leading forensic pathologist including Dr. Cyril Wecht, whose assistant stated he would conduct an autopsy if Bradley's body had not been cremated; she reached out but did not speak with Dr. Vincent DiMaio; she contacted and spoke with others including a forensic pathologist at a Body Farm, biokinetic among other experts, and in 2019 traveled to meet Dr. Henry Lee, to validate her investigative findings and concerns with the timing and lividity. (Dr. Vincent DiMaio and Dr. Cyril Wecht, sadly are deceased and Plaintiff honors their memory and dedication to help victims and the deceased obtain Justice and Truth.)

11. Laura documented her concerns on social media, asserting her First Amendment rights, and maintaining records of the ongoing harm caused by the alleged misconduct of SLED, the South Carolina Attorney General, and other parties. Incidentally, in 2018, Laura was informed that a prominent individual had placed a $50,000 price on her life, and she received direct death threats. Later, following the filing of her divorce, Mr. Marzen stated that this individual was supporting him in efforts to harm Laura, potentially leveraging political or prominent familial connections, thereby creating a continuing threat to her safety.

12. On October 27, 2017, Deborah Sines, Homicide Prosecutor, Assistant U.S. Attorney (USAO-DC), acknowledged receipt of Laura's investigative materials and forwarded them to the Criminal Section, Civil Rights Division, Department of Justice. "Hello – I reviewed the information you sent, however I have no jurisdiction to investigate anything in South Carolina. I have forwarded your email and the attachments to the Criminal Section of the Civil Rights Division at the Department of Justice. It is my understanding that a Deputy in that Section who has responsibility for South Carolina will examine all of this. Deborah Sines"

13. Laura provided additional evidence on November 3, 2017; Debra Sines with the DOJ confirmed receipt on November 6, 2017, "I have forwarded your additional information to the Department of Justice, Civil Rights Division, Criminal Section."

14. Laura contacted the United States Office of Inspector General (OIG), which responded that her submissions were taken seriously and were deemed to have merit. She communicated repeatedly with her designated OIG contact, FBI Special Agent Heather Butters; however, these communications ceased in 2025, apparently due to an email which is no longer functional.

15. Beginning in 2017 or before and to date, Laura has been harmed by a RICO enterprise that includes, but is not limited to, obstruction of justice, misprision of felony, mail fraud, wire fraud, securities fraud, bank fraud, embezzlement, unlawful restraints, psychological and physical abuse, human trafficking, threats of violence, violations of the Hobbs Act, forgery, and deprivations of constitutional, civil, and fundamental human rights. These harms were preventable and were carried out by multiple parties acting in concert. Throughout these events, Laura repeatedly reported the misconduct to the Office of the South Carolina Governor and the South Carolina Attorney General, including the deprivation of her property, obstruction of justice, and other criminal acts carried out by the RICO enterprise. Despite these communications, the Governor and Attorney General failed to take appropriate action, effectively allowing the RICO enterprise to continue its coordinated scheme. This inaction contributed to the ongoing deprivation of Laura's property, interference with her legal rights, and continuing threats to her personal safety.

2018

1. March 19, 2018 Laura and Mr. Marzen's letter to the United States Inspector General was forwarded to the Criminal Investigative Division on March 19, 2018, therefore reflective Laura continued to be a victim, witness, informant.

2. April 19, 2018 – Laura received a response from the letter sent to the United States Inspector General which stated in the last paragraph that Laura's initial complaint was forwarded to the Criminal Investigative Division on March 19, 2018. Laura had requested an investigation into the local Florence SC FBI since her private investigator, Mr. Jim Hand, a retired FBI Special Agent informed Laura that he had a conversation with the local FBI who contacted the Florence SC sheriff's office when they received Laura's inquiry from the Columbia SC office. Laura sent evidentiary suspicions regarding the Florence SC Sheriff's Office.

3. Throughout 2018, Laura experienced ongoing deprivation of marital intimacy and emotional isolation due to Mr. Marzen's controlling and harmful behavior, including the denial of marital and sexual intimacy while engaging extensively in communications with a man. Laura repeatedly requested marital counseling or sex therapy to address the unhealthy dynamics in their marriage; however, Mr. Marzen refused to participate. In an effort to resolve the situation amicably, Laura raised the possibility of annulment and the

restoration of her property. Mr. Marzen insisted that divorce was not a religiously acceptable option, despite the marriage being unhealthy, coercive, and painful to Laura.

4. In the summer of 2018, Laura traveled to visit her nephew and niece, celebrate her niece's birthday, and visit friends, while continuing her investigation into her nephew Bradley Ryan Clark's highly suspicious death and matters involving Florida State University (FSU) related to the retaliation and discrimination claims. Mr. Marzen encouraged her extended stay in SC, providing financial support, while stating that he would be otherwise occupied and she would be alone.

5. It was during this time, Laura was informed that a $50,000 price had been placed on her life. She also received threatening communications from an anonymous individual using a Google number with an Alabama area code, implying long-term familiarity with her. Laura could not identify the source. She initially thought it was her husband pranking her but he stated it was not him. She informed him she later suspected it had some ties to Bradley because the caller began to scare her yet she continued to investigate. Much later, Laura was informed via electronic communications, that it was Mr. Mark Khachaturian, a man Laura briefly dated before meeting her husband. Laura would not accept his Facebook friend request. Mr. Khatchaturian sent a Facebook messenger that he was divorced, Laura replied I really do hate to hear that. No matter how cruelly I have been treated I had said that I would not want what happened to me to happen to anyone else. Incidentally, the well-known man who stated he placed a price of $50,000.00 on Laura's life said he knew Mr. Mark Katchaturian and Ms. Kate Khatchaturian, whom in 2025 when Mr. Khatchaturian reached out stated they were divorced. Laura had informed him when he sent a request in 2025 that based on what that man had said, Laura blocked Kate and thought she had blocked Mark too. Mark stated they are divorced. Laura does not communicate with him and before he disclosed it was him and addressed concerns with electronic communications. Laura had also been told someone was falsely impersonating her via email yet she had not been able to obtain evidence and suspects it is someone with ties to the man who it was said put a price of $50,000.00 on her life.

6. Laura informed Mr. Marzen of these threats and her suspicions, but he refused to address the matter, stating he did not want to hear about it. Previously, in 2017, he had limited Laura's communications, initially stating to only discuss investigations to matters involving his and Darren Prum's lawsuits against FSU or Bradley's death.

7. Laura continued to uncover evidence of potential misconduct at Florida State University (FSU), including, but not limited to, Human Resources responding to parties affiliated with opposing interests, among other alleged malfeasance. She documented additional potential legal violations, including the unauthorized or illegal use of data.

8. Later, after Mr. Marzen's publication in the New York Journal of Law, addressing the denials of Mr. Marzen and Laura's FOIA requests to SC, he restricted Laura from discussing anything other than the FSU lawsuit, claiming he had obtained all necessary information regarding Bradley's death for publication purposes.

23

9. Laura and Mr. Marzen had experienced Freedom of Information Act denials. They contacted the South Carolina Attorney General's Office, which responded via email that they did not have jurisdiction over Florence County.

10. A solicitor in the Florence County office responded in a letter mailed from SC to FL which stated their office only handles domestic violence and DUI cases, effectively ignoring other alleged crimes. Laura documented this correspondence along with other evidence on her social media to document her pursuit of Justice and to protect herself from further harms and threats. Yet, she continued to be harmed and much more egregiously.

11. In the fall of 2018, Mr. Marzen requested Laura return to Florida, professed his love, and asked her not to pursue divorce, blaming FSU for his stress and unkind behavior. He did not account for the loss of relationship or consortium in his claims against Florida State University.

12. In 2018, Mr. Marzen purchased Christmas gifts for Laura (which he had not always done). This included a Subaru for Laura, after having previously purchased a car for himself using funds derived from her premarital assets. In 2021, Laura was compelled under duress, through coercion and deceit to make payments on the vehicle that had been presented to her as a Christmas gift. By 2024, she was required to sell the vehicle in order to pay for bills, rent, and basic necessities. These events reflect ongoing financial hardship and alleged coercive conduct by not only Mr. Marzen but Defendants who allowed it to occur and/or continue which resulted in significant harms to Laura.

2019

1. Laura continued to investigate Bradley's highly suspicious death. Laura met with Civil Rights activist and Florence SC Sheriff Kenny Boone was indicted and found guilty. This is the same sheriff's department who Laura sent suspicious activity reports to SLED. (As Laura's Facebook page reflects evidence over the years.)

2. There was a news article related to a prior FBI agent in Florence SC. Laura a couple of years before had contacted the United States Inspector General regarding potential conflicts of interest with the Florence SC FBI. On Facebook, Laura was threatened by someone, and there were what others alleged were concerning statements by someone who claimed to be Joe Younginer. Laura was told that was not Joe Younginer but someone impersonating him.

3. Laura was provided information from numerous people at FSU, conducted her own research, and spoke with the Attorney for the Union since Mr. Marzen was a union member. Based on Laura's investigations, FSU had many allegations of retaliation and discrimination which Laura would later experience firsthand. She discovered very concerning information which over the years she addressed with Marie Mattox, who told her she and Mr. Marzen were clients and she only had his name on the paperwork since

24

he was employed by Florida State University. Ms. Mattox during in person and phone call conversations led Laura to believe she was her attorney too. Laura had stated to both Ms. Mattox and Mr. Marzen that her investigative discoveries which Ms. Mattox stated she was not aware of and asked Mr. Marzen, how did you find this out. And he replied it was not him but me, his wife who discovered it. Laura clearly communicated that her investigative information was for their case only and could not be shared with other clients who were suing FSU. Previously, Mr. Marzen made comments to Mr. Darren Prum, a man he spoke with very frequently, and Laura discussed not sharing the information with Mr. Prum. Laura met and spoke with Mr. Prum on many occasions and always refused to divulge what her research had uncovered. Later, Mr. Marzen said that Laura's research had been passed along to Mr. Darren Prum and others, and that Attorney Marie Mattox had relied on it in their cases, even though Laura objected to its unauthorized use of her work, without her consent and without pay.

4.  In 2019, Mr. Marzen indicated that FSU would provide additional classes, which Laura relied upon to make mortgage and other household payments. Mr. Marzen said he again was skipped in getting classes when it was his turn in the rotation schedule. When the classes were not received, Mr. Marzen used Laura's credit card for summer expenses, promising repayment that never occurred and caused her to become Financially indebted, isolated, and abused. Laura's credit card was subsequently maxed out, leaving her in significant debt.

September 2019

5.  Mr. Marzen and Laura had a verbal disagreement, after which Mr. Marzen left the home with a suitcase, refusing to disclose if he would return. Laura was left financially burdened.
6.  Later that night, a Leon County Sheriff's Officer arrived, accompanying Mr. Marzen. Mr. Marzen informed Laura that he falsely stated, that Laura had punched him and threw him to the ground. Laura, approximately 4'10" and under 100 pounds, could not have thrown Mr. Marzen (6' tall) to the ground and Laura did not ever punch or hit him. Laura requested and sought to maintain control of her home's alarm system to preserve surveillance evidence. The third-party contract with the alarm system was in Laura's name. Incidentally, in 2021, Judge Hobbs stated that another judge had informed her that she did not have jurisdictional authority over certain aspects of the case between Laura and Mr. Marzen. Laura asserts that, despite this statement, the proceedings continued without affording her a hearing before a judge with proper jurisdiction, without her constitutional right to be heard, and denied access, deprived, of a jury trial. Laura further asserts that the alarm system, originally contracted in her name, was nonetheless allocated to Mr. Marzen.
    To date, Laura has not received the necessary and requested discovery, including all complete financial disclosures required from Mr. Marzen under Florida's mandatory disclosure requirements. Laura asserts that the failure to provide these materials has impeded her constitutional and procedural rights and caused serious harms which the Governor of Florida has been aware and via email replied to contact the Bar despite the fact the Bar has no jurisdictional purview over violations of Federal Statutes and Constitutional violations –

alleged crimes of serious nature.

7.  September 12, 2019 - Mr. Marzen filed for divorce.

8.  September 12, 2019 - Laura met with her mother, Gail Grice, who informed Laura that she was an equal beneficiary in her will, along with her siblings, and she had also set aside additional funds specifically for Laura to protect her from Mr. Marzen's financial and other harms. Gail instructed Laura not to allow Mr. Marzen access to any of her assets and Laura had promised that she would make sure Mr. Marzen directly or indirectly did not receive one penny or more of money Gail set aside for Laura. To date, Laura has been denied by the Florence County State Probate court, Ms. Stokes (as the Personal Representative), and others including her attorneys also South Carolina Lawmakers, access to those funds.

Fall – Winter 2019

9.  Mr. Marzen stated that primarily but not exclusively through the Courts, Laura was being destroyed to make her homeless and destitute so she would die. Once homeless, she would be gang raped, trafficked, tortured, organs harvested and killed. She should kill herself; no one likes or loves her and the world would be better off if Laura was dead.

10. Laura began to suffer from severe sleep deprivation, emotional, physical, and cognitive harms. The sleep deprivation began in September of 2019 and lasted until March of 2021 in which Laura only received an average of Zero to Three hours of sleep for this extended time period which resulted in serious physical and neuropathic harms.

11. Mr. Marzen claimed that Laura's attorney, Marie Mattox, had advised him to file for divorce and that he had obtained all of Laura's research and information related to the case against FSU.

12. Laura began consulting with attorneys to protect her intellectual, financial, and other property, including creation of her S Corporation, Privileged Solutions, Inc., which she created to protect her Trade Secrets. She discovered misappropriation of her intellectual property, allegedly by Mr. Marzen and others, violating the Defend Trade Secrets Act of 2016.

13. It was stated by an attorney that "these are dangerous people" to which Laura replied, oh I know they have stolen all of my assets and properties.

14. Laura sent FOIA Requests to Florida's Risk Management regarding FSU's payments including those to Attorney Marie Mattox.

15. Laura contacted Florida Risk Management related to a Freedom of Information Act Request, which led to Laura's communications between the Florida Chief Financial Officer's Office and Kelley Eaton which October 2019 emails confirm. Laura also went to the Chief Financial Officer's office. Laura addressed concerns of misappropriations of Laura's Trade Secrets, Intellectual Properties and harms by FSU, Mr. Marzen, Ms. Marie Mattox and others

26

since those persons were being paid by the State of Florida - directly or indirectly. Relating to the communications Laura was told via phone that a reporter sent a FOIA request but they did not share Laura's communications and FOIA request. Laura believed they were helping her.

13. Laura contacted Florida State University (FSU) and FSU's legal counsel, Attorney Lisa Scoles, regarding what she identified as the unauthorized use of her intellectual property and trade secrets, the deprivation of her rights, financial harms, and her financial standing in the Florida state court case (prior to FSU's removal of the case to federal court). Despite these communications (from a phone that was not Laura's cell phone), FSU continued actions that deprived her of her constitutional rights, due process protections, other significant legal interests, and harms.

14. Mr. Marzen stated that Marie Mattox was not Laura's attorney regarding the Florida State University case and they were using her intellectual properties and work product as their own. Laura continued to inform Mr. Marzen that he, Ms. Marie Mattox, or others could not and did not have her consent. Laura informed him it was her Trade Secrets.

15. Mr. Marzen stated the Judge and Florida Court were going to deny her rights and assist in harming her. Laura responded if they denied her constitutional rights, she would take it up to the United States Supreme Court if she had to. He stated his attorney was friends with the Judge, he would not settle and we were going to court because he already won.

16. Laura requested restitution from Mr. Marzen and related to the harms by Florida State University and Marie Mattox. Mr. Marzen stated the Union was going to pay him and Florida State University was going to pay him as physical pain and suffering to financially harm her in attempts to prevent her financial recovery. Despite Laura's objections – what Laura was told would be done to harm her did in fact happen.

17. Mr. Marzen refused Laura's request for the return of her properties, which she factually asserts he obtained through fraudulent means, including embezzlement and extortion. He told her that if she filed criminal complaints, his attorneys, Max (Factor) and Marie (Mattox), would harm her. Laura suffered harm as a direct result of these and other threats.

18. Mr. Marzen stated he would give Laura money to travel to SC to visit her dying mother on her last Thanksgiving and Christmas alive. At the last moment, he did not. He went out of state and at Christmas out of the Country to spend the holidays with his family. After Thanksgiving, Laura informed her attorney that Mr. Marzen was continuing to withhold marital funds, keeping Laura in debts and preventing her from traveling to see her dying mother. Laura was inaccurately told she required the Court's permission to travel out of State. Through her attorney Laura sought an order compelling Mr. Marzen to allow her the access funds, and the courts permission to visit her mother in South Carolina.

19. Laura's attorney, Halley Stephens, stated that she would take the necessary steps through the court to ensure that Laura obtained access to marital funds and that she would determine

27

the status of the lawsuit involving Florida State University (FSU), including issues related to Laura's trade secrets and financial losses. Laura asserts that Ms. Stephens did not take these actions or, if she did, she did not communicate any results to Laura beyond stating that she had made a phone call. Laura further asserts that Ms. Stephens was aware that Laura was not receiving required notices in the case and that there were potential due process concerns, yet no corrective action was taken.

20. Florida State University, Ms. Scoles, Ms. Santorro (and Ms. Mattox too), according to verified Court records, continued to violate Laura's constitutional and civil rights, including her right to due process and be notified knowing she had financial and marital standing. They tortiously interfered with her access to the courts, obstructed justice, and were made aware of alleged frauds presented before the Court. Laura asserts that these actions affected her financially, economically, her trade secrets, her S Corporation, and resulted in the alleged embezzlement of her properties by their employee. This also supported Mr. Marzen's abuse and harms which caused Laura's physical and emotional injuries.

21. Laura was referred to Attorney Doug Mannheimer by Mr. James Gwynn, in connection with allegations that her trade secrets and work product were being misappropriated and used without her consent in the lawsuit against Florida State University (FSU). Laura met with Mr. Mannheimer and Attorney Ginger Boyd. During the meeting, they requested that Laura disclose her trade secrets. Laura's business attorney had advised her not to divulge such information; nevertheless, she shared certain aspects of the case.

22. Mr. Mannheimer disclosed during the meeting that his son's wife works at FSU in the College of Business, which Laura asserts created a conflict of interest with the opposing party that was not disclosed until after they received information related to the case. Attorney Boyd allegedly stated that Laura did not have trade secrets, asserting that trade secrets must be an ingestible-type formula, such as Coca-Cola's recipe. Laura had read the Defend Trade Secrets Act of 2016 and was aware Trade Secrets are not limited solely to recipes. Laura asserts that she does not believe the law firm would provide similar incorrect guidance to entrepreneurial men with trade secrets and alleges that the statements were influenced by the initially undisclosed conflicts of interest. Laura was later informed that it appears Mr. Mannheimer was subsequently hired by the State of Florida.

2020

1.  In 2020, after Florida State University continued to fail to provide Notice and Due Process of law after her conversation with Lisa Scoles, Laura found the hearing dates on the Court records.

2.  Laura attended a hearing in Judge Flurry's chambers, in which Lisa Scoles, Maria Santoro and a woman who may have been Jennifer Meadows was filling in for Attorney Marie Mattox. Laura was initially told she could not be present. She responded that she understood it to be a public hearing. Prior to the hearing, Laura had informed Ms. Lisa Scoles that she was a party with a financial loss, her intellectual properties/Trade Secrets,

and was going through a divorce with Mr. Chad Marzen. At that time, Laura did not know she would later be denied discovery, all accurate financials, that the Court would continue to refuse to provide all financials as Florida law mandates, and that Laura would also remain without a divorce decree to date in 2025 despite emailed requests.

3. Mr. Marzen became very angry that Laura attended the meeting, stating that "all the bar is talking about it" and that Marie would find out. Laura responded that if Marie had attended in person rather than sending a substitute, she would have had the opportunity to see Laura herself.

4. Ms. Mattox per the bar had at least one bar complaint a year and was previously suspended. Many attorneys told Laura during divorce and other consultations that Marie almost lost her license, which Laura found through their and the Florida Supreme Court records. Laura informed the bar of Marie's misleading Laura to believe she was a client then using Laura's work product.

5. Laura was told by Mr. Chad Marzen that the Judge/Court would change her email one letter off to harm her and prevent her from obtaining filings. (Later Laura discovered in Court documents those statements were true.

6. February 2020, November 19, 2020, and February 13, 2020 reflect the statements of changing Laura's email to an incorrect email proved to be true, violated her Constitutional rights, due process of law, among other harms.

7. Laura continued to be financially controlled, denied funds for basic living expenses, and was required to obtain pre-approval for necessities such as food, gas, and feminine products. Mr. Marzen threatened her with arrest if she left Florida, leaving her emotionally and financially trapped.

8. Mr. Marzen at times would not give her money and threatened it would be the last month she received money for food.

9. Laura was forced to borrow money from her mother and others to pay attorney fees and some living expenses.

10. Mr. Marzen continued bullying, psychologically torturing, verbally, and financially abusing Laura. He isolated her from others despite Laura's crying and pleas that he settle and let her go (back home to South Carolina). He continued to state she would be destroyed, destitute and homeless so she would die and that she should kill herself.

11. Laura told Mr. Marzen many times that she was becoming very physically sick.

12. Mr. Marzen continued to deny Laura funds and approval to travel to South Carolina to visit her mother.

13. April 27, 2020 Attorney Williams email addresses Mr. Marzen's bullying and treating Laura with disrespect, prohibiting her from seeing family, isolating her, preventing her family from visiting her (but he allowed others in the home), addressed Laura knows

29

where all of his bodies are buried…as well as those suing FSU. She falsely stated she had gotten Laura lower the sent settlement offer to $500,000 which was not true as Laura's diminished settlement offer to expedite the case was over a million. Yet, Laura did not receive any counter other than mediation which was $1,000.00 a month for 10 months and would have kept Laura in debts and created homelessness.

14. Incidentally, Mr. Marzen, under oath in 2021, he falsely claimed he had paid all household bills, while evidence including credit card records show Laura had paid some of the household bills during and after the divorce process.

15. Laura's constitutional and civil rights were systematically violated: email tampering, denial of discovery, obstruction of justice, and denial of jury trial rights.

16. May 15, 2020 – Mr. Marzen conspired with attorney Rachel Chesnutt to create a fraudulent Will and Power of Attorney to transfer Laura's assets without her consent. Laura's attorneys failed to protect her, breaching fiduciary duties.

17. May 28, 2020 – Laura's mother, Gail Grice died. Mr. Marzen reportedly mocked Laura's loss, leveraged private communications to manipulate her, and continued depriving her of access to travel and stated he was obtaining her inheritance so she could not survive; Mr. Marzen later laughed that he and others kept Laura from seeing her dying mother. Laura was heartbroken, distraught and justifiably angry that attorneys knowingly kept her from seeing her dying mother.

18. May 28, 2020 – June 9, June 10, 2020 through May 28, 2020 emails reflect the Attorneys knew the status of my mother and she was dying and letting Laura move on with her life (and move back to her home state of SC), further evidence of unlawful restraints/false imprisonment wanted, emails reflect Laura repeatedly stated she was financially trapped, wanted the case to be over, attorneys (to present date in 2025) have not provided Laura with requested discovery which they agreed to obtain, Laura did not give consent to lower her settlement offer to $550,000 as she had communicated for her attorney to send the diminished settlement offer which was in excess and slightly over a million, yet Laura in attempts for settlement and dissolution did in 2020 diminish her settlement offer to $550K PLUS money to buy a home, move, and live. Laura addressed her very viable plan in 2020 before becoming physically sick to financially recover and have multiple properties and passive income for financial stability. Emails as follows: From: Laura Grice [mailto:lauraegrice@icloud.com]
Sent: Wednesday, June 10, 2020 4:37 PM
To: Harriet Williams
Subject: Re: SERVICE OF COURT DOCUMENT CASE NUMBER 372019DR002716XXXXXX MARZEN, CHAD G vs GRICE, LAURA E Attorney Client Confidential Attorney Client ConfidentialThank you so much!! I think we're on the same page and to clarify - I'll agree to $550k paid out over a very short period of time (with safeguards) PLUS money to buy a home, move, and live. I was unintentionally financially successful with flipping my home so I'm going to flip homes. I'll need money

to have a paid off home, money to live, and money to buy a small home/foreclosure to fix it up to flip. $550k plus $372k (my half less liabilities would allow me barely enough money to start over.)

I may have overlooked it but didn't see a request for his April 2016 copies of deposited checks - primarily the one before marriage where I gave him money only because he said he was adding me as a joint owner to the Ameritrade accounts. I found he transferred money last summer into that account. I was putting household bills on my credit card in leu of reimbursing the credit card - he transferred money into an account that he planned on keeping after the divorce and simultaneously saying we would never divorce. He also committed perjury on his financial affidavit which I told both Haley and him. And he never corrected it.

Heads up - Chad told his mom today he is planning to tell Max to tell you that if you don't get me to settle he's filing a bar complaint. Anything you've relayed has been my words and that's extortion. (I will reciprocate and file bar complaints on him, Darren Prum, and all of his attorneys. I've never said Chad had to pay me X amount or I would but if threatens you - I will reciprocate and I'll go to FSU, it'll get ugly for him.) He also said he's scared it'll go to court, he'll have to pay: attorney fees, alimony, and assets then it would've been cheaper to settle. And that's what he doesn't want and it might be cheaper to settle now. He also said because of the lawsuit (and salary) it's a high net worth case.

The truth coming out in court will be a much greater sum. That's my number and if he doesn't agree now then he's not at mediation and it'll go to court. We all want this over now and perhaps Max can explain it to him that way (it's a huge cost savings). Again, thank you so much!!

On Jun 9, 2020, at 3:17 PM, Harriet Williams <hwilliams@twalaw.com> wrote: FYI
From: Harriet Williams
Sent: Tuesday, June 09, 2020 3:02 PM
To: 'Eric Schab'
Cc: Max Factor; Sandie Hobbs
Subject: RE: SERVICE OF COURT DOCUMENT CASE NUMBER 372019DR002716XXXXXX MARZEN, CHAD G vs GRICE, LAURA E
Good Afternoon Eric, Please see attached the discovery requests in word version. I need additional information regarding the confidentiality of the financial disclosures. Is this request coming from Marie or just your client being concerned. I am unaware of such a need for protection. I did employment law and had cases against Marie some time ago. What is confidential about his financial disclosures in this case that would impact whether he was mistreated by FSU and seeks damages. I am not comfortable asking my client to sign or agree to anything that to the extent it is discoverable in another legal proceeding would make them jump hoops to get it. Has there been some type of requests in the Federal case and you are trying circumvent discovery.

I am still waiting on producing additional documents once I go to the office to scan in. I think unless you or Marie can provide me a better insight to the basis for confidentiality you will have to file your Motion. In the final analysis if he is trying to keep secret what he has from FSU my client feels that with all he took from her he is also trying to hide assets from them.

31

Let's get this formality of the discovery behind us and move forward with either resolution or settlement. I am still working on a counter but I need to see the bitcoin account and the Liberty documents regarding her retirement which have still not been received. I have made some progress and gotten her down to $550,000, paid out over time with an initial lump sum for relocation and to purchase a modest home.

Your offer is rejected and a Judge may agree with you and that is what will have to happen if she is to walk away with the amount offered or less. Your client is on track to be a Chair of the Department, salary increase, full professorship and it is apparent and he will make a lot of money by staying on with FSU. My client believes in her heart that her efforts helped her Husband and his friends with their lawsuit against FSU. She will not be around to enjoy the benefits of her labor so she needs to get some money and leave. Totally, outside the scope of marital law to me but my client is not budging so far although I am spending a lot of time trying to get her to move.

As for her licensure and employment opportunities they are in South Carolina. So the sooner she leaves the sooner she gets started or she will be happy to stay until we get to trial. She fully intends to be a witness or have a presence in the Federal lawsuit if we do not resolve this case. She can be depicted as an hysterical rejected wife but she apparently knows where at least a few bones are buried. She does believe her Husband is perpetrating a fraud on FSU just the same as he did on her. Perhaps he thought pretending to be a family man and marrying a woman and talking about having a family would make him a better Plaintiff. When he found out because of the type of lawsuit being filed it would not help or hurt he decided to dump his wife she was no longer needed to perpetrate his fraud. (her words not mine) She advises she did not know he was gay (not that it matters to me or her) but just more evidence of the fraud that just keeps coming out.

Let's go ahead and set for mediation based on when you project you will have your response to our discovery. File your Motion for protective order and we challenge it vigorously . The first step will certainly be to make sure my Bar license is protected and notifying FSU of the intent to hide assets. I suggest you tread lightly in this area; I have already consulted on this issue with some other attorney's and they advised to be careful. . This is a dissolution case and your client has the power to make it go away. Just like she was emptying her accounts before they said I do she was also getting information related to the lawsuit before they were married; not that any privilege I believe would attach anyway but his friends and your client had many conversations as she was being introduced about the FSU lawsuit or potential lawsuit. They are over my objection all that she talks about and the dissolution is secondary to her because of how and I guess why your client decided to divorce her .

I would love to talk to you and Max to discuss further. I think it is important that we speak directly as sometimes emails get really bogged down. I am offering up my cell number if you want to discuss. ▮▮▮▮▮▮▮▮.

Thanks

From: Eric Schab [mailto:eric@maxfactorlaw.com]
Sent: Friday, June 05, 2020 3:35 PM
To: Harriet Williams
Cc: Max Factor; Sandie Hobbs

Subject: Re: SERVICE OF COURT DOCUMENT CASE NUMBER
372019DR002716XXXXXX MARZEN, CHAD G vs GRICE, LAURA E
Hi Harriet, I just wanted to follow up on my request for a Word version of the discovery
documents.
Also, would you be willing to stipulate to a protective order prohibiting the Parties from
sharing Mr. Marzen's disclosures with any third parties? Specifically, this is
contemplated to prevent the disclosures from being provided to any other party in the
pending civil case. If not, I anticipate needing to file a Motion for Protective Order, and
that's only going to slow our case down. I think both of our clients have an interest in
ensuring that nothing from this case ends up compromising the civil case, so I'm hopeful
we can do this by stipulation. Please, let me know.
Eric Schab
115 N. Calhoun Street
Tallahassee, FL 32301
*www.maxfactorlaw.com*
(850)577-1699
On Jun 1, 2020, at 4:58 PM, Eric Schab <Eric@maxfactorlaw.com> wrote:
Harriet,
Can you send a Word version of the Request for Production and Interrogatories so that
Mr. Marzen can type in the answers? Thanks!
Eric Schab
115 N. Calhoun Street
Tallahassee, FL 32301
*www.maxfactorlaw.com*
(850)577-1699
On May 28, 2020, at 10:33 PM, Harriet Williams <hwilliams@twalaw.com> wrote:
Good Evening Eric,
I have not heard back from Ms. Grice. I will give her through the weekend. I agree to
Amanda Wall if she is not costs prohibitive. Remember my client has no money. We can
set the mediation date 35 days outside of when the discovery is due back to me. I will
need to ensure my client's availability  on proposed dates. Of course I am presuming
there will be no objections to the discovery since for the most part these are the exact
interrogatories sent to my client and I added Exhibit A for the production requests.
I agree with your analysis of the case for the most part. There are clearly some areas
where I disagree. But all in all I am trying very diligently to get to a middle ground even
before mediation. It is advantageous to both parties to reach an agreement and let Ms.
Grice move forward with her life and your client move forward with his. I am still
waiting on the additional discovery from her and will double check that when we speak. I
intend to make a counteroffer once she gives me the  authority to do so. Hopefully after
we speak this weekend. Just depends on the status of her Mother. I will happy to discuss
if you have any questions.

19. July 30, 2020 – Attorney Harriet Williams emailed asking why the Personal
Representative was denying Laura access to her inherited properties and assets, and
stated via email that Laura was going to be homeless after the (marital) dissolution.
Attorneys stated that is not true based on financials and Laura's rights; Laura should have

33

received ALL financials and discovery, due process, Hooker v Hooker, based on accurate assets and promissory contracts by attorney Chad Marzen and his unjust enrichment of Laura's premarital assets and potentially embezzled or extorted inheritance, she should never be told she would be homeless after the marital dissolution. Further evidence of alleged IIED, physical and other harms, (Gang) Conspiracy Against Rights, violations of Due Process and Discovery, and other issues.

20. July 31, 2020 5:28:53PM Filing # 111128793 Court Filing reflects Laura as the Wife's Third Request to Produce, Laura has not received all requested discovery, the filings and her 4th Request and Filed Stay and Request for Continuance (for discovery and all financials) and substantiates Laura's claims of alleged Wire Fraud, Cruel and Untrue Statements in the court file falsely stating Laura committed misconduct by delaying and misusing government property (the Court) to (paraphrase drag the court case out which is provably not true).

21. August–November 2020 – Laura discovered that Florida courts were publicly sharing her personal information, altering her email, and continuing to obstruct her access to justice.

22. August 5, 2020 – Court records reflecting false statements that Mr. Marzen needed to commute over a hundred miles several times a week, which was not true because Florida State University provided a van and driver. Laura had been told the driver's name was Mr. Alfred. The Court records reflect Laura's unlawful restraints as her premarital car had a flat tire and was not drivable, Mr. Marzen (who last drove it) and court records reflect would not repair it, requested exclusive use of the Subaru car which Laura was given as a Christmas gift in 2018 then later had to pay the loan payments (and subsequently in 2024 had to sell for bills). Establishing further evidence of alleged perjury, subornation of perjury, unlawful illegal restraints to keep Laura from having freedoms and freedoms of travel.

23. During the summer of 2020, Laura continued to be denied access to her inherited home, car, and properties despite informing the court and sending electronic communications to the Personal Representative and Mr. Grice, the other beneficiary. The personal representative was providing not only beneficiaries but also third parties access and benefits of Laura's inherited properties while depriving Laura of her inherited properties, all moneys, discovery, among other serious harms.

24. Laura had been calling and emailing the Court as exhibits reflect since she was initially told she could not see the Will and had to get it from the court, the locks had been changed from the key Laura's mother gave her, the car was removed from Laura's inherited home, taken to Mr. and Mrs. Stokes home in another town, and to date Laura has been deprived and denied her properties yet charged for others and third parties to have unjust enrichments.

25. Laura, from Florida, contacted Leila Jordan at Palmetto Tax Express in Florence SC. Laura requested her mother's tax returns with a 3-5 year look back from the date of

34

death. Laura was a beneficiary and had rightful lawful access to her mother's papers and financials. Initially, Ms. Jordan said she would provide them then said she could not and Laura would have to obtain them from the Personal Representative even though Laura called because the Personal Representative was denying Laura the financials. Incidentally, Ms. Leila Jordan is Jay Jordan's mother. Jay Jordan is a SC Lawmaker and attorney. (Later, when the Florence SC Court emailed if Laura did not like what the Personal Representative was doing (to harm Laura), then Laura had to hire an attorney. Laura was strapped for funds and could not afford the functional medical care she needed yet since the Court was depriving Laura of her Constitutional and other rights, Laura hired Mr. Gil Gatch to obtain all financials, tax returns, discovery, and remove the Personal Representative since Laura starting in 2020 had verbally been denied hearing by Judge Jesse Cartrette via Ms. Beverly Carroway. Mr. Gatch later unbeknownst to Laura hired Mr. Jay Jordan because he said he spoke to fellow lawmakers about Laura's case. Per Mr. Gatch, they told him to have Jay Jordan come on as Co-Counsel. Mr. Gatch informed Laura after the fact. He never provided financials, tax returns, did not remove the PR as agreed, refused to state who the lawmakers were that he spoke with regarding the case, billed me for a draft response to opposing counsels threats and refused to tell Laura who saw it by chance in the bill, refused to provide Laura with the draft response she paid for, told Laura they would remove the PR, told Laura there was a hearing to object to selling the home at a diminished value in which Laura requested if she needed to be there a zoom hearing due to health issues, Laura was told the morning of the hearing she had to be there, Laura later discovered it was a bench trial which Laura did not agreed to and previously was denied a jury trial, Laura did not arrive in Court until the hearing was almost over, and discovered via transcripts Mr. Jordan and Mr. Gatch addressed her health issues before the court to explain why Laura was late, did not bring any laws and did not bring exhibits into the hearing and court record despite all that Laura had provided them to help her case, did not remove the Personal Representative who along with others obtained unjust enrichments of Laura's property. Laura later discovered in or around 2025 the State Court is not an Article III Court and did not have jurisdiction when she was living in Florida (interstate parties), could not lawfully deny a jury trial, discovery, access to Laura's rightful property (which greatly harmed her in 2020 and since), among other harms including Laura's repeated requests to remove the court appointed Personal Representative (via hearings), discovery, access to properties, a jury trial, among other harms which were not disclosed and later not fully disclosed to Laura. Laura had told Mr. Marzen starting around 2019, that if her constitutional rights were violated in the Courts as he stated they would be then she would take her case all the way to the United States Supreme Court if that is what she had to do to invoke and firmly stand on her Constitutional rights to a fair jury trial. Laura has learned a great deal more of how she was harmed through research, reading, investigating, resources....

26. Court Case Filing 2019CP2103072 supports Laura's evidentiary allegations of violations of Constitutional, Civil, and other Rights, Due Process of Law, Purloining, Peonage/Involuntary Servitude related to Laura's intellectual properties, work, labor

without Pay, cruel and untrue, false defamatory type statements about Laura, False Light, Frauds before the Court, Wire Fraud, False statements to improperly sway a Jury and/or Judge, Obstruction of Justice, Tampering with a Victim, Witness, Informant, among other violations. Within the exhibits are further evidence that Bradley, who tragically died under highly suspicious circumstances and his rights were violated yet their filing addresses Laura's prior Facebook comments from years ago that it appears her civil rights were violated too. Laura's rights continue to be violated and Turner Padgett Graham and Laney never obtained Laura's Consent and Agreed amount of payment for her work which they allegedly stole as Laura's post addresses her having copyrights and other post addressing aspects of Trade Secrets.

27. The Exhibit 2 in Court Case Filing 2019CP2103072 has a many cruel, untrue, harmful and false statements about Laura. Additionally, Laura has not been posting a "rant" but a lawful fight for Justice and Truth in her nephew's death which she also emailed Governor Henry McMaster in 2018 and in her Facebook post from years ago, in which she stated she has sole copyright and intellectual properties, Laura alleged years ago and on facebook that her nephew, Bradley's macabre case fits the classic definition of a RICO. Laura's petition again, via evidence alleges continuous harms, violations of rights, and the case fits a classic definition of a RICO with much greater harms and evidentiary allegations. The filing also states "followed by a cliam that she'd had a conversation with Bradley the night before. Laura did not claim it, Laura then and now firmly states it because it is a fact which cell phone records, pings and switches will confirm she called and spoke to her nephew Bradley for almost and hour and the only reason they got off the phone was because he had to study for a test. Both Bradley and Laura were immensely proud of the work Bradley was putting into improving his grades so he could attend college. There was much other information that Bradley provided Laura which she truthfully relayed to the FBI and primarily but not exclusively the United States Inspector General's office and her contact Heather Butters, Tallahassee FBI Special Agent Kevin Cwirka, and others. Furthermore, this filing addresses not only violations of Laura's civil rights but only provides more evidence of violations of her rights. Laura did factually allege persons of authority of misconduct then in 2025 filed Declaratory Alleged Criminal Complaints, including officers of the court. Generally speaking, Laura takes this misconduct, gross negligence, violations of rights, actions and inactions of harms against her very seriously. She has stated and continues to state she firmly stands on her Constitutional, Civil, Fundamental, Inalienable and other Rights and Laws.

28. The United States Inspector General's letter and other emails which state Laura's investigative information was forwarded to the Criminal Division further establishes the cruel and untrue comments by Turner Padgett Graham and Laney that was filed in Court Records that Laura was a part of a Conspiracy which the response from the United States Inspector General proves their false light type harmful statements are not true.

29. August 11, 2020 – Laura's attorney emailed Mr. Eric Schab and Mr. Max Factor, "I will be filing a competing motion on contempt for failure to produce and answer the interrogs.

So I think 2 hours is good…" Reflective that opposing counsel had not produced and to date Laura has not received all accurate financials and other requested discovery, contrary to false and defamatory type cruel and untrue statements including the Court files stating the court found Laura had committed misconduct and misusing court time, which is factually and provably not true; the court, attorney for the court, judges and others have refused to provide Laura with evidence of misconduct and misusing court time which it appears would be: converting the court into an instrument of crime, obstruction of justice, frauds before the court, among other violations. Plaintiff, Laura, factually alleges: via evidence the court, administrators, judges, and other high ranking officials committed conspiracy against rights, obstruction of justice, concealment of evidence, refused to provide evidence which cannot lawfully/legally exist without being falsely manufactured and furthering alleged preexisting crimes, regarding fraudulent court records falsely accusing Laura Grice of misconduct before the court among other affiliated violations which also violates Laura's constitutional rights to be provided with evidence of their false accusations, as noted in *Brady v. Maryland*, 373 U.S. 83 (1963), furthermore, the Florida State Court, a lower court, has continuously obstructed justice, committed wire fraud, false light, doxing, IIED, VAWA, conspired against Laura's constitutional rights, aided in physical injuries resulting in the life altering harms, violated constitutional rights acting under the color of law, federal statutes, multifaceted and other actions or inactions to further harm and endanger Plaintiff, Laura's Constitutional Right to Life. (See exhibits – as exactly as Laura was told primarily through the courts, she would be destroyed, to make her destitute and homeless, so she would die. Once homeless she would be gang raped, trafficked (labor or sex), tortured, organs harvested and killed. She should just kill herself. Laura was also told at least in early 2020 that the Judge would change her email address one letter off to prevent her from accessing the courts and to detrimentally harm Laura. (Please reference documented EXHIBITS for Evidence, Emails, Court files, et cetera for the truth of the matter and for Justice.)

30. August 12, 2020 – Attorney Harriet Williams emailed opposing counsel she will get out her Motion of Contempt, FSU needs to receive a lien letter, not sure they want to open up that can of worms or do you (yet refused to provide Laura with what the can of worms was), violated attorney client privileges by sharing that Laura was going to file bar complaints. Laura had also stated factually alleged criminal complaints. Exactly as Mr. Marzen had told Laura, her attorneys were telling her they would file necessary needed court filings and obtain discovery but agreed with opposing counsel not to do so. Those statements via emails and court records were true and provide evidence as to Laura's allegations but what attorneys called, "Gang Conspiracy" and as Mr. Marzen told Laura the intents and goals were for Laura to die to cover up crimes, frauds, and to split money including insurance proceeds exceeding 1 Million on her life.

31. Aug 13, 2020, at 12:51 PM, Laura Grice wrote (and had previously discovered via a string of emails – exactly as Mr. Marzen told her that her attorneys had been providing

2:25-cv-13821-RMG     Date Filed 12/11/25     Entry Number 1     Page 38 of 93

opposing counsel and him via his attorneys with Attorney Client confidential information and had agreed not to obtain all discovery and financials to benefit him and harm Laura): I have a busy day so I will send a screen shot of the Envision and FSU which I have about $25.00 and the SC Telco has approximately $80 but I will have auto drafts so it will be less than that. This was from my very small amount of premarital money and money my mother gave me (prior to her death for attorney's fees Laura opened an account to ensure she did not commingle her inheritance so Mr. Marzen could not obtain any of her mother's money and exactly as Laura had promised her mother that Mr. Marzen directly or indirectly would not access her mother's money or Laura's inheritance. Yet Mr. Marzen stated through the Personal Representative of the Estate and Attorneys that was done though others and the May 2020 POA and Will which Laura continuously objected to...) Since they are insisting on these financials after the filing, proceed with obtaining: 1. detailed Bill for the Bank of America's Charge (there's approximately $12G of debt) which he obtained either during the marriage or shortly after filing and 2. the actual check copy images from the checks his parents gave him which I previously requested. 3. Have you requested/subpoenaed the April (and May) 2016 banking statements? I did not see the April 2016 (and May 2016) statements or especially the check copy images of all deposits into the account in April 2016 and May 2016. Sincerely, Laura-Elizabeth Grice"

32. August 13, 2020 Attorney Williams had not to date emailed and provided Laura with settlement offers other than in mediation of $1,000.00 a month for 10 months and less than $40,000.00 divided over time. This would have kept Laura in debts, and allegedly illegal because it kept Laura in debts to created impoverishment, further physical and emotional harms, Bills of Attainder via the Courts.

33. Aug 20, 2020, at 10:03 AM, Laura's Attorney Harriet Williams emailed: "Ok where are you. Be clear everything they are filing is to destroy you and leave you with nothing. We need to tan soon so whenever you are available let me know Harriet Williams" On Aug 20, 2020, at 8:24 AM, Laura Grice wrote: "Good Morning, if Mr. Marzen has presented or presents a settlement offer please email to me without delay. Thank you!! Have a good day, Laura

34. Laura met Mr. Dane Dunson, attorney for Governor Ron DeSantis as noted in text messages, and attorney for the Florida Lottery, the summer of 2020. Laura was led to believe they were friends and paid Mr. Dunson a dollar for attorney client privileged information since Laura's attorney was allegedly conspiring against Laura's rights, was not filing and obtaining discovery or access to marital funds, and had knowledge thus aiding, an accessory in violations of constitutional and other harms against Laura. There are multiple text messages between Mr. Dunson and Laura which she discussed she could not talk or do anything because of physical pains. Laura believed Mr. Dunson as a friend referred her to Attorney Anna "Dina" Foster or another attorney he had used in his divorce who relayed diminished financial recoveries in a consultation phone call to Laura which Laura knew was not legally true from consultations with many other attorneys and

reading attorneys blogs, laws, etc. Mr. Dunson via text made a comment that if it (the divorce) did not work out and later Laura discovered Anna Foster and Pennington Law had undisclosed conflicts of interest. Those were two attorneys Mr. Dunson referred and it appeared by text messages and conversations Mr. Dunson, an attorney, also was aware of the harms against Laura and violations of her Constitutional, Civil and Basic Human Rights. Laura ended what she thought was a friendship and ceased communications with Mr. Dunson, who she believes also deceitfully obtained information.

35. Laura was necessitated to go to the medical doctor for severe long term sleep deprivation, severe stomach pains, and other physical illness. Laura informed the doctor she was being abused and crying every day, not from depression but from abuse and everything that Laura was told through the courts, attorneys and others which violates her constitutional and other rights was being done to harm her – which was causing undue stress, physical and emotional pain and suffering. He refused to provide Laura with any sleep aid, stated blood work or test were not needed because her bp (blood pressure) and weight were fine. He said because of the divorce he could not provide sleep aid and Laura may overdose. Laura clearly communicated she was not suicidal but had been told to commit suicide and was not suffering from depression but desperately needed to sleep. Laura was talking to a therapist about the harms and coercive abuses – Laura reiterated she was not depressed but being abused. The doctor further shared his daughter went through a bad divorce and he wanted to put Laura on Prozac so she would not have a breakdown in court. Laura declined and took as he suggested NyQuil to help sleep one time and had been for years eating organic and taking minerals and supplements. The doctor refused to even provide Laura upon her request with one pill for one night of rest and sleep. Laura further emphasized she was not suicidal and could not and would not overdoes on one sleeping pill. He refused to provide Laura with anything to help with sleep but did say the stress (overload of cortisol) metalized into physical ailments – further evidence of preventable physical and emotional injuries as noted in ADA and VAWA. Laura continued into 2021 to suffer from sever long term sleep deprivation. Laura continued to have serious physical health issues as addressed in Florida and South Carolina Court Cases – which was brought to the Judges' and others attention.

36. August 26, 2020 – Pennington Law (Dina Foster, Nancy Floyd), Harriet Williams were emailed the following as Laura was necessitated to fire Harriet Williams who had breached attorney client privileges, unbeknownst to Laura falsely diminished Laura's settlement offer, agreed but never sent subpoenas for copies of checks, filed a lien with FSU (and related to violations of Due Process), had not had to hearing to obtain a Court Order for Contempt of Opposing Counsel, a restraining protective order against Mr. Marzen who per Attorney Williams emails bullied and treated Laura with disrespect (Laura was being psychologically/emotionally, verbally and financially abused, suffering severe sleep deprivation, becoming physically sick), obtained via a hearing or Motions provided access to marital funds to prevent Laura from unlawful restraints and financially trapped in the marital home, and that which kept Laura from seeing her dying mother.

39

37. August 26, 2020 excerpts from Laura's email to Pennington Law (and previously
Attorney Harriet Williams) From: Laura Grice <<u>lauraegrice@icloud.com</u>>
Date: August 26, 2020 at 10:57:46 AM EDT
To: Harriet Williams <<u>hwilliams@twalaw.com</u>>
Cc: Dina Foster <<u>dfoster@penningtonlaw.com</u>>, Nancy Floyd
<<u>nfloyd@penningtonlaw.com</u>>
Subject: Re: CHECKING ON STATUS Attorney Client Confidential "Attorney Client
Confidential if you are not the intended recipient immediately stop reading and
delete. Good Morning Ms. Williams, I am sorry to hear of the passing of your family
member. You and your family members are in my prayers. I did not receive an email so it
may not have gone through. Please let me know when you return and I'll pick up the
thumb drive....The drop box link Halley sent expired within 5 days so it is no longer
active. Again, if you did not download the documents please let me know and I'll quit
requesting it....I will give them a thumb drive of what you send me.

Dina and Nancy, a few points to clarify. And I'll send you a more detailed list of
documents, information, needed and previously requested: discovery, interrogatories,
etc.
• In mediation Mr. Marzen did <u>not</u> offer the correct calculation for the retirement - it was
for less (than my half).

• Prior to and during mediation I informed Ms. Williams, my attorney, and during
mediation I informed both her and the mediator that the assets were (fraudulently)
decreased and liabilities increased. (Another Fraud)

• Mr. Marzen lied in the recent motion stating he would drive hundreds of miles several
times a week. He only goes once a week and the University provides free transportation
and a driver. (Another fraud.)
And the car was a gift to me and I'll need a dependable car too.

• In mediation Mr. Marzen and his attorney via the mediator stated according to Florida
Statute I am not entitled to the home and none of the lawsuit so their offer to both was:
Zero, nothing.
According to FL Licensed attorneys I am financially entitled to the lawsuit which was
filed during marriage. In mid 2016 during our first meeting with Marie Mattox she stated
they did not have a claim yet and needed an action. The lawsuit was filed in 2018 -
during the marriage. Even though we were in a confidential divorce mediation that does
not give Mr. Marzen and his attorney the right to misquote and/or falsely misrepresent
statuses, laws, regulations, etc. (another fraud)

I informed Ms. Williams many times before mediation that despite her stating I am not
entitled to any of Mr. Marzen's lawsuit (other than via the contract) all other attorneys
which I had previously consulted stated it is a marital asset.
Additionally by law which she did agree with that I'm entitled to certain portions of the
marital home and assets. She agreed to legally fight for my getting more of an inequitable

40

division since he fraudulently obtained everything I had and to also make it fair and equitable to me. During mediation she did not refute their statement and stance that according to Florida Statute I'm not entitled to any of the lawsuit and none of the home so according to law I get "zero".

• I have a list of Mr. Marzen's (financial) frauds and I have recently obtained more which I'll provide to you.

• Ms. Williams did fight hard that the alimony offer of $1,000 a month for 10 months and the increased $1500 a month. I appreciated that she did fight hard for me as it's not enough for me to live on and start over and had Mr. Marzen not per her clients words frauded her out of her home, salary, licenses, and all of her assets she wouldn't need financial support.
Ms. Williams also fought hard that Mr. Marzen as a Licensed Attorney, Member of the Bar, and Business Law Professor: created, hand wrote, and presented a contract to his wife who has no legal experience but then after (fraudulently) continuing to obtain her help, support, assistance, information and only after getting what he needed and filing for divorce does Mr. Marzen now state it is not a contract. (Another fraud.)

• Mr. Marzen recently mentioned settling with FSU. The case passed through summary judgement.
Lien or not, please email notifying and attaching FSU Mr. Marzen's handwritten contract which provides me with 50% of the proceeds. He did not exclude future earning, pain and suffering, etc which as an attorney if he wanted those excluded he would have added that exclusion to the agreed contract.
Please also advise FSU that since I am not Marie Mattox's Client, I am under no verbal or written contractual obligation to pay her.
Her fees need to be paid directly out of Mr. Marzen's 50%.
(It's my opinion since it is a marital asset and I have a contract for 50% I should have some say in any settlement agreement....)

• All of my documents I've legally obtained which I have not shared with Mr. Marzen yet he has falsely accused me of illegally obtaining information. He threatened to sue me if I hurt his job or lawsuit. I've told him I will not be a party to fraud and I will not commit perjury. If he looses his job and lawsuit because of his frauds, that's not my fault. And, he's threatening a potential witness in a federal case.
His threats of suing me and others if we testify against him in the divorce or FSU Case back date to fall of 2019. And, I did inform Halley.

• Ms. Williams emailed a summary email which opposing counsel obtained via them being copied. I do understand accidents happen and this is not the first time. Ms. Williams recently emailed Max that I was going to file a bar complaint against Chad Marzen. I did not give her consent to share that information. Ms. Williams emailed me a string of emails on another client and emailed Mr. Marzen's counsel a different client's information...Eric sent her an email letting her know it was deleted. Those are the multiple emailed instances I know of and Mr. Marzen informed me of confidential

information he knew about but would not say how he accessed it. I told Ms. Williams not to contact an attorney who I had talked to about a Whistleblower/Qui Tam action but she later told me she spoke with him (even though I told her not to since it was my attorney client privileged information).

• I cannot in good faith or good conscious knowingly turn a blind eye to Mr. Marzen's frauds to me and others. In good faith, I gave him the opportunity to compensate me, provide me with restitution, and an NDA - all of which he refused. I thought if he had financial consequences for the frauds it would prevent or deter him from doing it to anyone else. I was wrong. I wouldn't wish this fraud and fraudulent financial nightmare on anyone. I will discuss with you prior to proceeding my (legal) remedies for obtaining restitution which I think are a separate action from the divorce.

• I communicated to Ms. Williams Halley advised any accounts I opened after filing Mr. Marzen cannot access. I thought considering all of Mr. Marzen's frauds (and only the ones I knew about at that time, I now have much more now) would have been smart enough to compensate me and settle me out with a NDA. And, I would need separate accounts since the FDIC ensures only up to $250k. If we agreed to settle out and if I agreed to an NDA the sum would be much more than $250k. I was told it was fine and wise to plan and be prepared.

I told Halley I had concerns since he had prior access to accounts opened during the marriage he would unethically/illegally access it or have a family member do so. (This is what he did with the May 15, 2020 POA.)

I first consulted with my attorney and obtained approval to and tried to use either my premarital credit card, the little premarital money I had, and/or money Gail, my now deceased mother, gave me.
Halley stated premarital money (even via the Bitcoin) was my premarital money and if I needed to use it do so. If the judge rules he is entitled to any interest it can be paid from the total of my portion of the divorce and a judge may rule considering (everything) that he cannot have that money too....I can use my premarital money and I do not have to get authorization or inform him as of the divorce filing date.
To be clear, I never socked away or hid money during the marriage of which he's falsely accused me. Money I spent during the marriage Mr. Marzen was aware of and authorized.
Also I recently emailed not to object as there were financials and information I wanted from Mr. Marzen which were also after we filed. When I initially request it, I was told I could not obtain those specifics since it was after the filing. I'll forward you the email and we will need to add those items to the list of requests since they filed a motion for my financials after the filing date.
And, I will bring you the thumb drives.
Have a wonderful day,
Laura

38. September 3, 2020 forwarded February 16, 2020 email to attorney Williams, which addressed Laura's being prohibited from travel and to see dying mother, lied to prohibit Laura from seeing her nephew before he died, September 3, 2020 Attny Anna Foster and Pennington Law were aware of threats, harms, alleged involuntary servitude, false imprisonment, isolation, financial indebtedness - criteria of human trafficking, lawsuit against FSU.

Laura clearly states Mr. Marzen deceitfully kept Laura from seeing her dying mother, Laura is ready to get away from Mr. Marzen and discusses his threats and harms. September 3, 2020 email addresses Laura was threatened with lawsuits for millions which implies Mr. Marzen and Ms. Grice's lawsuit against FSU was worth millions – if Marie Mattox was going to sue Laura for millions which per attorneys Ms. Mattox cannot do since she violated Laura's constitutional, due processs, and other rights including Laura's rights to intellectual and labor - work with pay by stating she was Laura and Chad's attorney (see attached exhibits of Laura's handwriting and only a few of many discoveries via lawful research. Emails were forwarded to Pennington Law prior to their disclosure and informing Laura of their conflicts of interest, the email Laura sent her Attorney Harriet Williams on February 16, 2020 email to Attorney Harriet Williams which discussed Unlawful/Illegal Restraints/False Imprisonment, Financial Entrapment, threats of harms, among other issues. There is evidence that Halley Stephens, the first attorney knew I was being kept from seeing my dying mother the last Thanksgiving and Christmas she was alive and later in 2020 Laura continued to be lied to about the law and financially trapped to prevent her from seeing her dying mother by Attorney Harriet Williams.

 Email as follows:

From: Harriet Williams <*hwilliams@twalaw.com*>
Date: September 3, 2020 at 2:13:05 PM EDT
To: Laura Grice <*lauraegrice@icloud.com*>
Cc: Dina Foster <*dfoster@penningtonlaw.com*>
Subject: FW: One Response to the 2 emails Attorney Client Confidential

Harriet W. Williams….

From: Laura Grice [mailto:*lauraegrice@icloud.com*]
Sent: Sunday, February 16, 2020 12:51 PM
To: Harriet Williams
Subject: One Response to the 2 emails Attorney Client Confidential

I quickly responded yesterday. Here's my viewpoint and notes below. This may be a short term marriage but is (financially) complex. It details some of the fraudulent behaviors and conduct employed in attempts to permanently steal, rob, and hurt me: financially, biologically, and emotionally therefore inequitable distribution is needed as are the supplemental discovery and depositions to solidify my case's stance and my financial recovery.

Mediation - Chad is the one who filed for divorce, due to my financial hardship, and I've been a homemaker since 2016...

I was told the Judge will grant that Chad has to pay legal fees (including mediation). I don't know if the Judge will require Mr. Marzen to pay for 2 mediations if the first isn't agreed upon. I want to use the money I've paid you to date for depositions and discovery. ...Chad complained about not rescheduling mediation because he would have to take time off (interfering with his classes) so to resolve that issue - if we have deps and discovery by then, we can schedule mediation during his spring break. He will not have to take time off from work, problem solved.

*Retainer* - Chad said you have to ask Max for the retainer. I know you mentioned $5k because that's all I could come up with that day although Max's retainer is $6k (which Chad may have already paid twice) and some attorneys want a $7,500-$10k retainer. FYI for if/when you ask Max for the retainer. If I need to come up with more to pay you for reimbursement from Max (I will do so). I think he knows I'm fighting back and why he is refusing to pay. In example - Chad told me before Thanksgiving he would give me travel money to see my family/friends over Thanksgiving and Christmas. He knew as of this summer my mom has stage 4 cancer, it's spread to her vital organs, and we don't know how much longer she'll live (doubtful she'll live to next Christmas). He flew to Iowa over thanksgiving because his grandparents are getting older. He refused to give me travel money for thanksgiving yet promised Christmas travel money then right before he left to fly to Mexico (first class??) for Christmas refused to give me travel money. I was alone for the first time in 47 years on both Thanksgiving and Christmas. He knew my mom and I were trying to mend our relationship before she died and it may likely her last Christmas alive. (Cases in point.)

*Discovery* - Chad's phone records prior to filing for divorce, 2015 tax statements and banking statements at least the month (and the year before marriage) shows the money he absconded from me under fraudulent pretenses even prior to marriage. If he would do so before marriage, he will do so during.

1. If he moved/hid assets before and during marriage. His conversations to determine who he was taking with and if he was talking with (his dad's) financial advisor (he met with his Dad's financial advisor on one of the trips to Iowa.) and/or other means of shelling money away before blindsiding me with a divorce.

2. He blatantly lied for years before and during marriage about the money I gave him before marriage stating he added me as a joint owner when he only added me as a beneficiary (BIG difference). This reflects his purposeful and willful fraudulently deceptive behavioral patterns to permanently steal/rob and hurt me (financially, biologically, and emotionally).

3. Was he getting money from other sources (ie percentages in companies that he may have shelled or delayed in taking profits until after the divorce, what was his consulting

44

company making, how many years did his family's company provide profit sharing, etc.)?

I haven't found on Sunbiz Mr. Marzen's business license. Sooo he teaches business law at a top ranked school and doesn't have a business license for his own company yet filed revenue to the IRS on a (non licensed) business? I have a business license for my consulting company and even hired a business attorney to set it up to ensure I was following the law.

Due to my lack of finances, I think it's best we only mediate once. I want to prevent a situation where money is needed on mediation and is not wisely spent on depositions and discovery which would build my case and provide informative negotiating tools to increase (my mediation) settlement. Chad has been vehemently opposed to additional discovery and depositions, there is a reason. Chad has been unrelenting that he's not paying me a penny more than the law requires and only on an equitable distribution. I told him if it's a number I'm comfortable with then we can agree to a settlement prior to mediation. He refuses.

I filed for an inequitable distribution and if our house and our (his) retirement has to be cashed out...then that's what has to happen. He opposes all "discrimination" and he as a man (10 years younger and making a lot of money) should not keep his retirement and home when that opportunity was fraudulently taken from me (by him). As you know they want a quick mediation based on a short term marriage. It might be short term but it's complex with a lot of moving parts. Short term or not I want to ensure I have taken every legally available right and advantage to protect myself and my finances (protecting myself from unnecessary financial hardships). I had a house before marriage, throughout marriage and my standard of living should be no less. I have already told Chad I have a dog who barks a lot at noises and cannot live in a condo or apartment, although he can. Chad has already shown he lies and conducts himself under fraudulent pretenses.

Appraisal - do we need an appraisal on our house since it may need to be sold for Chad to pay me? Selling it shouldn't be an issue as I sold my dream home and Chad wants to move away. My mom who was a realtor for 40ish years said when her social security check comes she'll loan me the money for an appraisal.

Max - perhaps if Max honored your Honor's request then you wouldn't have had to tell him again. If he got mad or angry - then he should be mad at himself. (You're not his scapegoat.) He also may be mad that I switched and have a FABULOUS attorney who will fight for me and it will not be as easy as he thought.

Marie - when you spoke to Marie what did she say?

I could provide substantial and evidentiary evidence that would probably blow her other FSU case out of the water.

I basically have perjury on all of them. And I have documented lies, fraud, etc.

45

I have perjury on Mr. Prum from his depositions. Marie knew he was not being honest during depositions because Chad and I had both informed her of information and conversations.

Mr. Marzen at the least committed perjury with the divorce's financial disclosures.

He told me (right before filing for divorce) how he would not "lie" on the stand but word it in such a way to make his vitaligo to be because of pain and suffering. I stated I would not agree - half truths and twisting the truth is still perjury when he knows otherwise. I will not be a party, and I will not commit perjury.

I mentioned (again) to Chad this past week based on what I've discovered/uncovered it appears there are bar violations and do I as a good citizen need to file bar complaints? He replied I cannot file bar complaints on him because he's my spouse. He threatened (and again) if I filed bar complaints (with the truth) that they would sue me. He also said if I do anything to hurt his case (sharing the truth) Marie will sue me for millions.

I replied I would counter, imagine what would come out in discovery, I will win but hypothetically if they win they'll be the grand prize winner of all of my assets - a 2006 Toyota Avalon with approximately 130k miles and a flat tire. Be my guest.

This weekend I talked to a friend (at the bar) who stated I absolutely can file a bar complaint on a spouse or anyone. Again he's lied pertaining to the law. This reflects his continuing to make fraudulent statements about the law and threatening me with lawsuits. He also stated (right after he filed) that after he filed that we no longer have spousal privileges. Not true. I can choose because he relinquished spousal privileges with Darren Prum (during his almost daily very lengthy conversations) and probably based on conversations with his parents, and grandparents. Chad and I are not married to Darren Prum therefore Darren didn't have spousal privileges. Maria Santorro already called out Marie and Darren (and Chad) in depositions for violating attorney client privileges when Darren and Chad talked absent of their attorney. I can confirm as I witnessed and questioned they're doing so at that time. I also suspect Marie and Chad illegally and/or unethically provided Darren with MY confidential work product and trade secrets which I specifically told Marie and Chad my confidential information could not be shared with Darren as he was a separate plaintiff- separate case. I only told Marie because I had repeatedly been told she was my attorney too. Marie also never once indicated in she was not my attorney. There was also information I did not share with Chad, was hidden, and marked confidential that is now gone. His reply was "it's not in his possession". (Unbeknownst to him, I have access to some of the important documents in my computer.)

I'm ready to end this chapter, get away from

Mr. Marzen, and move back to SC to be close to my friends and family. I have missed years of my nieces and nephew growing up. I missed the last opportunity to see my cherished first born nephew Bradley alive (before he tragically and allegedly was

murdered as a high school senior) because Chad lied stating his grandfather had cancer and he needed me to come back. I left the day I had plans to spend time with Bradley (after he got out of school) because of Chad's lies.

My nephew tragically and suspiciously died at the end of that month. I want this over more than Mr. Marzen although it will not be to my financial detriment and/or an unnecessarily imposed financial hardship.

My apologies for the long email although I think it has pertinent information to help you with determining when to set mediation.

Thank you,
Laura

39. Pennington Law agreed in consultation to do what Attorney Williams but did not then after deceitfully obtaining via alleged coercion, embezzlement, extortion, fraudulently obtained aspects of Laura's confidential Trade Secrets related to the lawsuit against FSU then informed Laura their Law firm represented Florida State University's Foundation, and had personal relationships with opposing parties in a lawsuit, did not have hearings, did not obtain discovery as agreed, did not relay or follow the law, did not file a restraining order against Mr. Marzen to cease his abuses, did not obtain funds for spousal support and attorneys' fees (among other serious harms), had emailed the Personal Representative of Laura's inheritance to provide the inherited assets (Laura had been trying to remove the PR from the SC Court case and obtain discovery, Pennington Law commingled the Federal Florida State University Court Case, Florida State Court Case, South Carolina Court Case, did not file an injunction to have Mr. Marzen withdraw his May 2020 POA and Will (which appeared to allocate Laura's assets despite her objections to others granting them an unjust enrichment via embezzlement/extortion), Pennington law then withdrew as counsel, after withdrawing as counsel emailed the court to set a final hearing date knowing Laura did not have all needed discovery, then replied via email Attorney Foster and Pennington Law would not correct the email to the court. Evidentary allegedly also took part in Gang Conspiracy against rights, deprivations of rights, wire fraud, obstruction of justice, IIED, domestic abuse/VAWA, physical and other known/informed injuries, among other factually alleged Constitutional, Civil, Fundamental, and Basic Human Rights violations. Per emails including but not limited to the October 2020 email excerpts as follows (in paragraph 29)

40. Per Pennington Law, Laura's confidential private information such as social security number and other information was publicly visible constituting Doxxing.

41. October 13, 2020 – email excerpts addressing violations of constitutional rights, property, VAWA. physical health issues, fears, threats, endangerment of homelessness, severe sleep deprivations, inaccurate financials harming Laura, among other matters. Plaintiff can provide email in entirety if needed and addressed the South Carolina Court Case involving Laura's property and assets that were being withheld, the SC court did not have

47

jurisdictional standing (abuse of process) also denied hearings to remove the Personal Representative, denied a jury trial, violated due process, among other issues and Laura discovered she was an equal beneficiary via the legally binding Will and consistent with her mother's statements:

42. From: Laura Grice <lauraegrice@icloud.com> Sent: Tuesday, October 13, 2020 1:54 PM To: Dina Foster <dfoster@penningtonlaw.com>Subject: Attorney Client Confidential Good Afternoon, I cannot meet and I have a super busy week. I also want to take some time to review in detail your emails and the documents...There are some concerns and issues I need to address. Due to time constraints they are in no certain order. I'm writing in haste so please ignore typos, grammatical errors, repeated statements. I have not reviewed or edited it.You mentioned they are waiting on my offer....so I could work on an offer which will consider all factors that are necessary to do equity and justice (to me).

You mentioned I'm being unreasonable. I'm not being unreasonable to think that $2k in alimony to start over is not enough. Many people have stated I am not being unreasonable and agreed $2k realistically is not enough and especially considering my position, age, health, circumstances, etc. I do not have any supplemental source of money or income. I do not have a trust fund. And I will not get my rightful inheritance because I don't have money to hire an attorney to fight the (bogus) added pages which I was told the court is accepting.

…..$2k a month commensing 30 days after I leave the home would have me homeless.

I had also stated I needed a lump sum and most especially rehabilitative based on my age, physical and emotional condition, my not having a college degree, my no longer having licenses and skill sets, etc....The equalizer gives him 100% of some marital assets and not correcting inaccurate liabilities that he submitted financially hurts me and is too large a deficit. It is an unrealistic amount that puts me into debt, is not enough to financially start over, and would not cover even a few bills. In fact it would not even cover housing and health insurance alone. The amounts need to be based on my financial affidavit which may not have even covered all of my costs….

…my funds are limited that Mr. Marzen and his attorney should have worked on a fair (to me) MSA offer which would include my relinquishing the FSU lawsuit, all other issues, contractual agreements we had, etc.
I have since Mr. Marzen filed for divorce and less than a month ago told Mr. Marzen if he offered a fair to me MSA I would not counter and I would be gone ASAP. But for whatever reason he refused. He says he wants me to leave but his actions are not consistent. He has not given me the means and incentive to leave and he has the ability.
I paid household bills, mortgage payments, paid off the heating and air conditioning unit, etc and I'm not leaving (it's legally my home too) until the divorce is finalized or unless we can reach a favorable MSA. Most reasonable people would not leave a home in which they have a financial stake and assets to move into a homeless shelter which is what I would have to do if I took your offer.

He can send his best all inclusive offer. If I'm comfortable with the number I would sign a release and be gone. For the right amount I would sign a NDA. (Those are statements not threats.)

This divorce is very continuous, high profile, high income, etc which is why I hired you. I heard you could fiercely go up against the best and win, you would fight for me, and you know the law. The fact is, now I fact check everyone and especially attorneys. My not trusting anyone is not personally geared or directed at you or anyone. I simply do not trust anyone and your recommendation of my getting only $2k doesn't give me a lot of reason to think you have my best interests at heart.

I am not saying you do not but my having to fear moving into a homeless shelter or live in my car (which I cannot afford [inserted: to have repaired])… is not in my best financial, physical, or emotional/mental interests at all. And it has never been my lifestyle.

... Had I known of the not one but at least 2 conflicts of interests I would not have hired you. Was a Chinese wall created so my confidential information is not on the same server and/or accessible by anyone with ties to FSU's Foundation at your firm? I hope my information has been safeguarded because I am to recover 50% of the case...

Why after emailing informing me of the conflicts and basically saying you will not file the lien and will not represent me if...

The lien would primarily be based on Mr. Marzen's and my contractual agreement but do you now suggest I take 35% instead of 50%? How would it help and be in my financial favor and financially advantageous for me to take 35% instead of 50%?

….I'm sincerely asking, you know my literally dire financial predicament so why would you suggest I take a decreased 35% instead of 50%?

Why would you suggest $2k a month which is such a meager amount? You mentioned your suggested amount is based on a bill in the house. I followed that bill last year. It has not passed the past few years, it is not a law, it would put me in a homeless shelter…would be unconstitutional for a Judge to apply a bill which is not law to my case.

Your recommendation….greatly harms me is very concerning. I need, not want but *need*…to protect me and my survival.

…Were you basing it on the bill that's not law, that doesn't appear to be applicable to me, even if it did pass and became law (at the earliest 2021)? We filed in 2019 and it was not law then and thankful to many women (and children) it is not the law now.

You mentioned if I don't trust you to find other counsel.... I have learned to fact check people and not to trust anyone at their word. I don't willingly give away my trust to any attorney especially pertaining to and regarding financials. I was conned out of literally everything I worked very hard for - for many years. I gave up a lot of my personal life for many years so I would have no debt, a paid off home, so I could retire early to enjoy my last few years of life, and to have some financial security and stability.

All of my assets and attainable dreams of early retirement and a paid off home are gone. I will never be able to have children or marry again. Based on my faith and beliefs marriage is only once. Even without faith - if I survive this, I will never put myself in this horrid position again. I know many people do remarry but I am not them (not a judgement, just a statement). I will never take a chance at being in this unnecessarily sorrowful, painful, stressful, terrifying of a situation again.

Mr. Marzen is assured I will never be able to have children or marry and obviously if it's up to him I will never own a home, never retire, and not be able to survive....

You stated I'm being unreasonable....

During consultation you saw Mr. Marzen's equalizer. You stated you knew it was not accurate and I should be getting more.

Your equalizer … Why did you not have my getting at the least 50% of all of the marital assets?

Nancy said…those types of items that my premarital money paid for we were trying to get reimbursed and that you both had been busy, she was working on correcting the numbers and you had a clerk was working on my case...

Also, if I'm reading it correctly according to Florida Statute gifts should not be included in the assets for division. Is that true? If it is true why are you putting the few gifts I received in the equalizer to be divided and giving him 50% but not putting his maritally obtained gifts into the equalizer so I can get 50% and so it's fair to me? I'm sincerely questioning because I don't follow the logic of how it is equitable and financially fair and helps me.

…I cannot emphasize enough that my financial survival depends on this divorce, I am immensely stressed, sleep deprived, etc. I'm not leaving this home unable to survive only so I can expedite a fraudulent marriage which financially helps him and would harm me (financially, emotionally/mentally, physically) to a much greater degree.

I cannot emphasize enough that the money and assets I had earned before marriage I NEVER "gifted" him... I did not and would have never worked as hard as I did to "gift" it to anyone. Before marriage my nephew was my beneficiary but I did not even "gift" to him my assets. My nephews and nieces are my world. I ensured and we agreed to make them beneficiaries in the will so they would not loose on their inheritance because I got married. Their inheritance had I not married would have been my home, assets, investments, life insurance, etc. if I had known Mr. Marzen was depleting and stealing from them too what I always planned and intended to leave them via an inheritance I would have never married him.

He said we were biblically combining our premarital assets. He always told me everything he had before marriage was also mine, I would never have to work again, he was adding me as a joint owner to everything, everything he had (premarital and marital) or will have was equally mine, and he would always financially take care of me. He stated divorce is never an option and he even said if we ever divorced he would always financially take care of me...

I think we would both prefer a settlement to end this but I'm not the fraud, I'm not going into court with unclean hands, I have nothing so I have nothing to lose. My worst case scenario is the judge gives me at least 50% of the marital assets and alimony which is more than I've got now. I'm not concerned about going to court.

If I were a licensed attorney, with a tenured job, and committed multiple frauds I would be concerned. I have not committed frauds or perjury but he knowingly has. He has a lot to lose. I really hope you can understand that I have to financially protect myself.

Mr. Marzen has shown he cannot be trusted …He has been deceitful, using his law license to deceitfully obtain what he otherwise could not have. He's lied on affidavits. He has reneged on every one of his promises, oaths, and contracts. I have learned the hard way that he is not to be trusted under any circumstance. Since you mentioned threats, I have not threatened Mr. Marzen. I was told by attorneys a MSA can and often includes items, assets, or payments which may or may not be obtained in divorce court. And he can include in a MSA assets or alimony which a judge may (or may not) award. A MSA would be for us to come to an agreement to expedite and finalize the divorce. He can make concessions as a time and money saving option and to simply honor his contracts as an attorney before and throughout the marriage.

Not all of his affidavit's are truthful. I have him on perjury. He would be going to into court with unclean hands.

I have been threatened. Mr. Marzen and others directly and indirectly threatened me. I have been threatened with: being homeless, with being sued if I tell the truth to the judge, he's threatened to file bar complaints against my attorney (previously and again recently the weekend of October 2nd), his mother threatened to harm me, etc. It's me who has the documentation to file justified bar complaints against him (and Darren Prum and his attorneys). That said, I did not want that relayed to him but he knows and if he or others feel threatened then he and others shouldn't have violated their oath, broken laws, been unethical, violated the ABA guidelines and rules, committed perjury, and/or etc.

I have not threatened him but I have asked, begged, cried, and pleaded for him to send me a fair settlement offer considering everything I've lost by his frauds. He doesn't know that I now have an attorney to sue for what I cannot recover in divorce court and I am filing criminal charges.

If he thinks or has thought that I'm going to allow him to fraudulently obtain everything I worked for - for many years and into my 40's to now not be able to eat and pay bills or struggle to do so, then he is very mistaken.

…a few issues I need to address. During consultation I hired you based on terms, conditions, agreements, and a few contingencies I had. I was told what I was asking for was not unreasonable and you would do it...

During consultation (short version) I stated Mr. Marzen has a Federal lawsuit against FSU and specifically additionally named John Thrasher. The case survived summary judgement. I showed you the contract and asked if you would file the lien with FSU. (If an attorney would not file the lien it would have been a dealbreaker.) You replied you

know FSU's legal counsel and have no problem filing the lien with FSU (against his case).

… I stated not having the lien would financially omit a lot and possibly any recovery to me (depending on how it was negotiated)…

In fact Mr. Marzen has said he will negotiate where anything he obtained would not be a marital asset (to cut me out). He has repeatedly since the day he filed for divorce stated he will make sure I do not get one penny from the lawsuit. He made that statement only months and years after he obtained my work and it greatly differs and contradicts our contractual agreements.

An attorney cannot legally (and ethically) create and present a contract under false pretenses so a benefit is derived at that time yet to only later state it was knowingly falsely created and presented (there is no justifiable reason for an attorney to fraudulently create and present over time a contract). I am not an attorney or legally trained but as a layperson even I know that is fraud.

I did a lot of work for years on the case and I need the 50% I'm entitled to based on Mr. Marzen's and my - verbal and written contracts and contractual agreements. You never disclosed your or your firm's conflicts of interest. If you had disclosed only one of your or the firm's conflicts, I would not have hired you. It's not personal. It's simply a conflict which could (subconsciously or consciously) create a prejudice which harms me.

It was after a month of having my case that the conflicts were disclosed. I don't think you suddenly became friends with the Thrashers (John Thrasher) who is named in the lawsuit. I told you in consultation he was specifically and additionally named in the lawsuit.

It's not my being unreasonable to be upset to discover over a month after hiring you that there are multiple firm conflicts of interest. Granted I don't want to hurt any of your friends or your firm's clients that have ties or are named in the lawsuit but the fact is I have a 50% recovery in the lawsuit based on contractual agreements based my work, discoveries, ideas, support, etc and it was literally MY financial losses and money in 2017 (and 2019) not his financial losses.

When I took money out of my premarital retirement in 2017 he stated he couldn't take money out of his retirement (as if it was a pension) which was yet another of many lies. He could have. He would have incurred the same tax penalties BUT he would not have had the additional gains of premarital funds if he had done so. …he lied to diminish and basically eliminate mine.

During consultation I asked if you would agree to request or subpoena his banking and financial records to obtain all deposited check copy images (that went into his financial accounts) from April 2016. My small credit union did not make check copy images so I need it requested from his accounts. You said you would...this was another deal breaker with my hiring an attorney. To my knowledge that still has not been done.

As noted above - I asked and you confirmed and mentioned due to my circumstances I need inequitable division. I said Halley filed for an inequitable division. You looked at the paperwork (filings) confirming Halley filed it as an inequitable division and replied good....

I needed a much greater percentage of the marital assets since (including but not limited to): I put so much into our home, I supported and helped with his career and advancements, I supported and helped with his writings and publications, the lawsuit, the marriage, I (not him) took care of every aspect of the home, cars, cooking, cleaning, errands, etc. I assisted, drafted, and also wrote emails for him, researched and worked on the lawsuit, etc. I've lost everything because of his fraudulent inducement and I am 10 years older. I'm physically and emotionally drained. The stress and sorrows from his frauds and the divorce has caused physical pains and problems which my doctor has said are only going to get worse...My doctor also said I have to take a break from the stresses of my situation and the divorce and it cannot totally encompass my life which it has.

...Based on my work and what I know there should be a very large settlement recovery from the FSU lawsuit.

Mr. Marzen stated I can just go back to what I did before. I cannot because I physically cannot do the work and hours that I did before which is why I needed and had an attainable plan to retire early. Even if I could physically do the work - I am not licensed so it's against the law. I have talked to friends for the past year (and before) who said positions were being eliminated and their position is being eliminated.

I have researched and as I stated I think at this time that getting licensed and selling real estate in Charleston (which has a very hot real estate market even in the pandemic) would be the quickest way to financially get back on my feet. Rehabilitative alimony helps me to do that...

I am closer to 50, I don't have a college degree, I don't have licenses or assets because Mr. Marzen stated I did not need them, he said to sell my home as his home is always my home too, I would never have to work again, he would always financially provide for me, etc. I've been out of work for years. I no longer have licenses and I've lost my skill sets because Mr. Marzen repeatedly stated I would never have to work again. He told me not to renew my licenses since I was never going back to work.

...He said I would never have to work again even if we divorced.

Unbeknownst to me, he committed financial frauds harming me before and during marriage and as an attorney committed perjury.

I would have had a paid off home, money, had (now lost) years of salary, retirement, licenses, possibly a child, etc and at the least I would have been semi-retired or retired (if I chose). I know I will never be able to recover all of my losses in divorce court which is why I need to recover every single thing I can via the divorce. I'll recover outside of divorce court via my other legal options and via filing criminal charges.

...I've made house payments, paid off the hvac unit, made improvements to the home, etc. I have financial and sweat equity plus equity via the marriage. The divorce and asset division also needs to be fair to me. A 50/50 division would not be fair to me, it would put me at a much greater financial loss, I would be almost or absolutely financially destitute, and I need to maintain a similar life to what I've always had.

I should never have to consider and fear living in a homeless shelter because I will not have enough money to financially survive and get back on my feet while he makes Two Hundred Thousand ($200k) a year and in part due to my work, support, ideas, writings, stolen writings, etc. I should not be immensely fearing not having enough money to pay for my living expenses and to survive. That has not been and should not be my life and greatest fears.

There is a comment (paraphrased) towards the end of a document you…stated that I did not contribute to or support his career and advancement therefore I'm not entitled to an inequitable division.

That statement is not true. I very much did including but not limited to: assisted, aided, supported, etc with his career and advancement, etc…when we dated and then throughout the marriage. That is a financially harmful and false statement about me and it needs to be immediately redacted.

I will review the statutes again. I feel if you didn't know of statutes and cases off hand from years of experience then research should have been done to find statutes and cases to help me. I was previously told and from what I've seen from research. I am referencing the

…Florida Statute which can found under: Title VI - Civil Practice and Procedure, Chapter 61 - dissolution of marriage; support; time-sharing
61.075 - according to the statutes it states relevant factors. The relevant factors are in my favor and considering all of the circumstances for my to receive a higher inequitable division. and referencing,
"(j) any other factors necessary to do equity and justice between the parties."
It's my understanding equity does not mean literally 50% to each of us but what would be equitable and fair for justice.
I want and need justice for my financial survival.
My fearing being homeless while Mr. Marzen makes approximately $200k or more a year and my being destitute is not fair (equitable) to me or representative of justice.
… It financially hurts me by knowingly using a lower and inaccurate resource for the value. It greatly diminishes my accurate marital value.
…I need the assets (and liabilities) to be accurate so I am not financially harmed anymore than I have been. I must insist to financially protect myself. I discussed and stated that since Mr. Marzen quit paying legal fees after Halley's retainer…I have had to pay fees and the money is borrowed/loaned and I have to get it back…. we needed to use it wisely.
…Based on our consultation conversation, representations, and communications you would not put me in a financial position of running out of money to pay divorce fees. You agreed and were supposed to (per your email) at the right time go to opposing counsel for the fees. The right time would have been before I ran out of money and my running out of money to pay for the remainder of the divorce is not what we agreed. This is a very emotional and stressful situation that I'm in….
These are items which you represented you would do when I hired you. You represented and confirmed you would do certain actions. I would have preferred you had been forthright during our consultation and also disclosed the conflicts. I felt blindsided when I was informed of the conflicts. I hope you understand where I'm coming from.
I am genuinely asking... Why did you take my case? Did you take my case for billable hours which is what Mr. Marzen said…I am not accusing you. I need to know so I know what steps to next take to protect myself and my financial survival.

You may not have ever been in my financial situation therefore cannot truly understand how fearful and stressful and what a toil this has taken. I am terrified, immensely

54

stressed, weep daily, I'm in shock, depressed and angry to discover that all that I worked so hard for - for so many years is gone and I'll never be able to have children because of this attorney who insists he's trustworthy and ethical and acts with integrity because he is an attorney is a fraud and con artist. Most people would feel the same way if they were in my situation.

I would have never dreamt in my entire life that I would be in this nightmare of a quandary. I am sorry but considering my plight, I cannot make concessions that are to Mr. Marzen's further financial benefit and my further financial loss. I hope you can at least try to understand where I'm coming from, my bleak future and situation, and compassionately empathize.
Thank you.
Laura

43. A confidential source told Laura (paraphrased) the person(s) hoped Laura "got justice, if she wanted a fair trial to find an attorney outside of Tallahassee (Florida) and out of the reach of FSU."

44. November 9, 2020 6:57pm – Laura was necessitated to text Mr. Chad Marzen to stop making cruel and untrue statements about her, he was refusing to provide a settlement offer that did not keep her in debts and financially trapped in the marital home with him, "I'm documenting via text that I have repeatedly asked you not to speak to me. So I'm now putting it in writing. You've lied about me and what I have or have not said. You have said I'm evil (that is not true), I'm a fraud (that is not true), I'm not beautiful (that's your opinion), I forced you to marry me (that is not true), my own mother didn't love me (that is very cruel and you have known my mother is dead), et cetera along with other very unkind and untrue comments towards and about me. You have made untrue comments about my nephew's death and stated it's up to parents to decide if there's an investigation into a suspicious death. That is not true or from what I understand is the law. I have not discussed with you what is going on since you filed for divorce. It is not your place to tell me to move on from researching and investigating and obtaining the truth and justice pertaining to my nephew's death. I've repeatedly stated your treatment is unkind, I feel is very cruel, I've told you it's upsetting, and I cry everyday.

I've told you repeatedly not to talk to me. As I've stated before we can live in the home without conversing. I do not know how else to politely tell you there is no need for you to converse with me. I have no desire for us to converse unless it's about our home or Flurry.
You've said I do not want to divorce which is not true. I very much do. My prior attorney and I both asked you to send a reasonable offer and the marriage could be over quickly. You've threatened to make me homeless which as a woman is a very scary thought. I feel the need to tell you again that not my choice to live with you and I had my dream home that would be been paid off. I lived in South Carolina where I had friends, family, and a career in insurance of over 16 years. Due to the extremely long hours I had an attainable plan to retire early. I could have been at least semi retired with a paid off home.

55

For whatever reason you choose to offer me a maximum in mediation that was less than my half of the retirement and less than $40k and you said only part of that I would get and the remainder I would not be able to access until you retire. The amount you offered in mediation was less than $40K. That was not even half of my share of the retirement and did not include any other applicable assets. You have had more than ample opportunity to settle and end this but for whatever reason you insist on dragging this out and going to court. I do not object and I look forward to going to court since that's what it will take to end this.

Again, please do not converse with me unless it's pertaining to our home or Flurry. Thank you.

Please disregard any typos.

Any and/or all electronic and/or verbal communications are not to be shared and/or distributed without my written consent."

45. November 2020 – The court knowing I was Pro Se, deprived my rights to a jury trial, discovery, hearings, Laura's email was incorrect by one letter off, among other continued patterns of unlawful conduct. Laura emailed the court the case was not ready for trial. Attorney Foster had withdrawn as counsel then emailed the court to set a trial date and refused to correct her Motion to the court knowing it was incorrect. (October 16, 2020 Exhibit). It appears Ms. Foster works for the State or courts.

46. November 19 2020 – Opposing Counsel, violated due process of law and emailed as a courtesy the Judge's Order setting a non-jury trial when Laura had emailed the Court that the case was not ready and told opposing party she would have a jury trial. Laura was never sent proper or meaningful Notice or a Notice for Readiness of Trial. Attached reflects Opposing Counsel's email and the Judge's Order which clearly reflects an incorrect email address for Laura. When in earlier 2020, Laura was told her email would be changed at the court to harm her, she did not believe it but much later saw it.

47. December 2020 – Laura filed with the Florida State Court, as Pro Se, a request for a Stay and Continuance for needed discovery, assets, the ability to hire counsel, among other issues. She continued to be denied access to her financials, assets, and court proceedings. She also informed Local Law Enforcement and at the Court house that she was scared, she was told her constitutional rights are and would be violated, the Judge exactly as she was told actions or inactions would happen to harm her (Laura), they were. Later, Laura went to the local sheriff's office at the Court officer's suggestion. Laura told them that her premarital and marital assets were allegedly stolen/embezzled, extorted, unlawful conversion, etc. and Laura was told if she left the state in the Subaru, the only working car she had, she would be arrested, among other issues. Law enforcement stated that since Laura had no bruises there was nothing they could do for the abuses, et cetera. Laura also informed Law Enforcement that she had told Mr. Marzen if he, Marie Mattox and others did not return and provide restitution for her properties and assets, she would file criminal complaints and repeatedly objected (did not consent) to their doing so. Laura previously worked in insurance and despite Mr. Marzen's statements that requesting or

demanding Restitution is illegal, insurance companies and others do it and it is not unlawful for Laura to do. Law enforcement did confirm that it was not unlawful/illegal for Laura to request or demand Restitution, in fact law enforcement prefers Laura do so, as it saves tax payer dollars with investigative resources, indictments, trials, and prison costs. In addition to statements that the court would falsely accuse and arrest Laura for crimes she did not commit, Mr. Marzen also stated they all agreed for him not to submit all accurate financials, money would be hidden in attorneys trust accounts to harm Laura, alimony and other laws would not be followed and they would use an upcoming bill which had not passed to further harm Laura. Incidentally, Pennington law and Attorney Anna "Dina" Foster, in an email addressed Mr. Marzen's not paying alimony because of a bill in the house which factually allegedly violated contracts, fiduciary duties, deprivations of constitutional rights, post facto constitutional violations, among other serious harms.

2021

1.  Similar unlawful conduct, violations, and harms against Laura continued.

2.  Laura's December 2020 filed request for a Stay and Discovery with the Florida Court continued to be ignored.

3.  February 2, 2021 – Exhibits reflect Laura's Fourth Request for discovery continued to be denied while opposing counsel and documents reveal later the court continued to make false, cruel and untrue statements about Laura, falsely stated she hired and fired attorneys, that she committed extortion when in fact what she sent were settlement offers, falsely stated she committed misconduct (before the court) by delaying the court case – all of which are provable false statements. Laura still has not received all requested accurate financials and discovery to present date in 2025.

4.  March 2, 2021 Laura was denied a jury trial to her property (over $20.00) and was told she had 7 days to find a place to live, pack and move in order to receive any money. If she did not accept, she would still have to move out of her home (the martial home) but with no money, which would have made her homeless. In the Florida State court case Laura's evidence was prohibited from court yet the judge ruled against her Hooker v. Hooker case while prohibiting Laura's evidence from being presented. Judge Barbara Hobbs continuously made cruel and untrue comments about Laura and also stated that Laura committed misconduct despite Laura's provable comments and evidence that it was not Laura but Mr. Marzen committed misconduct and refused to provide discovery and a settlement offer, was psychologically, verbally, financially abusive to Laura including criteria of involuntary servitude, human trafficking, cruel and inhumane treatments, severe long term sleep deprivation, very painful physical injuries, emotional and financial harms; the court took part in unlawful restraints by refusing and ignoring Laura's statements of needs for restroom breaks since she was physically very sick, suffering from severe stomach and bodily pains, profuse hemorrhaging, among other

harms, and pushed Laura past her emotional and physical threshold into trauma responses of fight, flight, freeze, fawn, and temporary memory loss with Laura stated her mother and nephew would testify on her behalf to their lies but Laura's mother died the year before and her nephew died in 2016. Knowing this less than 24 hours later they had Laura who was still suffering agree to a settlement because as her attorneys stated that if Laura did not agree the judge would/may rule Laura would get nothing. Later, Laura emailed the Court and others raising concerns of extortion, coercion and embezzlement while Laura was clearly very physically sick and could not correctly recall the year – also violating Federal and as Laura specifically addressed violating Florida Statutes. The last day of Court Judge Barbara Hobbs made statements as Laura has put the statement from transcript on social media that she prayed Laura did not lose health care insurance. There were clearly communicated violations of the ADA and VAWA which the courts and others were aware and informed; yet harms originating in Florida and South Carolina continued.

5. June 15, 2021 – Court records continued to make cruel, untrue and false light type statements about Laura.

6. Laura was blocked from electronically accessing her Court records. Mr. Jon Mickler with the Florida Court and IT department via email needed Laura's IP address since Laura had been blocked from the court records.

7. Laura emailed the Florida Court and subsequently others including the Governors and in 2021, 2022, 2023, 2024 including prayers for relief, describing and providing evidence of what attorneys referred to as serious constitutional violations and harms with subject and electronic communications addressing harms to Laura including and not limited to: Excerpts emails 7-22-24, May 8, 2023 - May 28, 2021 Fwd: URGENT DEMAND/Prayer for Relief-No Plausible Deniability. No Immunity. FINANCIAL frauds in Millions in harms (known by multiple State Officials, etc); Factually alleged: Conspiring, Criminal Malicious Intent, Frauds before the Federal & State Court amongst crimes to "destroy me, make me destitute so I would die", Violations of the DEFEND Trade Secrets Act, Title IX, SEC Violations, Violations of the RICO Act, Federal Tax Codes, Crimes Against Humanity, Abuses/Psychological Torture, Computer Crimes/Hacking, Intentional Serious Injuries/Crimes of Mayhem, Financial Bondage/Financial Indebtedness/Financial Entrapment Financial Imprisonment/Work without pay, Breaches of Fiduciary Duties, Breaches of Legal Duties, Dereliction of Duty/Violations of Oaths, et cetera. Forward to the Chief Financial Officer's Office (under health insurance or other funds) for Legally required payments/DEMANDS/compensation/relief

8. Laura refused to provide Max Factor Law, Max Factor, Eric Schab and Mr. Chad Marzen or anyone else with her Power of Attorney. (To date, Laura has refused to provide others with her Power of Attorney. Laura has refused to grant others to be her 'next friend" including those who have asked and most especially denied requests from others that she had not known for many years.

58

9. Laura continued to be prohibited from accessing her South Carolina inherited paid off home, accurate financial discovery, and inherited assets.

10. During a hearing in Palm Beach, FL, Judge Barbara Hobbs required Laura to vacate her marital home in order to receive necessary funds to survive, despite Laura experiencing severe sleep deprivation and ongoing financial, physical, and emotional harms.

11. Laura signed a lease with Sentinel Real Estate Corporation and Windward Long Point Apartments. Despite compliance, she was repeatedly denied rights under federal fair housing, VAWA, and other statutes.

12. March 23, 2021 – SC Attorney Gary Crawford, it was stated, sent correspondence to the Florence SC court and Personal Representative regarding Laura's denied access to inherited properties. Laura continues to be blocked from financial and property records.

13. Laura's electronic access to the Florida court systems was blocked; IT specialist Jon via email stated he needed access to Laura's IP address.

14. Laura continued to request discovery from Florida and South Carolina Court cases as her exhibits reflect.

2022

1. Laura continued contacting FSU via emails to Lisa Scoles. Laura still has not been provided any reason as to why her Constitutional and Due Process rights were violated, suffered financial harms exactly as Mr. Marzen stated.

2. Refusals and deprivations of rights under the color of law, obstruction continued in Florida courts and Florida State University Continued to deprive Laura of due process of law and information related to her financial losses, financial and marital standing in the Marzen v FSU Court Case.

3. From: Laura Grice <LauraEGrice@aol.com> Date: March 3, 2022 at 3:38:58 PM EST To: Lisa Scoles <lscoles@fsu.edu> Subject: Re: Prior Subpoenas FOIA or Public Records 2
Attorney Scoles, please kindly email me the following: 1. I know depositions were taken in Gregory Jason Smith's lawsuit and Attorney Darren Prum's lawsuit. Were depositions taken Chad Marzen's lawsuit? If so, please kindly email the depositions to me.; 2. How much was Attorney Marzen paid for the Union Grievance (due to not receiving Summer classes in 2019)?; When and how were payments issued?;3. Was Attorney Marzen paid directly or indirectly by Florida State University's Foundation or any other foundation? If so, what foundation, what were the amounts/benefits, and what were the dates of payments? Thank you in advance. ...Laura-Elizabeth Grice...

4. March 24, 2022 documents and court records reflect PR offered or provided properties including the car to third party's, refused to list the home when a realtor stated she would list the home at 225K all day long and continued to harm Plaintiff Laura, and on April 28,

2022 Plaintiff, Laura, emailed Attorney Gary Finklea regarding her need of the car and preserving the rights and interests of all beneficiaries which they did not do. Plaintiff, Laura, addressed her rightful properties and assets being prohibited from her communicated to the Personal Representative, "…I respectfully request as executor that you please act in good faith without bias or spitefully toward any beneficiary. The Court, Judges, Attorneys, High Ranking Officials, Governors, Attorney General and others knew the Personal Representative breached fiduciary and legal duties and having informed them of harms to Laura.

5. April 28, 2022 Plaintiff, Laura, was emailed by a Judge, "If you are not in agreement with what the PR is doing then you should get an attorney to represent you in this matter. The Probate Court does not need to see these types of emails between you and the attorney for the PR. Once you have retained a new attorney, have them file a Notice of Representation with Probate Court. Your Attorney will need correspond with Mr. Finklea and if something needs to be done, they will request a hearing and you can address these matters with the Probate Court…." Starting in 2020, Plaintiff, Laura, had been denied hearing as Pro Se knowing Laura did not have money to hire an attorney and continuously denied the beneficiary, Laura, access to the Courts while knowing her Constitutional rights to her properties were deprived (then later disbursed to others and diminished).

6. May 2022, Laura was forced to contact Charles Schwab to access her financial accounts and records related to her inherited assets which she should have received in 2020.

7. Charles Schwab Financial – Laura to date has been denied all financials, discovery and financial look backs at least 3 years from the date of death since Laura had been told her rightful inheritance had been transferred to others prior to Laura's mother's death and possibly after death. In May, during a phone conversation, a Charles Schwab Representative, who provided the name of Carl, then later a person at the local Mount Pleasant SC Charles Schwab could not provide her any information and stated there were no records to view and had no idea how the money appeared into an account. The amount over $70,000.00 appeared to be a very diminished amount.

8. August 1, 2022 Court Record via the Transcripts reflect the Court was informed of Laura's serious health conditions, unbeknownst to Laura until she saw the transcripts, this was a bench trial in which she did not and does not consent (previously was denied meaningful access to the court – abuse of process, denied hearings, a jury trial, among other serious harms. Transcripts reflect there was an insurance claim after the sell of Laura's home which she was not informed of and had not received any proceeds (alleged embezzlement), related to a real estate closing on Laura's home there was no due process, deprivations, denials, and diminishments of Laura's rightful property (continuously to date), that others including third parties had unjust enrichments and at Laura's financial and other serious harms when she was charged for their household bills. Laura continuously to date had been denied access (a key or key code since the locks had been changed) to her rightful lawful property when she was financially trapped, unlawfully restrained, suffering from abuses, severe sleep deprivation among other harms in the Florida marital home which contributed and aided in harming Laura by prohibiting her

financial ability to leave the Florida Marital home. Laura discovered via the transcripts her attorneys brought zero exhibits and laws despite what Laura provided to them, it was addressed the car which Laura needed to purchase via her deprived and denied inheritance was factually via electronic communications first offered to a third party, Paula Sanderson and refused to provide Laura with needed repairs, the car was taken from the estate property to the personal representative and Mr. William Stokes home. Ms. Stokes addressed in electronic communications (paraphrased) Will did not believe there was a leak from the gasket pan (as the mechanic stated) because they did not have a leak on their driveway. The car at the time of death did not need new tires which possibly reflects others and potentially third parties were driving Laura's car. There was an insurance claim and all financials with a 3 year look back from the date of death, a detailed contents inventory sheet, among other properties have not been provided to Laura. Despite violations and deprivations of Laura's rights which contributed to unlawful restraints, abuses, physical, emotional, financial and other harms Attorney Jay Jordan allegedly committed perjury by stating the personal representative had no ill will. Via evidence and Laura's factual verbal and written communications over the years, Laura suffered and continues to suffer.

The Officers of the Court who received documentation which stated otherwise allegedly had knowledge of via court records and communications between Laura, conspired against Laura's constitutional rights, deprived Laura of her Constitutional, Civil and other rights, committed frauds before the Court, perjury/subornation of perjury, obstructed justice, committed misprision of felony, wire fraud, insurance fraud (payments), financial frauds, aided in harming Laura physically when they knew she had health issues, harmed her emotionally and caused preventable undue stress, continuous embezzlement of Laura's rightful assets (via her inheritance and money her mother had set aside for her), which prevented Laura from obtaining suggested medical treatments to help alleviate physical pains, false light cruel and untrue statements about Laura, among other issues.

9. September 14, 2022 despite continuous emails the harms continue to date with documented refusals to provide Laura with discovery and information, as noted in the email from Andrea White, General Counsel Second Judicial Circuit at the Leon County Courthouse in Tallahassee, FL 32301 "Mrs. Grice Your additional requests have been received and we are in the process of reviewing them to determine if court administration has responsive documentation. Thank you. Sincerely, Andrea" Court attorney Andrea White to date never provided FOIA or court records requests including Who and how many times were changes made to Laura's email address one letter off, deprivations of constitutional rights (hearing, court dates without providing discovery, non-jury despite Laura's objections), failure to provide Notice, Laura's ignored filings, ALL financials, evidence of false accusations against Laura committing misconduct, if it's ethical, legal, customary conduct, and/or etc. for the Judge to act as Opposing Counsels' CoCounsel, Laura was asked if she filed bar complaints against Marie Mattox and Darren Prum, refusing to let Laura have a restroom break despite Laura's repeated communications for a needed restroom break that it was stated others could hear, who all had or was provided access or was on the Zoom hearing. Unbeknownst to Laura without her knowledge and consent which violated crime victims' rights, HIPPA rights, doxing, violations: of the Defend Trade Secrets Act, Sherman Act, Hobbs Act, Trezevant v. Tampa, Constitutional

Rights, Federal statutes, Misprision of Felony, Gang Conspiracy against Rights, Wire Fraud, Perjury, Subornation of Perjury, IIED, intentional physical injuries since Laura was suffering from severe long term sleep deprivation, severe physical pains and profuse hemorrhaging, deprivations of Laura's evidence, violations of Equal Protections, threatened if Laura filed bar (or criminal) complaints – Tampering with the Victim, Witness and Informant, falsely stated Laura had been committing misconduct before the court without true and accurate evidence because if there is evidence it's fraudulently/ falsely manufactured since Laura has accurate and true evidence she did not drag out the divorce or misuse the Court but factually alleges the court deprived Laura of rights with serious detrimental known intents and continued to do so – to date in 2025, among other factually alleged violations.

10. As exhibits reflect, similar consistent patterns of violations and harms against Laura continued despite her objections and continuous injuries.

11. October 22, 2022 emails reflect despite knowing Laura is a victim (VAWA) and of domestic abuse and coercion, Mr. Wallace "Jay" Jordan who is chair of ethics sent Laura a document which reflects he forwarded information to Mr. Chad Marzen, an opposing party, and the person Laura was also necessitated to send factually alleged criminal complaints which attorneys called very serious crimes committed against Laura. Despite November 10, 2022, addresses the courts refusal to accommodate Laura due to illness and physical health issues (alleged ADA violations). There were follow up emails to Mr. Jordan, who was Laura's legal counsel, asking why he forwarded information to the prior marital home, since Laura had not lived there since 2021; and there were subsequent emails 2022 – 2025 in which Laura has consistently not been provided information including for the Court to provide Jurisdiction among other serious harms.

12. December 30, 2022 – Ms. Ashley Green at Windward Long Point Apartments, forwarded an email to Mr. Chad Marzen despite the fact Laura's previously informed Windward Long Point/Sentinel Real Estate Corporation that Laura was a victim of crimes, victim of abuse and not to contact Mr. Marzen. Laura previously informed law enforcement, officers of the court and others of harms and had requested a Protective and Restraining Order against Mr. Marzen.

2023

1. December 2023 – Laura experienced mail theft at Windward Long Point and was instructed by Ms. Pam Williams not to notify law enforcement. Despite Laura's requests and agreements to provide video surveillance to show to stole Laura's mail package, Laura was never provided the information. After days, weeks and months of request Laura was necessitated to email a Preservation of Evidence. Laura was told by manager Cheryl Nead that the Surveillance evidence had been deleted and rerecorded over itself – alleged misprision of felony, mail theft/mailfraud, obstruction of justice, deletion of felony mail theft via concealing, destroying and tampering with evidence.

2.  In 2025, she reported Sentinel and Windward Long Point's evidentiary alleged felonies, concealment of felonies and other violations to the New York Attorney General, which assigned a case number confirming Laura's report's credibility.

2024

1.  Laura continued to contact state officials and agencies, including governors and the SC Attorney General, to recover property and protect her safety.

2.  Requests for surveillance footage from Sentinel Real Estate Corporation and Windward Long Point Apartments were denied; footage was later reportedly deleted after 30 days.

2025

1.  Thomas Howard, with Brownlee Whitlow and Praett, refused and refuses to date to provide discovery necessary for Laura to file federal civil claims, including factually alleged HUD violations, VAWA violations, retaliatory eviction, fraud, obstruction of justice, failure to file in a court of jurisdiction, Mount Pleasant SC magistrates court refusal to provide due process of law and meaningful timely notice, refusal to provide jurisdictional standing and a court of record for constitutional right to appeal, concealed from electronic records Laura's notices, motions, and filings but electronically posted Windward Long Point's filing which was provably material misrepresentations of fact, violations of equal protections, crime victims' rights, ADA, VAWA, ultra vires, obstruction to access of an article III court with jurisdiction (which Laura discovered through research, reading, learning that municipal agencies and some courts do not always have jurisdiction. Similarly, as in her other cases courts either refused to provide lack of jurisdictional standing or the courts knew there was not jurisdiction yet continued, among other violations of constitutional, civil, fundamental, common law, natural law and basic human rights. Plaintiff, Laura had recently was informed courts must provide full disclosure of lack of jurisdiction and cannot deny hearing, access to the courts, abuse process, deny rights to jury trials, courts with jurisdiction, among other harms which occurred in every court case in Florida and South Carolina.

2.  Federal and state procedural violations, including due process, jury trial rights, and access to discovery, persisted. Laura continues to be subjected to financial harm, asset deprivation, and obstruction of legal remedies. Laura was forced on June 12, 2025 to send Final Pre-Suit Notice and Demand to Florida regarding Willful refusals to provide remedies for harms and alleviate pains have exacerbated and prolonged worsening painful injuries from continued, preventable, willfully inflicted harms and premeditated gross negligence…life threatening and potentially fatal. Given that Risk Management and other state officials have been repeatedly notified starting in at least 2019, and also via my ongoing emails to date and additional demand in 2024 - that this situation is life-threatening, continued inaction. These actions and inactions may now be legally deemed premeditated indifference to ongoing, life-threatening harms and injuries, which could become potentially fatal if remedy is not provided…These communications meet all

elements of formal demand under Florida law, high ranking officials, politicians, and Risk Management has been aware of the life-threatening nature of this matter for years. If settlement is not reached within 7 calendar days or less, I will proceed with litigation in the U.S. District Court for the District of South Carolina Charleston Division, including but not limited to: • 42 U.S.C. § 1983 - Deprivation of rights under color of law (and also Title II of the ADA) • Civil Theft (§ 772.11, Fla. Stat.) • Trade Secret Misappropriation (Fla. Stat. § 688) • Intentional Infliction of Emotional Distress • Fraudulent Inducement and Unjust Enrichment • Civil RICO (18 U.S.C. § 1962) - Based on a pattern of racketeering acts including but not limited to wire fraud, extortion, coercion, mail fraud, and obstruction of justice, carried out by affiliated individuals and institutions under color of law.

3. June 9, 2025 regarding case 2025-228 2025CV1011100225 Continued Violations of Due Process of Law among other issues which Laura was necessitated to send Factually Alleged State/Federal Crimes of Mail Theft, Violations of Due Process of Law, Constitutional, Civil, Equal Protection rights, Converting Government Property/ Court into an instrument of crimes, Obstruction of Justice, Violations of Federal Statutes, Felonies, Action for Neglect to Prevent, Intentional Premediated Malicious harms continued, multifaceted harms, Tampering with a Victim Witness Informant, theft of property, work without pay, violation of the Hobbs/ RICO Act, Motion to Dismiss to be filed in Federal Court, Protective and Restraining Orders, et cetera. Governor Ron DeSantis, Governor Henry McMaster, Attorneys General and others were notified via electronic communications. This specific case appears to Governor Henry McMaster's municipal agency yet if Laura's constitutional, civil, due process, fundamental, and basic human rights had not been violated, and her rightful properties had been obtained via the Florida federal and state courts and South Carolina state courts then Laura would have owned multiple properties and would not have been necessitated to rent and subjected to further multifaceted physical, emotional, financial, economic and other losses.

4. Laura submitted declaratory factually alleged criminal complaints to federal and state authorities, including Congress and Formal Requests for Congressional Oversight Investigations, regarding ongoing violations of her constitutional, civil, and property rights.Laura was forced in her lawful fight for justice, her properties, harms and survival to send Declaratory Factually Alleged Criminal Complaints against the Defendants.

5. July 11, 2025 Laura was necessitated to send requests for Congressional Oversight and Investigations and to the United States Inspector General regarding only the 4 Court Cases of which she was aware at that time.

6. August 9, 2025 Laura discovered another court case involving Laura's property, a paid off home, which she had been unlawfully prohibited to accessing which kept her unlawfully restrained/false imprisonment in the abusive Florida home. The Court file reflects Ms. Amy Stokes was the Plaintiff, Laura Grice was a defendant in which a lien was filed on Laura's rightful property. Laura discovered this by chance when looking for

another court case. Laura was never notified by SC Attorney Gary Finklea, there was no certificate of service in the 2022 Court case which the Clerk of court and Court should not have permitted. Laura did not and to date does not consent.

## V.     IMMUNITY DOES NOT BAR CLAIMS FOR RELIEF

38. Immunity does not apply in this case, as there is no immunity for individuals or officials acting under the color of law who violate Plaintiff's constitutional, civil, fundamental, common, and natural law rights, including basic human rights. These violations have stripped her of dignity and severely hindered her ability to survive. The Defendants' actions have led to continuous harm, and they bear ultimate responsibility for the ongoing violations.

A. Congressional Exceptions and Supreme Court Precedents

1)     Violence Against Women Act (VAWA) and ADA/ Rehabilitation Act: Congress has provided exceptions in cases involving acts like the Violence Against Women Act (VAWA), as well as denials of access to the courts and properties, which are at the core of Plaintiff's claims. These laws specifically address harms related to violence, discrimination, and deprivation of constitutional rights and rightful properties to needed for survival.

2)     Tennessee v. Lane (2004):
The U.S. Supreme Court ruled in *Tennessee v. Lane*, 541 U.S. 509 (2004), that the Americans with Disabilities Act (ADA) validly abrogated Eleventh Amendment immunity, enabling plaintiffs to pursue claims in federal court. This ruling reaffirmed the fundamental right of access to the courts, particularly for individuals with disabilities. As in the Florida and South Carolina Courts were informed as Plaintiff needed accommodations for physical health issues including in Florida access to restroom breaks for profuse rectal hemorrhaging (not hemorrhoids) which was denied and in South Carolina requested accommodations for health issues were denied. Incidentally, in both cases when Laura mentioned or filed complaints – as documented, she was told she better not and in South Carolina the Judges emailed her valid redress (to the SC Attorney General, Federal Authorities, ODC, Media) the courts perceived as threats and if she continued the Court would Sanction her. Per attorneys the statements to Laura, were highly illegal and would have been false imprisonment and fines. Laura alleges continued unlawful restraints on constitutional rights and liberties, bills of attainder, malicious prosecution, IIED, et cetera. The Court held that violations of both substantive and procedural due process specifically, the right to access the courts could proceed despite state immunity claims. The Court found that Congress had sufficiently documented the barriers disabled individuals face in accessing courthouses, thus justifying the abrogation of immunity under §5 of the Fourteenth Amendment. The principles established in *Lane* apply to the present case, where Defendants' actions have prevented Plaintiff from exercising her fundamental and basic human rights.

B. The Clearfield Doctrine and Waiver of Immunity

    1)    Clearfield Trust Co. v. United States (1943):
The Supreme Court's decision in *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943), established that when the federal government engages in commercial activities, it relinquishes its sovereign immunity and is treated as a private entity for legal purposes. The Court held that when the government enters into commercial transactions, it is subject to the same laws as private corporations. This doctrine applies here, where the State of South Carolina and other Defendants are acting in commercial capacities, such as in the distribution of taxpayer-funded incentives to corporate entities like Scout Motors, which subsequently relocated its headquarters, undermining the public interest and misappropriating government resources.

The Clearfield Doctrine demonstrates that Defendants lose their immunity when engaging in commercial transactions and are thus subject to the same legal consequences as any private corporation. Therefore, they should not be shielded from liability in this case.

    2)    Recent Developments in South Carolina:
The South Carolina government's actions in awarding over a Billion and $400 million cash in taxpayer-funded incentives to Scout Motors, as reported in recent news, further illustrate the commercial activities that fall under the Clearfield Doctrine. The State's involvement in such transactions, especially when they have harmed Plaintiff, Laura, by denying her fundamental rights, access to courts, and properties (including intellectual and labor and aspects of her S Corp company which similarly occurred and related to the Court cases in Florida), should not be protected by immunity.

C. Waiver of Immunity and Constitutional Violations

    1)    Florida and South Carolina Defendants:
Both Florida and South Carolina have waived their immunity through their actions. Specifically, Florida waived immunity when it transferred the state court case involving Plaintiff's intellectual property and financial claims (Marzen v. Florida State University) to federal court, where immunity was effectively waived. Federal court records confirm this transfer, further substantiating that immunity was waived and that Plaintiff's claims, including violations of her constitutional and civil rights, should be heard in federal court.

    2)    Plaintiff's Claims of Constitutional Violations:
Plaintiff, Laura, has suffered egregious constitutional violations, including but not limited to involuntary servitude, peonage, and denial of access to courts. The Defendants have knowingly and willfully deprived Laura of her rights to life, liberty, and property, including intellectual property and trade secrets. Their actions, including unjust denials of hearings and lack of due process in both state and federal courts, have caused ongoing harm and continue to jeopardize Plaintiff's survival.

    3)    RICO, Hobbs, and Sherman Acts Violations:
Plaintiff alleges that Defendants' actions amount to violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, the Hobbs Act, and the Sherman Antitrust Act, particularly with respect to obstructing justice, extorting Plaintiff, and

engaging in a conspiracy to violate her constitutional rights. These violations demonstrate a pattern of intentional harm and misconduct, which further waives any claim of immunity.

4)    Additional Legal Doctrines and Precedents:
Plaintiff's claims also fall under established doctrines such as *Trezevant* (restrictions on fundamental liberties), *Fraud on the Court*, *Fruit of the Poisonous Tree*, *Monell*, and *Ultra Vires*, among others. These doctrines, along with numerous Supreme Court rulings, support Plaintiff's right to pursue relief despite claims of immunity.

D. The Defendants' Continued Violations and Plaintiff's Ongoing Harm Plaintiff has faced severe, ongoing harm due to the Defendants' actions, including physical, psychological, and financial injuries. Despite numerous communications with both Florida and South Carolina authorities, the Defendants have failed to provide any remedy or stop the ongoing harms. The actions taken by Florida State University, South Carolina officials, and others in positions of power are directly responsible for preventing Plaintiff from accessing her court rights, freedom to travel freely, family rights (such as Laura visiting her dying mother), and rights to property. Plaintiff has been subjected to unlawful practices such as forced labor, denial of compensation, and obstruction of justice, which constitute violations of the *Thirteenth Amendment* and *Civil Rights Act* protections. These actions, combined with the Defendants' being informed therefore knowledge of the preventable inflicted harms, allegedly leave them liable under both civil and criminal statutes.

VI.    CAUSE OF ACTION / CLAIM FOR RELIEF

39. Plaintiff realleges and incorporates by reference all allegations set forth in the Statement of Facts as though fully set out herein, and states that each predicate act relevant to this count is described with particularity in the Petition, the Statement of Facts, the Table of Authorities, and/or Exhibits.

40. Plaintiff further alleges that, in each instance described in the foregoing claims, Defendants knowingly concealed the commission of criminal acts, including fraud, obstruction of justice, and other violations cognizable under federal law, thereby committing misprision of felony, 18 U.S.C. § 4.

41. Defendants' condoning or concealment of criminal activity contributed to Plaintiff's injuries, impeded her access to the courts and legal remedies, and demonstrates Defendants' coordinated

intent, collaboration, culpability, and complicity in the unlawful schemes, establishing ongoing patterns and practices including violations of the Monell Doctrine, as Defendants acted with knowledge of the wrongful conduct and refused to take corrective measures within agencies and/or with others. Defendants' actions constitute intentional, willful, and wanton misconduct, as Plaintiff's injuries were foreseeable and entirely preventable. Despite repeated emails over several years in which Plaintiff communicated need and had pleaded for assistance, informed Defendants of her suffering, injuries and life-threatening harms, yet they consciously disregarded her rights, safety, and property, acting with deliberate indifference to the preventable pain, fears, and suffering they caused to Laura.

42. Count I: Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961-1968

Defendants and others formed, operated, or participated in an enterprise within the meaning of 18 U.S.C. § 1961(4), which previously existed separately from the individual defendants and engaged in activities affecting interstate commerce.

Defendants conducted or participated in the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5). The racketeering activity included, but was not limited to, obstruction of justice, obstruction of criminal investigations, witness tampering, fraud, wire fraud, embezzlement, misappropriation of assets, abuse of process, threats of harm, conspiracy, collusion, and other coordinated acts intended to defraud, injure, and deprive Plaintiff of property, assets, and civil and constitutional rights.

These predicate acts were related and continuous, forming a "pattern of racketeering activity" under 18 U.S.C. § 1961(5). As a direct and proximate result of Defendants' conduct which condoned Plaintiff to preventable prolonged physical and emotional suffering, injury to property, financial harms, and other damages.

43. Count II: Civil RICO Conspiracy - 18 U.S.C. § 1962(d)

Defendants and others conspired via condoning, collusion, complicity, and/or culpability formed and operated an enterprise within the meaning of 18 U.S.C. § 1961(4), which previously existed separately from the individual defendants and engaged in interstate commerce. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5) harming Laura. If Defendants had not done so, Laura would not have been harmed.

44. This pattern of racketeering included, but was not limited to, wire fraud, mail fraud, misprision of felony, obstruction of justice, crimes of violence, and other acts intended to harm, injury, defraud and deprive Plaintiff of property, assets, safety, security in her person, property and papers, civil, and constitutional rights. These actions and inactions and court cases commingled, crossed state lines, involved electronic communications, converting the courts into instruments of crimes, involve retaliation, tampering with a victim, witness, informant, among other violations of Plaintiff's Constitutional, fundamental and basic human rights.

45. Some harms were facilitated not only through defendants being complicit, complying, culpable but also by Governors Ron DeSantis via his office, referring Laura to the Florida Bar via email, despite the Bar having no jurisdiction over state agencies, criminal matters, constitutional violations, and/or federally protected rights. Similarly, the South Carolina Attorney General Alan Wilson's office, an Agency of Governor Henry McMaster's, similarly on the Attorney General's official website refers constitutional or alleged criminal complaints to the South Carolina Bar Association, which lacks jurisdiction over these issues.

46. Governors, as chief executives of their states, oversee state agencies and employees; Governor Henry McMaster oversees South Carolina agencies including SLED, the Attorney General's office, and municipal courts, while Governor Ron DeSantis oversees Florida agencies

including the Chief Financial Officer's office, Florida State University, the Florida Lottery, Courts, and other agencies, as documented on his official website.

47. The Bar Associations' actions or inactions by either dismissing valid documented complaints, as in South Carolina, or failing to respond, as in Florida - further reflect coordinated misconduct acting in concert, connected to multiple predicate RICO violations, and Conspiracy against Plaintiff's rights. Additionally, Laura's property (and homes) were embezzled, and official websites and/or electronic communications confirm that there were no instructions or referrals made to the Realtors' Association, while constitutional, federal and/or criminal violations were referred to the Bar Associations by Governor Henry McMasters's agency – the Attorney General Alan Wilson, and Governor Ron DeSantis in which Florida State University, the Courts and others also fall under the purview of his agencies as Governor.

48. As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered injury to her life by harming her good health, she nearly died and lost years of good health, properties, significant financial losses, and continuous deprivations of civil and constitutional rights.

49. Count III: Civil Rights Violations – 42 U.S.C. § 14141 (Pattern or Practice of Unconstitutional Conduct) Defendants, law enforcement, officers of the courts, and others, conduct included engagement in systemic unlawful practices including unlawful restraints, deprivations of freedoms of liberty and movement, denial of access to courts, abuse of process, and abuse of power under color of law, creating a pattern of unconstitutional conduct that deprived Laura of her Constitutional and Civil Rights under the color of law actionable under 42 U.S.C. § 14141. As a direct and proximate result of Defendants' actions and systematic misconduct of gross negligence, reckless disregard for Plaintiff's life and ability to survive, Plaintiff suffered deprivations of civil and constitutional rights and related draconian harms.

50. Count IV: Conspiracy and Violation of Constitutional Rights, 42 U.S.C. §§ 1983 & 1985

Defendants conspired, agreed, and/or acted together to interfere with and deprive Plaintiff of the equal protection of the laws and the equal privileges and immunities guaranteed under the Constitution. This conspiracy included coordinated actions by law enforcement actors, court actors, other state-associated individuals and associations (the Bar Association) who used their positions under color of law continuing to act in concert to obstruct Plaintiff's access to legal remedies, deny her constitutional protections, and shield wrongful conduct from accountability.

Defendants deprivations and retaliation include but are not limited to continuous: interfering and obstructing Plaintiff's ability to assert her constitutional rights; abusing state authority to deny Laura meaningful and substantive access to constitutional and federal protections and the courts; using official positions and/or positions of power to suppress complaints, investigations, or accountability measures to delay and deny justice as Plaintiff was forewarned with intents to destroy her and prohibit her survival and right to life; deprivations of due process, discovery, equal protection, hearings, jury trials; creating and/or maintaining systematic barriers to prevent Plaintiff from obtaining redress, remedy and relief; coordinated actions intended and which did protect and support and in many instances provide financial or other benefits to wrongdoers' threats and extortion, coercion, frauds, embezzlement, involuntary servitude, and other violations and unlawful harmful acts which to date continue to deprive Plaintiff of Constitutional, Civil and other protections.

52. As a direct and proximate result of Defendants' conspiracy against constitutional and other fundamental rights, Plaintiff suffered deprivation of constitutional rights, serious injuries to life and health, property, financial and economic losses, and other harms.

53. Count V: Interstate Stalking, Harassment, and Coercive Threats – 18 U.S.C. § 2261A (VAWA Civil Remedy)

Defendants condoned, supported, or failed to prevent, engaged in harassment, coercion, unlawful restraints, false imprisonment, intimidation, threats, and stalking behaviors that crossed state

71

lines and were also carried out through intrastate and interstate electronic communications.

54. These acts included communications, threats, coercive behaviors, and patterns of intimidation originating in or affecting both Florida and South Carolina, intended to manipulate, control, frighten, or retaliate against Plaintiff. Defendants' support for such acts, their failure to intervene, and the misuse of authority under color of law contributed to a pattern of conduct falling within the scope of 18 U.S.C. § 2261A and related protections under the Violence Against Women Act (VAWA).

55. As a direct and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, physical harms, loss of liberty, and other damages.

56. COUNT VI: Americans with Disabilities Act (ADA), Preventable Serious Physical Injuries, and Disability-Related Harms (42 U.S.C. §§ 12101 et seq.)

Defendants' actions and omissions caused Plaintiff serious, preventable painful physical injuries and long-term physical and emotional harm. Defendants, acting under color of law or in positions of authority, engaged in conduct including unlawful restraints, coercion, intimidation, retaliation and threats which resulted in severe physical pains and injuries that significantly affected Plaintiff's physical condition, her ability to function without ongoing pain, and materially altered and hindered her prior healthy active lifestyle.

57. Defendants further discriminated against Plaintiff based on her physical health needs and resulting disabilities by knowingly failing to provide reasonable accommodations, by disregarding serious physical health issues, medical information, abuses and restraints inflicting trauma, and by taking actions that worsened her injuries. Defendants' conduct created and exacerbated disability-related limitations, and caused Plaintiff preventable physical harm, emotional distress, duress, and other injuries altering her prior active and healthy lifestyle within the context and in violation of the ADA.

58. As a direct and proximate result of Defendants' conduct, Plaintiff suffered preventable physical injuries, disability-related harms, emotional distress, financial loss, economic harms, and other damages.

59. COUNT VII: Mail and Wire Fraud (18 U.S.C. §§ 1341–1343)

Defendants, affiliated parties, or others with Defendants' knowledge used the United States mail and interstate electronic communications to transmit, conceal, and perpetuate material misrepresentations, false statements, omissions, and/or fraudulent documents. These acts included, but were not limited to, the preparation, submission, distribution, and use of fraudulent financial affidavits, falsified filings, misleading communications, and other deceptive materials intended to deprive Plaintiff of property, assets, access to truthful information, and fair access to the courts.

60. Defendants' use of interstate wires, emails, electronic filings, and mailings constituted a continuing course of fraudulent conduct carried out across state lines. These fraudulent communications were used to manipulate proceedings, mislead agencies, obscure unlawful activities, prevent discovery of wrongdoing, and effectuate the diversion, concealment, or misappropriation of Plaintiff's property and assets.

There was also known mail theft of Laura's mail package, during which, despite requests for video surveillance, she was informed that the surveillance video had been deleted by rerecorded over itself. Despite request for icloud type discovery of surveillance – again, all requested discovery was denied.

61. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered financial losses, deprivation of property, obstruction of legal rights, emotional distress, and other damages.

62. COUNT VIII: Securities Fraud

Defendants were informed of material misrepresentations, omissions, and fraudulent statements regarding Plaintiff's stocks, bonds, and other investment interests and via their agencies, employees of, or those licensed through their agencies. Defendants' condoning actions and

73

omissions were intended to deceive, mislead, harm, and induce Plaintiff into reliance, resulting in financial harm and deprivation of lawful rightful properties. Then related to an agency court case that did not fully disclose lack of jurisdiction, financial accounts, tax returns, property and other discovery was with withheld from Plaintiff.

63. The agencies, other parties, and Charles Schwab, through wire transmissions, have refused to provide Plaintiff with her lawful entitlement to all relevant documents and inherited assets which Plaintiff started requesting verbally and via writing and emails in 2020, when her mother passed away, and despite subsequently requested through her SC lawmaker attorneys who agreed to obtain discovery then refused to do so. Plaintiff discovered via transcripts her attorneys brought in zero evidence, zero laws, did not object to false statements, false light, allegedly condoned perjury and subornation of perjury, allocation of Plaintiff's deprived, denied, and diminished properties to others, did not object thus conspired with frauds before the courts, violated due process of law and Plaintiff's rights to a Jury Trial, which similar happened in Florida Court Cases.

64. Such requests included discovery, requests for stay/continuous to obtain discovery, related to Laura's inherited assets a three to five year look back from the date of death, of all financial accounts through the present to ensure there was no embezzlement in anticipation of death to harm Plaintiff, and for proper accounting, and transfer of assets. Thereafter, Plaintiff visited a local Charles Schwab branch in Mount Pleasant, South Carolina, and was informed that no records regarding the account previously existed and that the source of funds exceeding $70,000.00, received more than one year after her mother's death, could not be identified. Despite repeated efforts, Plaintiff continues to be denied discovery and all rightful property.

65. Defendants knowingly engaged in acts constituting securities fraud, including concealment of information, falsification of financial records, and misrepresentation of investment conditions and rights. These acts directly and proximately caused Plaintiff to suffer monetary losses, diminished investment value, and the improper diversion of assets intended for Plaintiff's benefit.

66. COUNT IX: Insurance Fraud

Defendants engaged in acts of insurance fraud by condoning or committing false representations, withholding material information, benefits, and otherwise interfering with insurance policies and claims affecting Plaintiff. This includes, but is not limited to, a policy established in 2016 for over $4 million for Plaintiff's benefit, which was intended to secure her financial stability and a property insurance claim on a paid off home. Plaintiff Laura discovered by reading court transcripts there was an insurance claim(s) and payments denied to Laura yet to others gain.

67. Defendants' actions and omissions were deliberate and intended to mislead, deprive, or misappropriate benefits to which Plaintiff was lawfully entitled. These actions caused financial harm, improper denial of insurance benefits, and other losses to Plaintiff.

68. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered financial loss, deprivation of property, emotional distress, and other damages.

Plaintiff seeks compensatory damages, treble damages where allowed, rescission of improperly denied or diverted insurance benefits, punitive damages, and equitable relief as the Court deems just and proper.

69. COUNT X: Obstruction of Justice / Tampering with Victims, Witnesses, or Informants

Defendants directly or indirectly interfered with lawful proceedings, investigations, and Plaintiff's access to justice by concealing, deleting, or withholding evidence, falsifying records, falsifying documents, and tampering with victims, witnesses, or informants. In 2017, for example, SLED forwarded Plaintiff's suspicious activity report and exhibits to the alleged wrongdoers and sent a letter confirming that this had occurred, demonstrating willful interference. Similar actions of obstructions, harms, and retaliations continued in both Florida and South Carolina.

70. Defendants' conduct obstructed Plaintiff's ability to pursue legal remedies, compromised the

integrity of official investigations, compromised Courts and Agencies, and furthered wrongful acts committed against Plaintiff.

71. As a direct and proximate result of Defendants' obstruction and tampering, Plaintiff suffered denial of access to justice, financial loss, emotional distress, and other damages.

72. COUNT XI: Violation of Privacy / Unauthorized Access
Defendants, or individuals whose conduct they condoned, accessed or intercepted Plaintiff's electronic communications, records, and other private information without authorization. This included communications between Plaintiff, her mother, and other parties in Florida and South Carolina, which were obtained and disclosed without Plaintiff's consent.

73. Defendants' unauthorized access and disclosure caused Plaintiff to suffer harm, including loss of privacy, emotional distress, compromise of sensitive information, and facilitation of further unlawful acts against her. Defendants' conduct violated Plaintiff's rights to privacy and security in her communications and personal information.

74. As a direct and proximate result of Defendants' actions, Plaintiff suffered compensatory and punitive damages and seeks injunctive and equitable relief to prevent further unauthorized access or disclosure.

75. COUNT XII: Fraudulent Conveyance / Asset Dissipation
Defendants were culpable, conspired, complicit, or otherwise compliant in the transfer, concealment, or dissipation of Plaintiff's assets to deprive her of property to which she was legally entitled. For example, Mr. Chad Marzen stated that Plaintiff's assets would be transferred and hidden from her in attorneys trust accounts, and that the courts and others would deny discovery, constituting a coordinated effort to harm Plaintiff with statements starting in 2019 of intents to destroy Laura, make her destitute and homeless so she would die. These interferes with Plaintiff's financial rights and continue to cause serious harms.

76. Defendants' conduct directly and proximately caused Plaintiff to lose rightful property, suffer financial harm, and experience obstruction of her ability to maintain control over her assets. These actions were part of a broader pattern of misconduct intended to deprive Plaintiff of property and lawful remedies.

77. COUNT XIII: Breach of Oath of Office

Court actors and public officials, including judges, prosecutors, and other governmental employees, failed to uphold their duties, mismanaged proceedings, and allowed or participated in unlawful acts or constitutional violations against Plaintiff. These failures constituted breaches of their oaths of office, resulting in denial of access to justice, interference with Plaintiff's property and rights, and other harms.

78. Defendants' conduct directly and proximately caused Plaintiff to suffer deprivation of property, obstruction of legal remedies, emotional distress, financial loss, and other damages.

79. COUNT XIV: Civil Conspiracy Against Rights (42 U.S.C. §§ 1983 & 1985(3))

Multiple Defendants, including attorneys, judges, fiduciaries, government officials, and third parties, acted in concert to interfere with Plaintiff's constitutional rights, property, and lawful remedies. Defendants coordinated their actions, omissions, and endorsements of unlawful conduct, including deprivation of property, obstruction of justice, retaliation, and denial of access to the courts, thereby forming a conspiracy to violate Plaintiff's federally protected rights. As Plaintiff was told starting in 2019, the intents and goal was so she would die.

80. These coordinated acts directly and proximately caused Plaintiff to suffer physical, emotional, financial, economic and other harms. The Defendants' concerted actions constitute a civil conspiracy actionable under 42 U.S.C. §§ 1983 and 1985(3).

81. COUNT XV: Conversion / Misappropriation of Property

Defendants condoned, participated in, or directly caused the diversion, misappropriation, or unauthorized taking of Plaintiff's property, including her Greenville, SC home; Tallahassee, FL home; Florence, SC home; cash; stocks; bonds; inherited assets; assets and/or properties set aside solely for Laura by her mother, intellectual property; trade secrets; and potential patents. Defendants acted without Plaintiff's consent or lawful justification, depriving her of property and interfering with her lawful ownership and control.

82. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the loss of

property, financial harm, emotional distress, physical and other damages.

83. COUNT XVI: Breach of Fiduciary Duty

Defendants or affiliates, acting as fiduciaries, owed Plaintiff a legal duty to preserve, protect, and manage her property and financial interests. These fiduciaries failed to uphold their duties, allowed or participated in the misappropriation of Plaintiff's assets, and were informed yet continued to neglect obligations despite knowing the harms to Plaintiff.

84. As a direct and proximate result of Defendants' condoning breaches, Plaintiff suffered financial loss, deprivation of property, physical and other harms.

85. COUNT XVII: Unjust Enrichment

Defendants and/or third parties received and retained benefits, including Plaintiff's assets and property, without legal justification and at Plaintiff's expense. The Defendants were aware that the benefits were improperly obtained, yet condoned and failed to enforce return or disgorge them.

85. As a direct and proximate result of Defendants' conduct and complicity, Plaintiff suffered financial harm, deprivation of property, and other losses.

86. COUNT XVIII: Intentional and Negligent Infliction of Emotional Distress / Duress

Defendants engaged in extreme, outrageous, and/or coordinated conduct causing severe emotional harm, duress, and distress to Plaintiff. This conduct included threats, harassment, unlawful deprivation of her property, obstruction of legal remedies, coercion, abuses, cruel and inhuman treatment, unlawful restraints, deprivations of fundamental rights and freedom of travel, and interference with Plaintiff's ability to protect her rights. Defendants' actions were intentional, willful, or negligent, and directly caused Plaintiff to experience emotional suffering, mental anguish, and physical manifestations of harms from stress.

Defendants' conduct directly and proximately caused Plaintiff to suffer emotional distress, duress, mental anguish, safety, was injured, and suffered other compensable damages.

87. COUNT XIX: Negligence / Breach of Duty / Premeditated Preventable Harms / Willful and Wanton Misconduct

Defendants and/or others affiliated owed Plaintiff a legal duty to act lawfully, protect constitutional rights, her property and other rights, and prevent foreseeable harm. Defendants breached these duties by failing to act, by obstructing legal processes, filing fraudulent documents, and allowing or participating in preventable harms, all of which were reasonably foreseeable. Certain acts were willful, wanton, or premeditated, resulting in preventable injuries and economic, physical, and emotional harm to Plaintiff.

88. As a direct and proximate result of Defendants' negligence and misconduct, Plaintiff suffered financial loss, deprivation of property, physical and emotional injuries, and other damages.

89. COUNT XX: Sherman Act Violations

Defendants condoned and/or permitted or engaged in anti-competitive, extortionate, and unlawful conduct primarily through court cases and government property that interfered with Plaintiff's property rights, financial opportunities, and federally protected interests. These actions were intended to restrain trade, manipulate markets, and deprive Plaintiff of lawful economic advantages, in violation of the Sherman Antitrust Act.

90. As a direct and proximate result of Defendants' conduct, Plaintiff suffered economic losses, lost profits, deprivation of property, lost business opportunities, and other damages.

91. COUNT XXI: Hobbs Act Violations

Defendants engaged in or condoned acts of robbery, extortion, threats, and coercion intended to deprive Plaintiff of life, liberty, and property. Defendants' conduct included condoning or participating in threats of harms and also to those she loves, financial harms, sanctions, and intimidation communicated verbally or electronically in Florida and South Carolina. These acts interfered with Plaintiff's constitutional and federally protected rights and constituted crimes under the Hobbs Act.

92. As a direct and proximate result of Defendants' actions, Plaintiff suffered financial loss,

deprivation of property, emotional distress and duress, and other damages.

93. COUNT XXII: Breach of Contract

Defendants condoned or participated in failure to honor contractual obligations owed to Plaintiff. Defendants' breaches included failure to perform agreed-upon duties, failure to preserve or protect Plaintiff's rights and assets, and other acts constituting nonperformance under legally enforceable agreements.

94. As a direct and proximate result of Defendants' breaches, Plaintiff suffered financial loss, deprivation of property, and other damages.

95. COUNT XXIII: Human Trafficking / Involuntary Servitude / Peonage (18 U.S.C. §§ 1581–1595)

Defendants, having knowledge of such actions, condoned and permitted conduct that coerced Plaintiff into performing unpaid labor and work, restricted her freedom, and exercised control over her through threats, intimidation, and other coercive means. As a result, Defendants' conduct deprived Plaintiff of her liberty, subjected her to involuntary servitude, and violated federal statutes prohibiting peonage, slavery, financial indebtedness, isolation, restrictions of freedom of movement, unlawful restraints, threats of harm, injuries, and human trafficking.

96. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of freedom, emotional distress, physical and mental harm, and deprivation of property and lawful rights.

97. COUNT XXIV: Defend Trade Secrets Act Violations (18 U.S.C. § 1836 et seq.)

Defendants condoned the misappropriations of Plaintiff's trade secrets and/or intellectual property, including but not limited to materials related to her solely exclusively woman owned S Corporation and with 100 percent ownership of all shares, in her attempts to protect her work from purloining and for economic interstate commerce. Defendants' conduct involved unauthorized access, use, and disclosure of Plaintiff's proprietary information for their, affiliates, or others own benefit, without Plaintiff's consent, and in violation of federal law protecting trade secrets.

98. As a direct and proximate result of Defendants' misappropriation, Plaintiff suffered loss of

property, financial harm, and damage to her competitive and economic interests.

99. COUNT XXV: Interference with Prospective Economic Advantage

Defendants condoned or participated in intentional interference with Plaintiff's prospective economic relationships, contracts, and business opportunities. Defendants' actions disrupted Plaintiff's financial arrangements, professional engagements, and anticipated economic benefits, including through threats, coercion, injuries, deprivations of rights, security within Laura's person and papers, and unlawful conduct.

100. As a direct and proximate result of Defendants' interference, Plaintiff suffered financial loss, deprivation of property, and other economic and consequential damages.

101. COUNT XXVI: HUD / Fair Housing / VAWA Housing Violations

Defendants condoned or participated in the denials of Plaintiff's property, housing rights, engaged in discrimination, and violated protections under HUD regulations, the Fair Housing Act, the Violence Against Women Act (VAWA), and other applicable federal laws. Defendants' conduct included deprivations of constitutional rights resulting in loss of property, resulting in renting a home instead of access to properties and rightful assets to purchase properties. This resulted in Plaintiff Laura being forced to sign a lease to avoid unlawful judicial orders and threats of homelessness which subsequently resulting in renting instead of owning a home then also knowledge of a retaliatory eviction, misrepresentations of material facts before the court, deprivation of rights, conspiracy against constitutional rights, obstruction of justice and access to the courts, interference with Plaintiff's right to safe housing, destruction or theft of mail and surveillance evidence, and obstruction of Plaintiff's access to the courts. These acts were part of coordinated efforts that violated Plaintiff's federally protected rights and caused her harm.

102. As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of housing, deprivation of property, emotional distress, and other damages.

103. COUNT XXVII: Doxxing and False Light / Violation of Constitutionally and Federally Protected Privacy Rights / Unlawful Disclosure of Private Communications / Doxxing / Privacy Violations (ECPA / SCA / Privacy-Tort Theories)

Defendants, affiliated agencies, or individuals whose conduct they condoned, knowingly

81

published, disclosed, or disseminated Plaintiff's personal, private, and sensitive information publicly and/or to third parties without Plaintiff's consent. These actions included, but were not limited to, posting or sharing identifying information, private communications, financial details, health information, and other personal data, with the intent to harass, intimidate, retaliate, inflict emotional and/or other harms to Plaintiff Laura.

104. Defendants condoned or participated in conduct that placed Plaintiff in a false light by misrepresenting her actions, character, or circumstances to the public, governmental agencies, courts, and private parties, causing reputational harm, emotional distress, financial harms, and interference with Plaintiff's personal and professional life. Such conduct violated Plaintiff's constitutionally and federally protected privacy rights, including rights under the First and Fourteenth Amendments, and applicable federal statutes protecting electronic communications and personal information.

105. As a direct and proximate result of Defendants' actions, Plaintiff suffered invasion of privacy, emotional distress, reputational damage, interference with property and business opportunities, and other harms.

## VII.    DAMAGES – PLUS TREBLE DAMAGES

106. These restraints on liberty, combined with the ongoing acts and/or omissions of Defendants, Have continued through the present date in 2025. Defendants' conduct, both through affirmative Acts and deliberate failures to act, has caused serious, ongoing, and preventable injuries. Plaintiff has suffered from substantial painful physical harm, emotional distress and duress, financial and economic losses, and constitutional harms, including ongoing deprivation of liberty, restrictions on personal movement, deprivations and loss of properties, financial indebtedness, isolation from loved ones, and other preventable physical, emotional, and economic injuries.

107. These harms have caused significant and lasting detriment to Plaintiff's well-being, safety, and ability to exercise her constitutional rights. The continuing nature of Defendants' and/or

affiliates conduct constitutes ongoing violations of Plaintiff's constitutional rights and federal law, thereby tolling any applicable statute of limitations. Plaintiff further asserts that the ongoing and continuous nature of the injuries constitutes a continuing violation for purposes of both damages and tolling. In support, Plaintiff cites *Trezevant v. City of Tampa*, 741 F.2d 336 (11th Cir. 1984), as well as other authorities recognizing that the unlawful restraint of liberty constitutes a serious deprivation warranting compensatory relief. Plaintiff's damages will be established at trial through evidence demonstrating the duration, severity, and impact of the alleged restraints and related injuries.

108. Defendants acted under color of law, deliberately and willfully violating Plaintiff's clearly established constitutional rights. No immunity shields such acts, as they fall outside the scope of lawful official duties. Plaintiff reserves the right to supplement and quantify damages through discovery and at trial.

## VIII.    PRAYER FOR RELIEF

109. Plaintiff alleges that Defendants, acting jointly and severally, owed Plaintiff a duty of care and breached that duty, among other wrongful acts set forth herin. As a direct and proximate result, Plaintiff suffered damages.

110. Pursuant to S.C. Code Ann. § 15-38-15, and consistent with the Erie Doctrine established in the Supreme Court Case, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), Defendants are jointly and severally liable for the full amount of damages recoverable herein, as their combined negligence was a proximate cause of Plaintiff's injuries. The named Defendants' fault exceeds fifty percent (50%), thereby subjecting them to joint and several liability notwithstanding the involvement of other affiliated actors', parties, entities, or agencies.

111. WHEREFORE, Plaintiff respectfully requests, and in the interest and spirit of justice demands,that judgment be entered against Defendants, jointly and severally, for all relief sought herein, including but not limited to compensatory damages, punitive damages, costs, and

such other relief as the Court deems just and proper.

1)  Award Compensatory damages including but not limited to: all economic, financial, and non-economic harms, including deprivation of property, assets, business opportunities, income, emotional distress, and consequential harms and damages in an amount to be determined at trial;

2)  Award Punitive damages for conduct demonstrating malice, oppression, fraud, and willful disregard for Plaintiff's constitutionally and federally protected rights in an amount sufficient to deter and punish similar conduct in the future against each Defendant for willful, wanton, intentional, malicious, reckless, or in callous disregard of Plaintiff's rights;

3)  Award Declaratory and injunctive relief declaring that Defendants' conduct violated Plaintiff's Constitutional, civil, statutory and federal rights;

4)  Award Equitable Relief including, but not limited to, Injunctive relief prohibiting further restraint, interference, unlawful conduct, return of misappropriated properties, reversal of fraudulent transfers, recission of unlawful contracts, return insurance benefits, preserve and reimbursement for labor and work, misappropriations of trade secrets, and all other intellectual properties, compensate and prevent further deprivation of Plaintiff's liberty, freedom of movement, and fundamental rights; also preventing Defendants from continuing or repeating the violations alleged herin;

5)  Restitution, Replevin, or recovery of all assets, funds, any real, intellectual, any benefits, other property losses caused by Defendants actions;

6)  Specific Performance - Enforcing contractual obligations or oaths wrongfully denied or ignored by Defendants;

7)  Treble damages pursuant to applicable federal statutes, including the Racketeer Influenced and Corrupt Organizations Act (RICO) and Sherman Act, for all recoverable losses caused by Defendants' participating in or condoning unlawful conduct;

8)  Injunctive Relief - To prohibit Defendants from continuing unlawful acts, including harassment, retaliation, threats, interference with Plaintiff's property and rights, and further violations of federal and state laws;

9)  Grant such other and further relief as the Court may deem just and proper under law or equity, including but not limited to costs, attorney's fees, and any other just remedies;

10) Plaintiff further demands a trial by jury on all claims so triable.

### IX.     JURY DEMAND

112. Plaintiff asserts her Seventh Amendment right to trial by jury on all issues so triable and seeks all remedies available under federal law, including damages and injunctive relief. Plaintiff has submitted a separate Motion for a Trial by Jury in accordance with the applicable local rules.

### X.     EXHIBITS

113. See Attached Exhibits listed in Chronological Order

Exhibit 1 - January 10, 2018 – 2017 emails related to Florida State University and Plaintiff's research, discovery, and harms to Plaintiff

Exhibit 2 - April 19, 2018 Response from United States Inspector General – forwarded Laura's investigative exhibits and complaint to the Criminal Division

Exhibit 3 - July 20, 2018 email to Governor Henry McMaster and South Carolina Law Enforcement Division addressing SLED's letter to Plaintiff Laura that they had forwarded Laura's Evidentiary Suspicions as a Victim, Witness, Information which they provided to the alleged criminals, also attached is the April 19, 2018 response from the DOJ/United States Inspector General, with response from letter to Inspector General, Plaintiff, and Laura's investigative suspicions and exhibits

Exhibit 4 - February 27, 2019 Mr. Chad Marzen forwarded Plaintiff, a draft email in which he said FSU has caused my wife and I financial harm; Mr. Marzen stated he was sending the email to Nancy with the Union regarding the claims against FSU for retaliation and discrimination

Exhibit 5 - October 7, 2019 through August 14, 2020 – Emails to the Florida Chief Financial Officer's Office

Exhibit 6 - January 30, 2020 Affidavits for Laura Grice from her mother, Gail Grice, addressing

Mr. Marzen's harms to Laura and deceitful statements to induce Laura into marriage, and cruel

treatment towards Laura including alienation of affection, Mr. Marzen's depriving Plaintiff,

Laura, of intimate sexual martial relations

Exhibit 7 - February 13, 2020 Judge's Order reflecting Plaintiff's email was changed one letter

off, as she had been forewarned it would happen to harm her

Exhibit 8 - April 27, 2020 – emails addressing bullying and disrespect towards Plaintiff,

isolation, Plaintiff's offer to settle was on the table, addressed alleged frauds and extortion,

Florida State University case, Plaintiff's sacrifices based on his lies,…

Exhibit 9 - June 9, 2020 – addressed Plaintiff's need to relocate, harms, Plaintiff will not be

around to enjoy the benefits of her labor, lack of confidentiality privileges, knows where a few

bones are buried, suspected his intents to hide assets (from FSU or Plaintiff), Plaintiff intents to

be a witness to the Federal case

Exhibit 10 - August 5, 2020 Court Order addressed violations of Plaintiff's Constitutional, Basic

Human, and other Rights, unlawful restraints and deprivations of her freedom of travel,

Plaintiff's premarital car was left undrivable and with a flat tire, Mr. Marzen did not want

to repair it and wanted exclusive use of the Subaru, frauds before the Court or misrepresentations

of Material facts regarding having to drive when FSU provided a van and driver, et cetera

Exhibit 11 - August 20, 2020 email from Attorney Williams confirming filings to destroy

Plaintiff and leave her with nothing, her financial accounts had approximately $25.00 and $80.00

but there were autodrafts so it would be less, Mr. Marzen refused to provide counter settlement

so Plaintiff could leave, attorney Williams needed to file a lien with FSU (Plaintiff had been

deprived of due process of law involving her financial and other losses

Exhibit 12 - October 16, 2000 Attorney Anna "Dina" Foster's email that she will not correct her motion for withdrawal which did not state the withdrawal was previously undisclosed conflicts of interest and Laura was informed Mrs. Foster stated to set a Court date knowing Laura was not ready for trial and still needed discovery.

Exhibit 13 - November 19, 2020 Attached exhibit of Violations of Due Process of Law, No Notice for Readiness for Trial, No Notice for Trial at all was sent to Laura, who was Pro Se. Laura received a courtesy email from opposing counsel with an attached Court Order for a NonJury Trial, reflecting again the Court's usage of an incorrect email for Laura, (Plaintiff Laura had stated she wanted a jury trial to ensure Justice and a fair trial, emailed the Court she was not ready for trial and needed discovery, a final trial date was set anyway, in December of 2020 filed with the Court a Request for a Continuance and needed discovery and to prepare for trial which the Court ignored and denied (denials of all discovery continue to present date in 2025)

Exhibit 14 - February 22, 2021 Response to Husband's Response to Wife's Fourth Request to Produce addressed bullying and extortion of Plaintiff's assets, Plaintiff had not extorted Mr. Marzen, but as a homemaker whose prior assets had been depleted due to his manipulative conduct, she pleaded with him, who made over $200,000 (public record via FSU), to offer a settlement to resolve the case.

Exhibit 15 - March 2, 2021 Court ordering Plaintiff, Laura, to move from her home and property without a jury trial, in order to received funds to live on, states the order is valid in all jurisdictions but Plaintiff Laura was told the Florida State Court did not and does not have jurisdiction for federal questions, third party contracts, et cetera

Exhibit 16 - March 23, 2021 Attorney Gary Crawford, who sadly is now deceased, sent a letter to the Personal Representative, Mrs. Amy Stokes, to Plaintiff Laura, and Laura was told also to the

Court addressing Mrs. Stokes denying Laura with a key to a home, to provide Laura a key to the home, she is an equal owner, and has the right to a key, just as you and Jason do. To date, Plaintiff Laura never received a key (or key code) to the home or all discovery.

Exhibit 17 - June 15, 2021 the Florida Court and others made cruel and untrue comments about Plaintiff, Laura, constituting false light and further intentional multifaceted harms.

Exhibit 18 - June 9, 2022 email sent to Governor Ron DeSantis, email exchange with is office who referred Laura to the Judicial Counsel/Bar when Laura reported violations of Constitutional Rights, deprivations of rights/discrimination acting under the color of law, federal issues and alleged crimes which crossed state lines by those paid by the State of Florida; Plaintiff, Laura, asked what jurisdictional purview the Judicial Counsel has (over continuous alleged violations of serious nature) with forwarded emails dating back to 2021

Exhibit 19 - September 1, 2022 through noted 2021 to Governor Ron DeSantis and the Florida Bar's response that they do not have jurisdiction. (The FL Attorney General's Office also referred Laura to the Bar Association.) Redacted emails to avoid duplication since they are also included in other exhibits (in example July 17, 2024 - 2021)

Exhibit 20 September 14, 2022 Andrea White, General Counsel to the Leon County Courthouse responded stating, "your additional requests have been received…process of reviewing to determine responsive documentation (to Plaintiff emails requesting who changed Plaintiff's email one letter off, all (opposing party's) discovery as mandated by Florida's Manadatory Disclosure Act, hearings, et cetera dating back to Plaintiff's prior email (string from 2021 addressing continuous requests for discovery, violations of constitution and civil rights, unlawful restraints, Laura's physical, emotional, financial and other injuries, deprivations of rights acting under the color of law, requested who changed Laura's email one letter off, et cetera

88

Exhibit 21 - October 7, 2022 to 2020 string of emails to SC Attorney General Alan Wilson and others addressing factually alleged violations of conspiring (conspiracy against rights), violations of Laura's constitutional, civil and other rights acting under the color of the law, requested a Freeze, Stay, and clawbacks for Laura's allegedly embezzled assets, deprivations of properties, harms, et cetera

Exhibit 22 - June 6, 2023 The Florida Attorney General's Office emailed Laura to contact local law enforcement which she already had and to contact the Florida Bar. The Florida Bar previously emailed Laura they do no have jurisdiction which Laura already suspected. Plaintiff, Laura, responded "there are documented alleged frauds in excess of a million, frauds before the court, perjury, abuses, et cetera. I was told the AGs office had a news conference regarding abuses and crimes committed against victims -stating for Victims to contact the AGs office to report crimes. Who should I contact regarding public officials and crimes if not the Attorney General? Thank you very much for your assistance…"

Exhibit 23 - July 17, 2024 through 2021 Emails Urgent Demand. Prayer for Relief. No Plausible Deniability, No Immunity, Harms in the Millions, Alleged Conspiring, Malice, stated intents of Plaintiffs death, violations of the RICO Act, Abuses/Torture, Aspects of Human Trafficking, etc. Court cases which Plaintiff was aware of at that time include: Federal Case 4:20-cv-00220 Lawsuit against Florida State University, President John Thrasher and the Board of Trustees; FL Leon County Case 2019 DR 002716; Florence SC Case 2020 ES 2100458; Florence South Carolina Case 2019 CP 2103072

Exhibit 24 – June 5, 2025 Motion to Dismiss, and June 5, 2025 Motion for Confirmation for Jurisdiction and Court or Record Status, Including Deprivation of Rights under Section 1983, and July 14, 2025 Abuse of Process, Notice of Jurisdictional and Constitutional Objection and

Federal Supremacy (in which Governors Ron DeSantis and Henry McMaster, Attorney General

Wilson, Florida State University and others including Law Enforcement were notified and

informed via email)

Exhibit 25 - June 9, 2025 Violations of Due Process of Law in the Mount Pleasant SC Municipal

Court

Exhibit 26 - June 12, 2025 and prior 2025 Final Pre-Suit Notice and Demand to Florida

regarding Willful refusals to provide remedies for harms and alleviate pains have exacerbated

and prolonged worsening painful injuries from continued, preventable, willfully inflicted harms

and premeditated gross negligence….now life threatening and potentially fatal.

Exhibit 27 - July 11, 2025 – Congressional Oversight Request


Respectfully submitted,

Laura Elizabeth Grice, Pro Se, Sui
Juris
P.O. Box 33
Sullivan's Island, SC
29482
(Physical address is an undisclosed Women's Shelter for Abused Women, where Petitioner is
residing temporarily due to abuses and serious, preventable financial, physical, and other harms,
and to avoid homelessness.)
Contact: LauraEGrice@icloud.com
Cell (text only please): 803-528-1795 Date: November 30, 2025
Footnote: Petitioner respectfully maintains non-consent to disposition by a U.S. Magistrate Judge
under 28 U.S.C. § 636(c).

 Date: December 10, 2025


CERTIFICATE OF SERVICE AND SUMMONS – See Attached Completed Forms

IX. Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I
certify to the best of my knowledge, information, and belief that this complaint: (1) is not being

90

**I.**  **The Parties to This Complaint** *Please see attached Certificate of Service for Defendants addresses and phone numbers*

**A.**  **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name *Laura-Elizabeth Grice*

Street Address *PO Box 33*

City and County *Sullivans Island*

State and Zip Code *South Carolina  29482*

Telephone Number *(803) 528-1795*

**B.**  **The Defendant(s)** *Please text first as I do not answer unknown numbers*

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

Name *Governor Ronald DeSantis in his*

Job or Title
(if known) *individual and official capacity as Governor for the State of Florida*

Street Address *The Alliance Center 113 S. Monroe St.*

City and County *Tallahassee, Leon County*

State and Zip Code *Florida 32301*

Telephone Number *850-717-9337*

Defendant No. 2

Name *Governor Henry McMaster in his individual*

Job or Title
(if known) *and Official Capacity as Governor of the State of South Carolina*

Street Address *State House, 1100 Gervais Street*

City and County *Columbia*

State and Zip Code *South Carolina 29201*

Telephone Number *803-734-2100*

Defendant No. 3

Name *Attorney General Alan Wilson in his individual and Official Capacity as Attorney General of the State of South Carolina*

2

|  | Job or Title (if known) | Attorney General of the State of South Carolina |
|--|--|--|
|  | Street Address | Rembert Dennis Building, 1000 Assembly St. |
|  | City and County | Columbia |
|  | State and Zip Code | South Carolina 29201 |
|  | Telephone Number | 803 |

Defendant No. 4

|  | Name | Florida State University, in its Official |
|--|--|--|
|  | Job or Title (if known) | capacity via Attorney General of the State of Florida. |
|  | Street Address | The capital Office of the Attorney General PL-01 |
|  | City and County | Tallahassee    Leon |
|  | State and Zip Code | Florida 32399-1050 |
|  | Telephone Number | 850-717-9337 |

**II.    Basis for Jurisdiction** - Please see Plaintiff's Petition/Complaint

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

_____

_____

_____

3

presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A. For Parties Without an Attorney I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: December 10, 2025.

Signature of Plaintiff _Laura Elizabeth Brice_

Printed Name of Plaintiff _Laura Elizabeth Brice_

91