**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Laura Elizabeth Grice, | ) | Case No. 2:25-cv-13821-RMG-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Governor Ron DeSantis; | ) | |
| Governor Henry McMaster; | ) | |
| Attorney General Alan Wilson; and | ) | |
| Florida State University, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Laura Elizabeth Grice ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this civil action against Florida Governor Ron DeSantis, South Carolina Governor Henry McMaster, South Carolina Attorney General Alan Wilson, and Florida State University ("FSU") (collectively, "Defendants"). (Dkt. No. 11.) Plaintiff has also filed a Motion for Trial by Jury (Dkt. No. 4); Motion for Emergency Relief (Dkt. No. 5); Motion for Temporary Restraining Order (Dkt. No. 12); and Emergency Motion for Referral to Article III District Judge (Dkt. No. 16). Under 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2) (D.S.C.), the undersigned is authorized to review all pretrial matters in this case and submit findings and recommendations to the assigned United States District Judge. For the reasons discussed below, the undersigned recommends that this action be summarily dismissed without leave to amend, and that Plaintiff's pending motions (Dkt. Nos. 4, 5, 12, and 16) be dismissed.

1

## BACKGROUND

In bringing this action, Plaintiff submitted a 90-page Amended Complaint (Dkt. No. 11) with over two hundred pages of supporting exhibits (Dkt. No. 1-2).[1] The crux of this lengthy pleading is an alleged conspiracy lasting over five years whereby a "[g]ang of powerful prominent people" (Dkt. No. 1-2 at 149)—including Plaintiff's ex-husband, attorneys, judges, and state officials—colluded to "harm, injur[e], defraud and deprive Plaintiff of property, assets, safety, security in her person, property and papers, [and] civil and constitutional rights" by "converting the courts into instruments of crime." (Dkt. No. 11 at 69.) While Plaintiff's rambling allegations are somewhat difficult to follow, she appears to contend that through the course of four legal proceedings[2] (Dkt. No. 1-2 at 153–155), these individuals attempted to "destroy" her life by making her "destitute and homeless so [she] would die. Once homeless [she] would be gang raped, a trafficking victim, tortured, organs harvested, and killed." (*Id.* at 148; *see also id.* at 157, stating, "[s]tarting in 2019, there were consistent documented statements and actions of intents by a group of people to prohibit my survival and end my life.")

---

[1]    Before the Court could complete an initial review of Plaintiff's original Complaint (Dkt. No. 1), Plaintiff filed an Amended Complaint "to correct misnomer of 'Petition' to 'Complaint'" on certain pages of the original pleading. (Dkt. No. 11 at 1.) Although the pleadings are otherwise identical, Plaintiff's Amended Complaint (Dkt. No. 11) replaces the original Complaint (Dkt. No. 1) and governs the scope of this case. *See Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) ("As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect.").

    Notwithstanding the above, Plaintiff did not include the exhibits attached to her original pleading (Dkt. Nos. 1-1, 1-2, 1-3, and 1-4) in filing the Amended Complaint. The undersigned assumes, in an abundance of caution, that these exhibits were omitted in error and therefore considers them as part of the Amended Complaint for purposes of this Report and Recommendation. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that courts must construe *pro se* pleadings liberally to allow for the development of a potentially meritorious case); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (emphasizing "the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities") (internal citations omitted).

[2]    Although the Amended Complaint focuses on four primary lawsuits, the pleading and attached exhibits include brief references to several other civil actions. For example, Plaintiff references a matter against Amy Stokes (Dkt. No. 11 at 8), the "personal representative of the Estate of [Plaintiff's] deceased mother" (*id.* at 19), involving Plaintiff's purported property, "which she had been unlawfully prohibited from accessing. . . . The Court file reflects Ms. Amy Stokes was the Plaintiff, Laura Grice was the defendant in which a lien was filed on Laura's rightful property." (*Id.* at 64.) In another example, the supporting exhibits reference a lawsuit in East Cooper Magistrate's Court brought by Sentinel Real Estate Corporation, Greystar, and Windward Long Point against Plaintiff. (*See* Dkt. No. 1-2 at 178, referencing "Case 2025CV101110028.") Because Plaintiff does not meaningfully discuss these lawsuits in the Amended Complaint, the undersigned's analysis focuses on the four primary matters discussed below.

## I.     Divorce Proceedings

The first legal proceeding stems from Plaintiff's marriage to Chad Marzen, a professor at FSU and a "licensed attorney." (Dkt. No. 11 at 17.) Plaintiff suggests that the marriage was the result of "fraudulent inducement," and that Mr. Marzen "used his position, knowledge, and institutional protections to isolate, financially control, and psychotically impair [her]." (Dkt. No. 1-2 at 198.) According to Plaintiff, Mr. Marzen essentially took control of her finances on the "false promises" that he was "combining all assets," and "all accounts and properties would be jointly owned." (Dkt. No. 11 at 17.) After they were married, "Mr. Marzen . . . depleted [Plaintiff's] assets for his own benefit, including paying his personal debts, mortgage payments, and other obligations." (*Id.* at 18.) Mr. Marzen also used "elements" of Plaintiff's work from "a potential book on insurance and business topics" in a "future publication without her consent and despite her objections." (*Id.*)

Although the Court has been unable to locate any electronic records, Plaintiff claims that the "filings" in her "divorce case"— which apparently occurred in Leon County, Florida (*see* Dkt. No. 1-2 at 155, referencing Case No. 2017-DR-002716)—demonstrate that she "was bullied, treated with disrespect, frauded, [and] extorted" by Mr. Marzen and his lawyers, and that they "consistent[ly] refus[ed] to settle" the lawsuit in good faith. (*Id.* at 129.) Plaintiff claims that these individuals also "[b]locked [her] access to legal divorce documentation" (*id.* at 198) and "the necessary and requested discovery, including all complete financial disclosures." (Dkt. No. 11 at 25.) They also refused to give Plaintiff access to "martial funds," such that she was forced to "request and obtain preapproval for reimbursement of food, feminine products, gas, expenses, etc." (Dkt. No. 1-2 at 155.) Plaintiff claims that she emailed Governor Ron DeSantis about these alleged litigation tactics, but his office referred her to the Florida Bar Association, which "has no

3

jurisdictional purview over violations of Federal Statutes and Constitutional violations." (Dkt. No. 11 at 25.) As a result of these divorce proceedings, Plaintiff claims that she no longer has a home and survives on "very little money." (Dkt. No. 1-2 at 167.)

## II.     Florida State University Lawsuit

The next lawsuit discussed in Plaintiff's Amended Complaint is an action filed by Mr. Marzen alleging "discrimination and retaliation" by FSU. (Dkt. No. 11 at 18.) Plaintiff appears to be referencing Case No. 4:20-cv-220-WS-MAF (Dkt. No. 1-2 at 153), which was initially filed in Leon County Circuit Court (Case No. 2018-CA-1311) in June 2018 and removed to the United States District Court for the Northern District of Florida in April 2020.[3] *See Marzen v. Florida State University Board of Trustees*, Case No. 4:20-cv-220-WS-MAF (N.D. Fla. Feb. 17, 2021)). The case was ultimately dismissed by stipulation of the parties in February 2021.

Although the available state and federal records do not list Plaintiff as a party to this lawsuit, Plaintiff contends that she "was a party to the case with financial standing because when FSU bypassed Mr. Marzen for certain courses, [she] suffered premarital and marital financial losses." (Dkt. No. 11 at 18.) Nevertheless, Plaintiff "was not given proper notice of legal proceedings that affected her, and her rights to present her case, access discovery, and be heard in court were deliberately obstructed." (*Id.* at 14.) For example, Mr. Marzen and his attorneys allegedly rescheduled teleconferences and hearings without notifying Plaintiff and eventually removed the case to federal court "to further prevent [her] from accessing [the lawsuit]." (Dkt. No.

---

[3]     The Court takes judicial notice of the records filed in Case No. 4:20-cv-220-WS-MAF. *See Aloe Creme Labs., Inc. v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970) (explaining that a federal court may take judicial notice of the contents of its own records, as well as those records of other courts); *Tisdale v. South Carolina Highway Patrol*, No. 0:09-cv-1009-HFF-PJG, 2009 WL 1491409, at *1 n.1 (D.S.C. May 27, 2009), *aff'd*, 347 F. App'x 965 (4th Cir. Aug. 27, 2009) (noting that the court may also take judicial notice of factual information located in postings on government web sites).

1-2 at 154.) Plaintiff also suggests that court personnel changed "her email one letter off to . . . prevent her from obtaining filings." (Dkt. No. 11 at 29.)

Moreover, Plaintiff alleges that during the course of the FSU proceedings, she conducted certain "research and discovery" in relation to the case (*id.* at 18), and "continued to uncover evidence of potential misconduct at [FSU]" (*id.* at 23). Plaintiff claims that Mr. Marzen and his attorney later used these "investigative discoveries" (*id.* at 24)—which Plaintiff refers to as "intellectual property" and "trade secrets" (*id.* at 27)—as their own in the lawsuit against FSU "without her consent and without pay." (*Id.* at 25, 27.) Although Plaintiff "clearly communicated that her investigative information . . . could not be shared" (*id.* at 25), the Amended Complaint alleges that Mr. Marzen's attorney also "misappropriated" Plaintiff's "trade secrets and work product" by sharing them with other clients in similar employment disputes with FSU. (*Id.* at 25, 28.)

Plaintiff claims that FSU was aware "of her involvement and standing" in the lawsuit (*id.* at 13), as she informed the school's legal counsel that she had been "denied meaningful access to the courts and her rightful properties"—the latter being a reference to the unauthorized use of her purported "trade secrets." (*Id.* at 14). "Despite being informed of [Plaintiff's] legal standing and the serious violations being committed against her, FSU failed to provide [Plaintiff] with due process." (*Id.* at 13–14.) Plaintiff argues that the university's "failure to intervene" and "refusal to honor [her] legal rights" were a "direct contribution to the ongoing cruelty and injuries inflicted upon her." (*Id.* at 14.)

### III.    Estate of Gail Grice

Plaintiff's Amended Complaint also discusses a legal dispute before the Florence County Probate Court regarding the estate of her late mother, Gail Grice.[4] (*See* Dkt. No 1-2 at 155, referencing Case No. 2020-ES-2100458; *see also* Dkt. No. 11 at 26.) Plaintiff "was informed that she would receive an equal share of her inheritance alongside her brother and sister" (Dkt. No. 11 at 20) as "as an equal owner and beneficiary." (Dkt. No. 1-2 at 133.) Nevertheless, Plaintiff has been denied "access to [her] rightful assets" (*id.*), including, but not limited to, "her inherited home, car, and properties despite informing the court and sending electronic communications to the Personal Representative. . . ." (Dkt. No. 11 at 34.) Plaintiff's "requests for discovery, including property records and financial information" have also been denied by the probate court, and she has continued to be "deprived of such information to date." (*Id.* at 20.) Plaintiff was eventually informed that "her rightful inheritance had been transferred to others prior to [her] mother's death and possibly after death. (*Id.* at 60.)

### IV.    Estate of Bradley Ryan Clark

In November 2016, Plaintiff's nephew Bradley Ryan Clark "tragically died under highly suspicious circumstances." (Dkt. No. 11 at 19.) Since then, Plaintiff has "actively investigated and sought justice for the . . . death of her nephew" by "contacting attorneys, research death investigators, and compiling evidence regarding potential foul play." (*Id.*) During her investigation, Plaintiff learned that Bradley's body had been cremated "despite prior arrangements for an open casket," suggesting potential "destruction of evidence and obstruction of justice." (*Id.* at 20.) Plaintiff also claims that the Florence County Sheriff's Office "made false statements to [her]" in relation to the case and denied certain "Freedom of Information" requests. (*Id.*) To that end,

---

[4]    The Court was unable to locate electronic records of any probate proceedings for Gail Grice. *See* https://www.southcarolinaprobate.net/search/ (searching "Gail Grice") (last visited Jan. 23, 2026).

Plaintiff "submitted evidentiary allegations with exhibits to the South Carolina Law Enforcement Division (SLED)," who then "forwarded [Plaintiff's] confidential investigative materials to the alleged perpetrators." (*Id.*) Although Plaintiff contacted Attorney General Alan Wilson and Governor McMaster regarding SLED's purported misconduct and the "need for a Crime Victim's Advocate," her communications went "unanswered." (*Id.* at 20– 21.)

According to Plaintiff, certain attorneys later used her investigative materials regarding Bradley's death—which she again refers to as "trade secrets"—"without pay" in the civil action filed by Bradley's estate in the Florence County Court of Common Pleas.[5] (*Id.* at 35–36.) Plaintiff also claims that "many cruel, untrue, harmful and false statements" were made about her during the course of this apparent civil action. (*Id.*; Dkt. No. 1-2 at 155–156.) To be clear, Plaintiff was not named as a party in the case, which ended by jury trial on November 20, 2023, in favor of the defendants.

## V.     Present Lawsuit

It is against this procedural background that Plaintiff now brings this case against Defendants, stating that "[t]he preventable harms and injuries and injustices to [her] occurred with [their] knowledge, help, [and] aiding/abetting." (Dkt. No. 1-2 at 195.) Plaintiff claims that she made "repeated requests for intervention" (Dkt. No. 11 at 15) by sending "copious amounts of emails [ ] over the years to [Defendants]." (Dkt. No. 1-2 at 150; *see also* Dkt. No. 11 at 68, referencing "repeated emails over several years in which Plaintiff communicated need and had pleaded for assistance, [and] informed Defendants of her suffering, injuries and life-threatening harms.") Nevertheless, Defendants "intentionally chose not to act" (Dkt. No. 11 at 15) and "consciously disregarded [Plaintiff's] rights, safety, and property. . . ." (*Id.* at 68.) "Through their inaction,

---

[5]     *See* Florence County Public Index, *Amy G Stokes as Personal Representative v. Kinsley Odom,* https://www.sccourts.org/case-records-search/ (searching Florence County, Case No. "2019CP2103072") (last visited Jan. 23, 2026); *see also* Dkt. No. 11 at 35.

7

[Defendants] contributed to the continuation of these crimes and the very serious, near-fatal harms [Plaintiff] endured and continue[s] to endure." (Dkt. No. 1-2 at 206; *see also* Dkt. No. 11 at 15, asserting that "Defendants' continuous failure to act renders them alleged accessories to the ongoing violations. Their inaction, especially after being informed of the harms, leaves them liable for their role in perpetuating these injustices.") Based on these allegations, Plaintiff raises the following causes of action:

| | |
|---|---|
| Count I: | Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961–1968; |
| Count II: | Civil RICO Conspiracy—18 U.S.C. § 1962(d); |
| Count III: | Civil Rights Violations—42 U.S.C. § 14141 (Pattern of Practice of Unconstitutional Conduct); |
| Count IV: | Conspiracy and Violation of Constitutional Rights, 42 U.S.C. §§ 1983 & 1985; |
| Count V: | Interstate Stalking, Harassment, and Coercive Threats—18 U.S.C. § 2261A (VAWA Civil Remedy); |
| Count VI: | Americans with Disabilities Act (ADA), Preventable Serious Physical Injuries, and Disability-Related Harms (42 U.S.C. §§ 12101 et seq.); |
| Count VII: | Mail and Wire Fraud (18 U.S.C. §§ 1341–1343); |
| Count VIII: | Securities Fraud; |
| Count IX: | Insurance Fraud; |
| Count X: | Obstruction of Justice/Tampering with Victims, Witnesses, or Informants; |
| Count XI: | Violation of Privacy/Unauthorized Access; |
| Count XII: | Fraudulent Conveyance/Asset Dissipation; |
| Count XIII: | Breach of Oath of Office; |
| Count XIV: | Civil Conspiracy Against Rights (42 U.S.C. §§ 1983 & 1985(3)); |

Count XV:        Conversion/Misappropriation of Property;

Count XVI:       Breach of Fiduciary Duty;

Count XVII:      Unjust Enrichment;

Count XVIII:     Intentional and Negligent Infliction of Emotional Distress/Duress;
Count XIX:       Negligence/Breach of Duty/Premeditated Preventable Harms/Willful Wanton Misconduct;

Count XX:        Sherman Act Violations;

Count XXI:       Hobbs Act Violations;

Count XXII:      Breach of Contract;

Count XXIII:     Human Trafficking/Involuntary Servitude/Peonage (18 U.S.C. §§ 1581–1595);

Count XXIV:      Defend Trade Secrets Act Violations (18 U.S.C. § 1836 et seq.);

Count XXV:       Interference with Prospective Economic Damage;

Count XXVI:      HUD/Fair Housing/VAWA Housing Violations; [and]

Count XXVII:     Doxxing and False Light/Violation of Constitutionally and Federally Protected Privacy Rights/ Unlawful Disclosure of Private Communications/Doxxing/Privacy Violations (ECPA/SCA/Privacy-Tort Theories).

(Dkt. No. 11 at 68–82.) Plaintiff claims she is entitled to at least $4 billion in damages. (*Id.* at 6.)

In addition to the Complaint, Plaintiff filed a Motion for Trial by Jury seeking an order "direct[ing] that this case be tried before a jury on all issues." (Dkt. No. 4 at 3.) She also filed a Motion for Emergency Relief, requesting that the Court "grant emergency equitable monetary and other relief to sustain life" and "an expedited trial by jury," or, in the alterative, "immediate summary judgment due to the severe, ongoing injuries, and constitutional violations caused by Defendants' unlawful conduct." (Dkt. No. 5 at 1.) Plaintiff claims that as a result of Defendants' actions, she "is suffering extreme financial hardship, physical injury, and severe emotional

distress," and "[t]he ongoing denial of [her] rights, coupled with Defendants' failure to act . . requires immediate relief." (*Id.* at 2.)

Thereafter, Plaintiff filed a Motion for Temporary Restraining Order, reiterating that her "dire situation, caused by the conduct of others and preventable by Defendants, presents irreparable harm to [her] constitutional and other rights, including the right to life, which cannot be remedied after the fact and therefore requires the Court's immediate intervention." (Dkt. No. 12 at 2.) Plaintiff requests "immediate emergency monetary relief in an amount reasonably necessary to cover all essential living expenses, including food, transportation, housing, immediate debt obligations required for survival, and other pressing financial obligations, totaling approximately $16,000 for the next 30 days." (*Id.*)

Finally, Plaintiff submitted an Emergency Motion for Referral to Article III District Judge, stating that she has "not consented to the jurisdiction of the Magistrate Judge under 28 U.S.C. § 636(c)," and asking that the case and her "pending emergency motions" be referred to "an Article III District Judge and addressed within five (5) days or less." (Dkt. No. 16 at 1–2.) Plaintiff seems to believe that the referral will ensure "immediate relief," which is critical given her current financial situation. (*See id.* at 2, noting that any delay "may leave Plaintiff with insufficient time or resources to seek extraordinary relief.") Plaintiff further asks that the Court "[v]acate all orders entered by the Magistrate Judge" as part of this referral. (*Id.*)

## STANDARD OF REVIEW

The Amended Complaint has been filed pursuant to 28 U.S.C. § 1915, which permits an indigent litigant to commence an action in federal court without prepaying the administrative costs of proceeding with the lawsuit. To protect against possible abuses, the court must dismiss any prisoner complaints, or portions of complaints, that are frivolous or malicious, fail to state a claim

upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). A complaint is frivolous if it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992). Accordingly, a claim based on a "meritless legal theory" or "baseless" factual contentions may be dismissed *sua sponte* at any time under § 1915(e)(2)(B). *Neitzke v. Williams*, 490 U.S. 319, 324–25, 327–28 (1989). The United States Supreme Court has explained that the statute "is designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits." *Id.* at 326.

As to failure to state a claim, a complaint filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2) of the Federal Rules of Civil Procedure. In order to satisfy this standard, a plaintiff must do more than make conclusory statements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the court need not accept as true a complaint's legal conclusions). Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. When "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), the complaint fails to state a claim.

*Pro se* complaints are held to a less stringent standard than those drafted by attorneys. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). A federal court is therefore charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case. *Erickson*, 551 U.S. at 94. Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure to allege facts that set forth a cognizable

11

claim under Rule 8(a)(2). *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 390–91 (4th Cir. 1990); *see also Iqbal*, 556 U.S. at 684 (outlining pleading requirements under Rule 8, Fed. R. Civ. P., for "all civil actions"). The Fourth Circuit has explained that "though *pro se* litigants cannot, of course, be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985).

## DISCUSSION

"[T]he district court is entrusted with the discretion to dismiss [a] case for factual frivolousness 'when the facts alleged rise to the level of the irrational or the wholly incredible.'" *See Johnson v. Dep't of Just.*, No. 6:21-cv-1131-MGL-JDA, 2021 WL 6424626, at *3 (D.S.C. Apr. 19, 2021), *adopted*, 2022 WL 105724 (D.S.C. Jan. 11, 2022) (citing *Denton*, 504 U.S. at 33); *see also Van Dyke v. Davis*, No. 1:05-cv-357, 2006 WL 1582396, at *1 n.6 (W.D.N.C. June 6, 2006) (explaining that a court "is permitted to apply common sense and reject the fantastic") (internal citations omitted). Such is the case here, where Plaintiff bases her entire action on the premise that Defendants "colluded, conspired, and acted as co-conspirators" with her ex-husband, various lawyers, judges, and other state officials to violate her rights via the state and federal court systems with the "inten[t] to harm [her] in such a way as to lead to [her] death." (Dkt. No. 1-2 at 206; *see also* Dkt. No. 11 at 67–68, asserting that Defendants' "condoning or concealment of criminal activity contributed to [her] injuries, impeded her access to the court and legal remedies, and demonstrates Defendants' coordinated intent, collaboration, culpability, and complicity in the unlawful schemes" against her.)

To accept such a claim "requires a leap of logic so untenable that this argument borders on the frivolous and ridiculous." *Pyne v. United States*, No. 8:04-cr-18, 2016 WL 1377402, at *5 (D.

12

Md. Apr. 7, 2016); *see also Twombly*, 550 U.S. at 555, 570 (noting that the plaintiff must offer factual allegations that raise a claim "above the speculative level" to one that is "plausible on its face"). Indeed, as a threshold matter, Plaintiff's theory hinges on the unrealistic assumption that Defendants, most of whom serve millions of constituents, were on notice of the alleged violations of her rights because they personally received and reviewed each of her email communications. (*See* Dkt. No. 11 at 68, asserting that Plaintiff sent Defendants "repeated emails" over several years; *see also* Dkt. No. 1-2 at 150.) Although highly unlikely, even if Defendants did personally review these emails, Plaintiff is essentially asking this Court to require our top state officials to insert themselves in personal lawsuits and intimate familial disputes any time someone suffers a disappointment or injustice—a request that is both untenable and unreasonable. To that end, Plaintiff's action is subject to summary dismissal as frivolous. Nevertheless, in an abundance of caution, the undersigned briefly addresses each of Plaintiff's apparent federal claims in greater detail below.

## I.    Criminal Claims

The Amended Complaint raises several criminal causes of action, including interstate stalking, harassment, and coercive threats (Dkt. No. 11 at 71–72); mail and wire fraud (*id.* at 73); securities fraud (*id.* at 73–74); insurance fraud (*id.* at 75); obstruction of justice and tampering with victims (*id.* at 75–76); Hobbs Act violations (*id.* at 79–80); and human trafficking and involuntary servitude (*id.* at 80). It is well-established, however, that a private citizen cannot obtain criminal charges against defendants through a civil action. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973) (finding that a private citizen does not have a judicially cognizable interest in the prosecution of another person); *see also Hoffman v. Smart-Gittings*, No. 9:18-cv-1146-RMG-BM, 2019 WL 8759417, at *10 (D.S.C. Aug. 26, 2019) (noting that a private citizen "has no

constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime") (internal citations omitted); *Diamond v. Charles*, 476 U.S. 54, 64–65 (1986) (collecting cases). Thus, even if Plaintiff believes, for example, that Defendant Alan Wilson, as South Carolina's Attorney General, should have pursued certain criminal charges against her ex-husband or his lawyer based on their purported misconduct, she is not entitled to such action. *See Curtis v. S.C. Dep't of Pub. Safety*, No. 3:15-cv-3753-MGL-PJG, 2016 WL 1273881, at *2 (D.S.C. Feb. 26, 2016), *adopted*, 2016 WL 1258324 (D.S.C. Mar. 31, 2016) ("Third parties do not enjoy a constitutionally protected right to have wrongdoers criminally investigated or prosecuted, even if a third party is the victim of an alleged wrongdoer's criminal acts.") Accordingly, Plaintiff cannot bring any criminal claims through this lawsuit, and any such allegations are subject to summary dismissal.[6]

## II.    Racketeer Influenced and Corrupt Organizations Act

Plaintiff brings two claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (Dkt. No. 11 at 68–70), which "multiplies criminal punishment and civil liability for certain criminal acts performed as part of an ongoing criminal organization or enterprise." *Percival Partners Ltd. v. Nduom*, 99 F.4th 696, 700 (4th Cir. 2024). To state an actionable RICO violation, the plaintiff must show conduct of an enterprise through a pattern of predicate acts constituting racketeering activity that caused injury to the plaintiff's business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). "Racketeering activity" is generally defined as "any act which is indictable under the Hobbs Act as well as any act or threat involving extortion which is chargeable under state law and punishable by imprisonment for more

---

[6]    The undersigned notes that while the Amended Complaint references a "civil remedy" (Dkt. No. 11 at 71) pursuant to the cyberstalking provisions of the Violence Against Women Act ("VAWA"), 18 U.S.C. § 2261A, this is "a criminal statute, and it does not provide a private right of action for civil litigants." *Barca v. Adib*, No. 8:25-cv-3480-SAG, 2025 WL 3513814, at *2 (D. Md. Dec. 8, 2025); *see also United States v. Morrison*, 529 U.S. 598, 617 (2000).

than one year." *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (referencing 18 U.S.C. § 1961(1)(A), (B)) (internal quotation marks omitted). "The standard for a civil RICO action is a high bar, because it 'is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" *Barca v. Adib*, No. 8:25-cv-3480-SAG, 2025 WL 3513814, at *2 (D. Md. Dec. 8, 2025) (referencing *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010)).

Here, Plaintiff claims that Defendants participated in a RICO enterprise by "converting the courts into instruments of crime" and referring Plaintiff's "constitutional" and "criminal complaints" to the state bar associations. (Dkt. No. 11 at 69–70.) However, Defendants' purported actions—or more accurately, inactions—do not reflect the type of habitual criminal activity contemplated under RICO. Rather, Plaintiff's allegations boil down to an attempt to "collaterally attack[ ] the validity of state court civil [proceedings] under the guise of a RICO claim," *Riley v. Adams*, No. 3:19-cv-1796-JMC-PJG, 2019 WL 7195630, at *2 (D.S.C. July 23, 2019), *adopted sub nom. Riley v. Civ. Action No. 2014-CP-32-00665*, 2019 WL 5417736 (D.S.C. Oct. 23, 2019), which she simply cannot do. *See Riley*, 2019 WL 7195630, at *2 (dismissing RICO claim as "patently meritless" and "frivolous" where plaintiff alleged that defendants' actions in relation to state court proceedings were improper); *see also Bardes v. Magera*, No. 2:08-cv-487-PMD-RSC, 2009 WL 3163547, at *16 (D.S.C. Sept. 30, 2009), *aff'd*, 403 F. App'x 862 (4th Cir. 2010) (dismissing RICO claim because it was "unreasonable for the court to accept as true that the 'state, DSS, the prosecutors, the state insurance department, the judges, and others, all collude[d] together for the mutual destruction' of Plaintiff"). Plaintiff's allegations therefore fall short of an actionable RICO claim.

15

### III.    Civil Rights Violations (42 U.S.C. § 14141)

Next, Plaintiff brings a claim for "civil rights violations" under 42 U.S.C. § 14141 (Dkt. No.

11 at 70–71), which prohibits

> any governmental authority, or any agent thereof, or any person acting on behalf of a
> governmental authority, [from] engag[ing] in a pattern or practice of conduct by law
> enforcement officers or by officials or employees of any governmental agency with
> responsibility for the administration of juvenile justice or the incarceration of
> juveniles that deprives persons of rights, privileges, or immunities secured or
> protected by the Constitution or laws of the United States.

42 U.S.C. § 14141(a). While it is unclear as to how this statute applies to the facts alleged in the

Amended Complaint, "[o]nly the Attorney General of the United States, rather than a private

citizen like [P]laintiff, is authorized to bring suit" pursuant to § 14141. *Ferrer v. Garasimowicz*,

No. 1:13-cv-797-LMB-IDD, 2013 WL 5428110, at *4 (E.D. Va. Sept. 27, 2013), *aff'd sub nom.*

*Ferer v. Garasimowicz*, 569 F. App'x 149 (4th Cir. 2014); *see also Robinson v. City of Conway*,

No. 4:24-cv-5448-JD-KDW, 2025 WL 1852267, at *3 (D.S.C. Feb. 21, 2025), *adopted*, 2025 WL

1788659 (D.S.C. June 30, 2025) ("Actions authorized by [42 U.S.C. § 14141] are brought by the

United States Attorney General; individuals cannot sue for a violation of this statute."). Thus,

Plaintiff cannot pursue a cause of action for civil rights violations under § 14141.

### IV.    Civil Conspiracy and Constitutional Rights Violations (42 U.S.C. §§ 1983, 1985(3))

Plaintiff also alleges violations of her constitutional rights pursuant to 42 U.S.C. § 1983

and § 1985(3). (Dkt. No. 11 at 71, 77.) More specifically, the Amended Complaint states that

"Defendants conspired, agreed, and/or acted together to interfere with and deprive Plaintiff of the

equal protection of the laws" and "used their positions under color of law continuing to act in

concert to obstruct Plaintiff's access to legal remedies, deny her constitutional protections, and

16

shield wrongful conduct from accountability."[7] (*Id.* at 71.)

Turning first to § 1983, this statute "creates a private right of action to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012). To state a claim to relief under § 1983, the plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, most of the purported misconduct alleged in the Amended Complaint was committed by private actors like Plaintiff's ex-husband and his lawyers. However, purely private conduct, no matter how wrongful, does not constitute state action under § 1983. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). A state will be held responsible "for a private actor's decision" only when "the state's engagement or encouragement is so significant that 'the choice must in law be deemed to be that of the State.'" *See Rogers v. McMaster*, 696 F. Supp. 3d 193, 205 (D.S.C. 2023) (citing *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 115 (4th Cir. 2022)). "Mere approval of or acquiescence in the initiatives of a private party," as Plaintiff alleges here, is insufficient to demonstrate state action as required under § 1983. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

To the extent Plaintiff is alleging that Defendants should "bear the ultimate responsibility" (Dkt. No. 11 at 65) for any person "acting under their authority" (*id.* at 3), the doctrines of vicarious liability and *respondeat superior* generally are not applicable in § 1983 actions. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (noting that "Section 1983 will not support a claim based on a *respondeat superior* theory of liability"); *see also Iqbal*, 556 U.S. at 676. Thus, Plaintiff likewise cannot state an actionable constitutional violation against Defendants based on

---

[7]     It bears repeating that while Plaintiff may believe she had a personal interest in—and, therefore, constitutional rights with respect to—the FSU lawsuit and/or the action brought by Bradley Ryan Clark's estate, she was not a party to either of these legal matters in the first instance.

their supervisory roles over any state agencies and/or employees.

With respect to 42 U.S.C. § 1985(3), this statute protects against conspiracies predicated on "racial, or perhaps otherwise class-based invidiously discriminatory animus." *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (referencing 42 U.S.C. § 1985(3)). To state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Simmons v. Poe*, 47 F.3d 1370, 1376–77 (4th Cir. 1995).

Plaintiff does not raise any factual allegations that indicate a class-based, invidiously discriminatory animus. *See Brown v. City of Charleston*, No. 2:11-cv-466-DCN, 2013 WL 4499138, at *8 (D.S.C. Aug. 20, 2013) (dismissing § 1985 claim because "[a]bsent from the amended complaint is any allegation that the purported conspirators were motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus") (internal quotation marks omitted). Moreover, the Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Id.* In this case, Plaintiff offers nothing more than mere speculation to support her claim that Defendants conspired against her, which is "insufficient to demonstrate a conspiratorial agreement" for purposes of § 1985. *See Gunn v. Cheeks*, No. 7:18-cv-3427-HMH-KFM, 2019 WL 831122, at *2 (D.S.C. Jan. 22, 2019), *adopted*, 2019 WL 804658 (D.S.C. Feb. 21, 2019) (dismissing § 1985(3) claim where *pro se* plaintiff "set forth only conclusory allegations" because "conjecture and speculation" do not demonstrate a "mutual understanding" as required under § 1985); *see also Smith v. Jehovah's Witnesses*, No. 1:22-cv-123-LMB-TCB, 2022 WL 500601, at

18

*2 (E.D. Va. Feb. 11, 2022), *aff'd*, No. 22-1158, 2022 WL 2915453 (4th Cir. July 25, 2022) ("Courts have routinely dismissed *pro se* complaints that allege such amorphous and vast conspiracies."). For these reasons, Plaintiff's constitutional claims are subject to summary dismissal under both § 1983 and § 1985.

## V.     Americans with Disabilities Act

Plaintiff also claims that Defendants violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Dkt. No. 11 at 72), which "prohibit[s] public entities from discriminating against individuals with disabilities." *Shumate v. Crawford*, No. 7:23-cv-199, 2025 WL 618867, at *2 (W.D. Va. Feb. 26, 2025). More specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (quoting 42 U.S.C. § 12132). "To make out a basic ADA violation, [a plaintiff] must show that [she]: (1) has a disability; (2) was otherwise qualified to get some public program, service, or activity; and (3) was denied that program, service, or activity on the basis of [her] disability." *Koon v. North Carolina*, 50 F.4th 398, 405 (4th Cir. 2022). The third prong may be satisfied by "a failure to make reasonable accommodations." *Id.*

Here, Plaintiff states that Defendants "discriminated against [her] based on her physical health needs . . . by knowingly failing to provide reasonable accommodations, by disregarding serious physical health issues, medical information, abuses and restraints inflicting trauma, and by taking actions that worsened her injuries." (Dkt. No. 11 at 72.) The primary support for this contention appears to be a rather cursory allegation that Plaintiff was denied "restroom breaks"

19

by the Florida and South Carolina courts. (*Id.* at 62, 65.) The Amended Complaint does not, however, allege that Plaintiff was disabled for purposes of the ADA, or that she was ultimately denied access to the courts by virtue of that disability and/or the courts' alleged refusal to accommodate her. Consequently, Plaintiff's allegations fall short under the ADA.

## VI.    Sherman Act Violations

Plaintiff next claims that Defendants violated the Sherman Act (Dkt. No. 11 at 79), which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. § 1. More specifically, Plaintiff claims that Defendants "condoned and/or permitted or engaged in anti-competitive, extortionate, and unlawful conduct primarily through court cases" with the intent "to restrain trade, manipulate markets, and deprive Plaintiff of lawful economic advantages." (Dkt. No. 11 at 79.)

"[T]he Sherman Act does not itself provide a private right of action." *McCallum v. N. Carolina Div. of Motor Vehicles*, No. 1:25-cv-170, 2025 WL 2781764, at *4 (M.D.N.C. June 27, 2025), *adopted*, 2025 WL 2781759 (M.D.N.C. July 31, 2025) (referencing *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012)). Rather, "the right to sue is established by section 4 of the Clayton Act," 15 U.S.C. § 15, "which authorizes private suits by any person who shall be injured in [her] business or property by reason of anything forbidden in the antitrust laws." *See id.* (internal quotation marks and citations omitted). Nevertheless, even if the Court construes the Amended Complaint as invoking a private right of action under the Clayton Act, Plaintiff "simply expounds a collection of legal buzzwords"—she does not make any factual allegations against Defendants that would demonstrate a true anti-trust injury. *Windham v. Graham*, No. 9:08-cv-1935-PMD-GCK, 2008 WL 3833789, at *6 (D.S.C. Aug. 14, 2008); *see also Brantley v. Nationstar Mortg. LLC*, No. 9:19-cv-490-BHH-BM, 2019 WL 8918793, at *3 (D.S.C. Oct. 8,

2019), *adopted*, 2020 WL 1181309 (D.S.C. Mar. 11, 2020) (noting that a federal claim requires more than "citation to a federal statute, and a mere allegation that a federal statute has been violated is not sufficient" to state a claim to relief). Because the Sherman Act does not appear to apply to the set of facts alleged in the Amended Complaint, any such claims are subject to summary dismissal.

## VII.    Defendant Trade Secrets Act Violations

Plaintiff contends that Defendants also violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, by "condon[ing] the misappropriation of [her] trade secrets and/or intellectual property" and the "unauthorized access, use, and disclosure of [her] proprietary information." (Dkt. No. 11 at 80.) "To state a viable DTSA claim, a plaintiff must plausibly allege that (1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce." *See Samuel Sherbrooke Corp., Ltd v. Mayer*, 159 F.4th 252, 256 (4th Cir. 2025) (referencing *Sysco Machinery Corp. v. DCS USA Corp.*, 143 F.4th 222, 228–29 (4th Cir. 2025)). Pursuant to the DTSA, "information is a trade secret if (1) its owner 'has taken reasonable measures to keep [it] secret' and (2) it 'derives independent economic value' from its secrecy." *See id.* (citing 18 U.S.C. § 1839(3)). In other words, the information is not "generally known" to others or "readily ascertainable through proper means." 18 U.S.C. § 1839(3)(B); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be a trade secret."). Notably, "a trade secret is 'extinguished' when it is disclosed 'to others who are under no obligation to protect the confidentiality of the information.'" *See Sysco Machinery Corp.*, 143 F.4th at 229 (referencing *Ruckelshaus.*, 467 U.S. at 1002).

Although Plaintiff does not clearly identify the purported "trade secrets" to which this

21

claim applies, the undersigned assumes she is referring to her "research" and "investigative discoveries" in relation to the FSU lawsuit (Dkt. No. 11 at 18, 24, 27); her research regarding her nephew Bradley's death (*id.* at 19, 24); and/or the work she produced for her "potential book on insurance and business topics." (*Id.* at 18.) Because the aforementioned information was compiled through general research that any individual could have ascertained, the undersigned notes from the outset that Plaintiff's DTSA claim in tenuous. Even more persuasive however, is that Plaintiff shared these purported "trade secrets" with others. Indeed, she acknowledges that she shared her research regarding the FSU lawsuit with her husband and his attorney. (Dkt. No. 11 at 18, 24–25.) While she may have asked them not to divulge the research to other individuals suing the university, they were under no obligation to protect such information. (*See id.* at 18, noting that Plaintiff did not have an attorney-client relationship with Mr. Marzen's lawyer.) Similarly, Plaintiff states that she shared her "investigative materials" and "evidentiary suspicions" (*id.* at 21–22) regarding Bradley's death with SLED and the Department of Justice, among other agencies. (*Id.* at 20–22.) Plaintiff also shared her work for the "potential book on insurance and business topics" with her husband because she was under the impression that they may "co-author a publication together." (*Id.* at 18.) Plaintiff's dissemination of the aforementioned information plainly undermines the existence of any alleged "trade secrets," and her DTSA claim is therefore subject to summary dismissal.

## VIII.   Fair Housing Violations

Next, Plaintiff alleges that Defendants "condoned or participated in the denials of [her] property, housing rights, engaged in discrimination, and violated protections under [the U.S. Department of Housing and Urban Development] regulations [and] the Fair Housing Act." (Dkt. No. 11 at 81.) The Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, "is a far-reaching statute

that takes aim at discrimination that might be found throughout the real estate market and throughout the process of buying, maintaining, or selling a home." *See Prince George's Cnty., Maryland v. Wells Fargo & Co.*, 520 F. Supp. 3d 747, 752 (D. Md.), *amended*, 575 F. Supp. 3d 578 (D. Md. 2021) (internal quotation marks and citations omitted). Under the FHA, it is unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). To establish a claim under the FHA, the plaintiff "must demonstrate that the housing action or practice being challenged was either motivated by a discriminatory purpose or had a discriminatory impact." *See Mays v. Raynor & Assocs.*, No. 5:15-cv-177-FL, 2015 WL 6759951, at *4 (E.D.N.C. Oct. 12, 2015), *adopted*, 2015 WL 6817093 (E.D.N.C. Nov. 5, 2015) (referencing *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984)).

The Amended Complaint does not allege that Plaintiff is a member of any protected class under the FHA, or that her "loss of housing" (Dkt. No. 11 at 81) was motivated by unlawful discrimination. To the contrary, Plaintiff suggests that she lost her home as a result of the financial struggles stemming from her marriage to Mr. Marzen and the delay in receiving her share of the inheritance from her mother's estate. (*See, e.g.*, *id.* at 29–30, 33–34.) Thus, Plaintiff cannot hold Defendants liable for the purported deprivation of her property under the FHA.

## IX.    Electronic Communications Privacy Act Violations

The Amended Complaint also contains a brief reference to the Electronic Communications Privacy Act ("ECPA"), 18 USC § 2510 *et seq.*, stating:

> Defendants, affiliated agencies, or individuals whose conduct they condoned, knowingly published, disclosed, or disseminated Plaintiff's personal, private, and sensitive information publicly and/or to third parties without Plaintiff's consent. These actions included, but were not limited to, posting or sharing identifying

> information, private communications, financial details, health information, and other
> personal data, with the intent to harass, intimidate, retaliate, [and] inflict emotional
> and/or other harms to Plaintiff.

(Dkt. No. 11 at 81–82.) The ECPA "prohibits intentionally intercepting any electronic communication." *Lugo v. Inova Health Care Servs.*, No. 1:24-cv-700-PTG-WEF, 2025 WL 905191, at *5 (E.D. Va. Mar. 25, 2025). Under the ECPA's private right of action, "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation." *See Attkisson v. Rosenstein*, No. 1:20-cv-68-JRR, 2021 WL 978821, at *6 (D. Md. Mar. 16, 2021) (citing 18 U.S.C. § 2520(a)). To state a claim under the ECPA, a plaintiff must show "that a defendant (1) intentionally (2) intercepted, . . . (3) the contents of (4) an electronic communication (5) using a device." *See Lugo*, 2025 WL 905191, at *5 (referencing *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003)). Plaintiff has alleged no such facts here, and the ECPA appears to be inapplicable to the instant case. Plaintiff's ECPA claim must therefore be dismissed.

## X.    Stored Communications Act Violations

Using the same set of facts offered in support of the ECPA claim, the Amended Complaint also references the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*. (Dkt. No. 11 at 81–82.) The SCA protects users' "legitimate interest in the confidentiality of communications in electronic storage at a communications facility." *See Hately v. Watts*, 917 F.3d 770, 783 (4th Cir. 2019) (referencing *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072 (9th Cir. 2004)). More specifically, the SCA prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[ing] an authorization to access that facility; and thereby obtain[ing] . . . a wire or electronic communication

while it is in electronic storage in such system." *See Future Field Solutions, LLC v. Van Norstrand,*, No. 1:23-cv-1301-DKC, 2026 WL 183522, at *24 (D. Md. Jan. 23, 2026) (referencing 18 U.S.C. § 2701(a)). Notably, "[t]he relevant 'facilities' that the SCA is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated* by electronic communication service providers and used to store and maintain electronic storage." *See Am. Sci. Team Richmond, Inc. v. Chan*, No. 3:22-cv-451, 2025 WL 1943787, at *7 (E.D. Va. July 15, 2025) (citing *Garcia v. City of Laredo*, 702 F.3d 788, 792 (5th Cir. 2012) (emphasis in original)). Because this action does not involve a communications "facility" as contemplated by the SCA, any such claims are subject to summary dismissal.

## XI. Remaining State Law Claims

With respect to Plaintiff's remaining state law claims—or what appear to be state law claims—it is well-established that if a federal district court has original jurisdiction over a civil action, it may also exercise supplemental jurisdiction over any state law claims that are "so related" to the claims under the court's original jurisdiction "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Without original jurisdiction, however, a federal court generally cannot exercise supplemental jurisdiction over state law claims. *See id.* § 1367(c)(3) (stating that the district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction). Because Plaintiff has failed to state an actionable federal claim in this case, this Court may not exercise supplemental jurisdiction over any potential remaining state law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (stating that "if the federal claims are dismissed . . . , the state claims should be dismissed as well"); *see also Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999) ("[T]he Constitution does not contemplate the federal judiciary deciding issues of state law among non-diverse litigants.").

## XII.    Pending Motions for Emergency Injunctive Relief

It is for the same reasons discussed above that the undersigned also recommends denying Plaintiff's Motion for Emergency Relief (Dkt. No. 5) and Motion for Temporary Restraining Order (Dkt. No. 12). Immediate injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282, 2025 WL 2313244, at *3 (4th Cir. Aug. 12, 2025) ("Far from a mainstay in the ordinary course of litigation, a preliminary injunction is extraordinary and drastic and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks and citations omitted)). Rather, a temporary restraining order should issue only when the movant has established all four of the following elements: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *see also Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (noting that "*Winter* made clear that each of these four factors must be satisfied to obtain preliminary injunctive relief"); *Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994) (showing that the standard for a temporary restraining order is the same as that applied to motions for preliminary injunction). Here, the first element is dispositive, as Plaintiff is not likely to succeed on the merits of her claims. *See Am. Fed'n of Tchrs.*, 2025 WL 2313244, at *3 ("[S]ome requests for preliminary injunctions can be quickly resolved on just the first *Winter* factor alone."). Thus, this Court is constrained to deny Plaintiffs' motions for emergency injunctive relief (Dkt. Nos. 5, 12).[8]

---

[8]    Because this case is subject to summary dismissal, the undersigned finds Plaintiff's Motion for Trial by Jury (Dkt. No. 4) moot. Plaintiff's Motion for Referral to Article III District Judge (Dkt. No. 16) is likewise moot, as an assigned district judge will review this Report and Recommendation, and any objections Plaintiff may file, pursuant to 28 U.S.C. § 636(b)(1).

**CONCLUSION**

Based on the above, the undersigned is of the opinion that Plaintiff cannot cure the deficiencies in the Amended Complaint and therefore **RECOMMENDS** that this action be **DISMISSED** without prejudice and without leave to amend. The undersigned further **RECOMMENDS** that Plaintiff's Motion for Emergency Relief (Dkt. No. 5) and Motion for Temporary Restraining Order (Dkt. No. 12) be **DENIED**, and Plaintiff's Motion for Trial by Jury (Dkt. No. 4) and Motion for Referral to Article III District Judge (Dkt. No. 16) be **DISMISSED**. In light of this recommendation, the Clerk of Court shall not forward this matter to the U.S. Marshal for service of process at this time.

**IT IS SO RECOMMENDED.**

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

February 2, 2026
Charleston, South Carolina

**The parties' attention is directed to an important notice on the following page.**

27

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).